UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH, KENTUCKY
CIVIL ACTION NO. 5:18-cv-00069-TBR

\* \* \*

TAMARA INGRAM                                    PLAINTIFF

    vs.

BURGER KING #11281, et al.                       DEFENDANTS

\* \* \*

Deposition of TARA AMENSON, Ph.D, a witness herein, called by the plaintiff for cross-examination pursuant to the Rules of Civil Procedure, taken before me Denise L. Shoemaker, a Notary Public within and for the State of Ohio, at the offices of SEA, Ltd., 7001 Buffalo Parkway, Columbus, Ohio, commencing on Friday, July 12, 2019, at 9:00 a.m.

\* \* \*

MIKE MOBLEY REPORTING
334 SOUTH MAIN STREET
DAYTON, OHIO  45402
937.222.2259

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

**Page 2**

INDEX

TARA T. AMENSON, Ph.D.
  CROSS-EXAMINATION BY MR. OLIVER            5
  DIRECT EXAMINATION BY MR. JONES          185
  RECROSS-EXAMINATION BY MR. OLIVER        189

EXHIBITS                              MARKED
  DEPOSITION EXHIBIT 1                     5
  DEPOSITION EXHIBIT 2                    10
  DEPOSITION EXHIBIT 3                    31
  DEPOSITION EXHIBIT 3A                   32
  DEPOSITION EXHIBIT 3B                   32
  DEPOSITION EXHIBIT 3C                   36
  DEPOSITION EXHIBIT 3D                   37
  DEPOSITION EXHIBIT 4                    44
  DEPOSITION EXHIBIT 5                    44
  DEPOSITION EXHIBIT 6                    49
  DEPOSITION EXHIBIT 6A                   51
  DEPOSITION EXHIBIT 7                    53
  DEPOSITION EXHIBIT 8                    81
  DEPOSITION EXHIBIT 8A                   81
  DEPOSITION EXHIBIT 9                   149
  DEPOSITION EXHIBIT 10                  151
  DEPOSITION EXHIBIT 11                  151
  DEPOSITION EXHIBIT 12                  153
  DEPOSITION EXHIBIT 13                  156
  DEPOSITION EXHIBIT 14                  165
  DEPOSITION EXHIBIT 14A                 168
  DEPOSITION EXHIBIT 14B                 177
  DEPOSITION EXHIBIT 14C                 177
  DEPOSITION EXHIBIT 15                  202

                              * * *

**Page 3**

APPEARANCES:

      On Behalf of the Plaintiff:
          OLSEN & OLIVER, PLLC
      By: Jonathan R. Oliver, Esq.
          806 Clark Street
          Paducah, KY  42003
          270.575.3500
          jonathan@olsenlawoffice.com

      On behalf of the Defendants:

          BOEHL, STOPHER & GRAVES, LLP

      By:  Edwin A. Jones, Esq.
           410 Broadway
           Paducah, KY  42001
           270.442.4369
           ejones@bsgpad.com

ALSO PRESENT:
      Michael Teater, SEA, Ltd.
                    * * *

**Page 4**

                   Friday Morning Session
                     July 12, 2019
                       9:00 a.m.
                         - - -
                     STIPULATIONS

          It is stipulated by and between counsel for the respective parties that the deposition of Tara T. Amenson, Ph.D., a witness herein, called by the plaintiffs, under the applicable Rules of Civil Procedure, may be taken at this time in stenotypy by the Notary, by notice of counsel; that said deposition may thereafter be transcribed by the Notary out of the presence of the witness; that proof of the official character and qualification of the Notary is waived; that the witness may sign the transcript of her deposition before a Notary other than the Notary taking her deposition; said deposition to have the same force and effect as though signed before the Notary taking it.

                         - - -

**Page 5**

Thereupon,

          TARA AMENSON, Ph.D

a witness herein, having been first duly sworn as hereinafter certified, was examined and deposed as follows:

                   CROSS-EXAMINATION

By Mr. Oliver:

          Q     Could you state full name for the record, please.

          A     Tara Troxel Amenson.

          Q     Dr. Amenson, my name's Jonathan Oliver. We met briefly just before we started here.  I represent Tamara Ingram in a lawsuit that's been filed in U.S. District Court for the Western District of Kentucky on behalf of Ms. Ingram against the defendants in this matter.

                You've been identified by the defendants as an expert who will offer testimony regarding the fall suffered by Mrs. Ingram in this case, correct?

          A     Yes.

                         - - -

                Thereupon, Deposition Exhibit 1 was marked for purposes of identification.

                         - - -

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

By Mr. Oliver:

Q    We have been provided a copy of your report that you authored in this matter, and I will hand you the copy that we received marked as Exhibit 1 and ask you to take a look at that.

Is this a true and correct copy of your report in this matter?

A    Yes.

Q    Have you authored any other reports in this matter?

A    No.

Q    Have you updated, changed, or amended your report in this matter?

A    No.

Q    Does this report truly and accurately reflect the opinions you have formed in this matter along with the factual basis and analysis?

A    Yes.

Q    As we sit here this morning, do you hold any opinions about this occurrence, the site in question, or Ms. Ingram's fall that are not set forth in the report marked as Exhibit 1?

A    No.

Q    As we read your report, we identified, I believe, three opinions that you have reached in this matter, but I want to go through and make sure that we're correctly identifying that so that we can be on the same page.

As I read the report, it looks like your first opinion is that the landscape edging to the right side of the entrance did not protrude into the pedestrian walkway; is that correct?

A    Yes.

Q    And then opinion two, if I'm reading the report correctly, would be that for Ms. Ingram to trip over the landscape edging in the location that she testified to, she would have to be traveling a pathway outside the provided 6-foot wide pedestrian walkway.  Is that your second opinion?

A    Yes.

Q    And then number three -- by the way, I misspoke.  I think there's four, not three.

Number three, if I understand correctly, your third opinion would be:  Had Ms. Ingram walked normally to the Burger King entrance, she would have had ample opportunity to discern the walkway environment and could have safely traversed the sidewalk such that she would not have encountered the

landscape edging located outside the provided pedestrian walkway; is that correct?

A    Yes.

Q    And then opinion four, again, I apologize for misstating that, as I read the report is:  Burger King followed industry recommended practices for safe pedestrian walkways by having a maintenance procedure that included periodic walkway checks and cleanups; is that correct?

A    Yes.

Q    Are those your four opinions in this matter?

A    Yes, they are.

Q    And have I missed any opinions that are intended to be set forth in this report?

A    No.  In fact, the opinions are bolded in the report.

Q    That was one of the things I was going to ask you.  I thought that's what I was seeing here.

So what you've done is where you state an opinion, you bold the font, correct?

A    Yes.

Q    And then the verbiage around that bolding would be the facts or analysis or considerations going into that opinion.  Is that what I'm understanding?

A    Yes.

MR. JONES:    Mr. Oliver, she has reviewed additional depositions since drafting the report because we took Fred and some of the others.

MR. OLIVER:    I'll get to that in a minute.

By Mr. Oliver:

Q    Now, paragraph one of your report that we have identifies information that you have reviewed in this case and lists the complaint, deposition transcripts, and exhibits of Earl Christian, Tamara Ingram, and Sherrice Key and photographs of the incident site.  Now I want to stop there for a second to make sure we're on the same page.

At the time that your report was written, those were the depositions that had been taken in the case, correct?

A    Yes.

Q    Those were the only depositions that you had reviewed at the time your report was written, correct?

A    Yes.

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

**10**

Q    Where did you get the photographs of the incident site, do you know?

A    They were provided to me.

Q    Through defense counsel?

A    Yes.

Q    Did you review -- with regard to facts of the case, did you review anything other than the complaint, those deposition transcripts that we have identified, and the photographs of the incident site at the time of the drafting of your opinions in Exhibit 1?

A    So to make this easy. I created a list of documents that I reviewed at the time I wrote the report, and then the documents I reviewed after I wrote the report.

Q    Do you have that with you?

A    I do.

Q    Great. Is this a copy that we can attach to the deposition transcript?

A    Yes.

                - - -

        Thereupon, Deposition Exhibit 2 was marked for purposes of identification.

                - - -

**11**

By Mr. Oliver:

Q    I took the list that you have handed to me and have marked it as Exhibit 2. Give me just a moment to review.

        Very good. So documents reviewed before you authored the report in Exhibit 1 includes certain color photographs and black-and-white photographs, and you have identified those by numbers such as IMG 8003 through 8007 or photographs 000522 through 000535, correct?

A    Yes.

Q    I know some of the photographs that have been produced by the defendants in this case carry what I call Bate stamp numbers. I think most people in the industry call them Bate stamp number. You know what I'm talking about, right?

A    Yes.

Q    Do these numbers correlate to the Bate stamp numbers on those photographs?

A    I'm not sure if that's how you do it in Kentucky, but they're the numbers that are down here in the lower right-hand corner.

Q    We'll take a look at some photographs in a moment, and we'll make sure we're on the same page

**12**

using an exhibit, okay?

A    Okay.

Q    And then did the deposition transcripts of Sherrice Key, Tamara Ingram, and Earl Christian have the exhibits attached?

A    Yes.

Q    Those were the only three depositions that you reviewed, correct?

A    Prior to writing the report, yes.

Q    Thank you. Bad question on my part. Thank you.

        Then since authoring your report, you have reviewed the deposition transcripts of John Drury, Larry Nelson, Fred Schneider, Cathy Boer, Joe Neikirk, and Karen Suggs. Were the exhibits attached to all of those transcripts?

A    Yes.

Q    Did review of those transcripts alter or change your opinions in any way?

A    No.

Q    And then you reviewed the report of Clay Barnes?

A    Correct.

Q    Did you formulate any opinions about Mr.

**13**

Barnes's report?

A    No.

Q    And then you reviewed some color photographs provided by the defense of Ms. Ingram's foot and footwear. Did those photographs lead to any new opinions or alter your opinions in any way?

A    No.

Q    Did you form any opinions about -- based on those photographs?

A    No.

Q    And then you list some references here that you reviewed in arriving at your opinions in this case. Is that a correct interpretation?

A    Yes.

Q    I'm going to have to turn this list around so that I can read it.

A    That's fine.

Q    But I think you know what they are.

A    Yes.

Q    ASTM F1637-13 and -19, Standard Practice for Safe Walking Surfaces. Did you review that standard before you authored your report in Exhibit 1?

A    Yes.

Tamara Ingram vs Burger King, et al.                                                      Tara Amenson, Ph.D.

14

Q    Have you reviewed it since then?

A    Yes.

Q    And then appears to be a book or article or section of a book, I'm not sure what the best description would be, but the title is "Slip, Trip and Fall Prevention: A Practical Handbook" by DiPilla, D-i-P-i-l-l-a.

A    Correct.

Q    Did you review that before you authored your report?

A    Yes.

Q    And then you list that you looked at the Oly-Ola, and for the court reporter that's O-l-y, second word O-l-a, Oly-Ola website. Did you look at that before you authored your report?

A    No.

Q    Did you look at that after -- sometime between authoring your report and today?

A    Yes.

Q    Do you recall when?

A    After I read Fred Schneider's deposition transcript.

Q    What were is you looking for on that website?

15

A    Just information about the landscape edging and how to install it.

Q    Did you find anything?

A    I did.

Q    What did you find?

A    One image I found on the website is about lawn edging proper staking depth, and it talks about burying the top bead halfway below the grade.

I also found a data sheet for the Black Jack 4.75 Inch Lawn Edging with a 1 Inch Bead and a Single V-Lip Wall Anchor.

And I found the Edging Install Basics, Lawn Edging Installation Basics with Overlap Method.

Q    Okay. Are these copies that you've pulled out additional copies, or are these your originals?

A    These are my originals, but I would be happy to copy them for you.

Q    How about as we go through your deposition today, we will identify maybe some documents that we want to have copied; and if it's okay with Eddie, we'll have those copied and added to your deposition after we're done today, and they will be a group exhibit at whatever our last exhibit

16

number turns out to be. Fair enough?

Okay with you, Eddie?

MR. JONES:    Sure.

Q    Let me grab some sticky notes.

Can we go off the record for just a minute.

- - -

Discussion held off the record.

- - -

By Mr. Oliver:

Q    We're going back on the record.

Dr. Amenson, what we are going to do is we're going to put a yellow sticky note on the documents that will be copied after we're done today. Where a group of documents have a paper clip on them, we're just going to put a yellow sticky note on the front page. That indicates the whole document to be copied, okay?

A    Okay.

Q    And then if you would send those once they are copied or scanned to the court reporter in whatever fashion we work out when we're done today, I would appreciate that.

A    Will do.

17

Q    Since I'm not going to put exhibit stickers on your original documents, we're going to have to take a little bit of care to make sure we identify and describe what we are looking at.

I'm going to hand you this single page document from the documents you just provided me from the Oly-Ola website, correct?

A    Yes.

Q    And this is a document that has, it looks like, maybe a screen captured image?

A    Correct.

Q    And at the top in blue it says Lawn Edgings, and then it says underneath that Proper Staking Depth, correct?

A    Yes.

Q    And could you read what that paragraph of text there says from Oly-Ola?

A    "All of our landscape edgings should be nearly invisible when installed properly. The round bead should be buried halfway below grade so that the turf and bedding are divided, yet they help to conceal the edging itself. When staked properly and installed at this depth, the edging should stay in the ground and be out of the way of mower blades and

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

18

string trimmers."

Q    Okay.  Do you have any reason to dispute that description from Oly-Ola about proper staking and installation --

A    No.

Q    -- of black plastic landscape edging?

A    No.

Q    Seeing that description, did that have any impact on any of your analyses or opinions in this case?

A    No.

Q    Can you tell me why not?

A    I did not specifically opine on the staking methods.

Q    Going back to Exhibit 2, the next item listed under References is 2015 International Building Code, Chapter 10:  Means of Egress adopted by the Kentucky Building Code.

Is that material something that you reviewed prior to authoring your report in Exhibit 1?

A    No.

Q    When did you review that, those materials?

A    July 11th.

19

Q    What caused you to review those materials on July 11th?

A    To confirm there was nothing in the 2015 International Building Code, which has been adopted by the Kentucky Building Code, related to landscape edging.

Q    And I suspect you confirmed there is not?

A    Correct.

Q    And then we will put a sticky note on those documents.  There is not a paper clip, but we would like all those, okay?

A    Understood.

Q    Then finally under References you have Paducah, Kentucky Code of Ordinances website.  Is that something that you reviewed before authoring your report in Exhibit 1?

A    No.

Q    When did you review those?

A    July 11th of 2019.

Q    What caused you to review those on July 11, 2019?

A    The same reason I reviewed the International Building Code, to confirm that there

20

was no code adopted regarding landscape edging.

Q    And did you find that there was not?

A    Correct.

Q    Did you look in either the Kentucky Building Code or the Paducah ordinances with regard to any other issues other than landscape edging?

A    Protrusions.

Q    What did you find with regard to protrusions in either of those documents?

A    There's not a specific regulation for exterior pedestrian walkway surfaces regarding protrusions.  But on the interior, structures are permitted to have at least a 4-inch protrusion into the pedestrian walkway.

Q    From which source does that come?

A    It is the 2015 International Building Code, Chapter 10, Means of Egress, Section 1003.3.3 Horizontal Projections.

Q    Could you read that into the record if it's not too long?

A    "Objects with leading edges more than 27 inches and not more than 80 inches above the floor shall not project horizontally more than 4 inches into the circulation path."

21

Q    May I see that please?

A    Yes.  (Providing.)

Q    The first part of that statement where it says, "Objects with leading edges more than 27 inches and not more than 80 inches above the floor," what does that part mean?

A    Basically if there is an object that is more than 27 inches high but less than 80 inches above the walkway surface, it is permitted that 4 inches of that object can project horizontally into the circulation path.

Q    That's what I thought.  So if we're talking about something that is more than two foot tall, then it can come into the walkway path, protrude into the walkway path up to 4 inches, correct?

A    Yes.

Q    That provision would have no application to something that is less than 27 inches tall, correct?

A    Yes.

Q    That's a correct statement on my part?

A    That is correct, yes.

Q    So it would have no application here,

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

22

correct?

A    Correct.

Q    Do you believe that under the building codes or under accepted safety practices that an item that would be less than 2 foot tall should not protrude into a walkway at all?

A    Well, I think we have to be more specific in terms of where the pedestrian walkway is located.

Q    Okay.  Are there times when it shouldn't?

A    Repeat the question.

Q    Are there times when it shouldn't?

A    When what shouldn't?

Q    Something that is less than 2 foot tall should not protrude into a walkway.

A    I think there are times when there are protrusions into a walkway, and some examples include trash cans in an interior environment.  On an exterior environment you may have a bench sitting on an exterior walkway surface, you may have a bike rack on an exterior walkway surface, and those could be considered possible obstacles that a pedestrian would have to negotiate.

23

Q    Most of those objects, if I'm thinking correctly, are going to be 2-foot tall or more, correct, trash cans, benches, bike racks?

A    Not necessarily.  I've seen some shorter bike racks that just hold the front tire of a bicycle, and there's some benches that are lower than 2 feet.

Q    Okay.  I understand what you're saying.
Let's catch up with where we've marked.
Those have been marked.  It showed the Paducah ordinances.  We will mark those, if you don't mind.
Have we discussed everything that's on Exhibit 2?

A    No, we have not talked about -- I mean, the ASTM standards I guess we've talked about.  I guess so.

Q    We haven't gone in depth yet, but --

A    Correct.

Q    -- we've identified everything is a better question on my part?

A    Yes.

Q    Is there anything else that you reviewed or considered in formulating any of your opinions in this matter?

24

A    No.

Q    Is there anything else that you reviewed or considered in analyzing or reviewing this matter?

A    No.

Q    Was there anything you reviewed in the subsequent deposition transcripts, John Drury, Larry Nelson, Fred Schneider, Cathy Boer, Joe Neikirk, and Karen Suggs that you believed supported your opinions in this matter?

A    Yes, I believe so.

Q    Could you identify what that would be?

A    Specifically the observation by the maintenance technician that observed the edging about an hour after the event occurred.  His observation of the location of the landscape edging and how he repaired it in the photographs that he provided after he repaired it.

Q    That would be Earl Christian, correct?

A    Correct.

Q    I believe you had an opportunity to review his deposition before you authored your report?

A    Correct.

Q    What specifically about Earl Christian's

25

observations of the, I think you said locations and how he repaired it in photographs, what specifically about those support your opinions and which opinion does it support?

A    It supports the first opinion.

Q    And that would be that the landscape edging to the right side of the entrance did not protrude into the pedestrian walkway?

A    Correct.
So as I recall from multiple deposition transcripts, Burger King had no notice of this ever being raised in the location where the trip event occurred such that they've never had another trip event in that specific location as a result of the landscape edging.
So Earl Christian talks about the overall width of the edging is about 4 inches.  He says it has a rounded edge that stays above the ground, and the rest of it is below the ground.

Q    At the risk of getting us off track, and I apologize, but just to make sure we're clear on terms.  Width of 4 inches, do you know what he meant by that, do you recall?  Or what's your understanding of what he meant, if that's better because we're

26

really here to talk about what you understood.

A    My understanding of the 4-inch dimension is that it was the height, and on Page 45 of his deposition, Line 1 he states:  I think 4 inches is the standard height of one.

Q    Sorry to interrupt.

A    So I can continue to go through his deposition and pull out specific points if you want me to.  I don't have them memorized, but I can find them.

Q    Okay.  I'm just wanting to see, and my question I think that got us started or my intention with my question that got us started was things that you saw after you issued your report, and if they supported or furthered your opinions in this case, because they wouldn't be captured in your report.  That's what I'm trying to get to.

A    Right.

Q    So Earl Christian you had before, so Earl Christian we don't have to go through.

A    Again, I have read the other depositions that I listed here.  I can go through each one of them and find the specific locations that may support various opinions in my report, but I don't have them

27

all memorized.

Q    You have copies of those deposition transcripts here.  Do you have any notes or highlighting in any of those copies?

A    No, they're all blank.

Q    Did you take any notes as you reviewed the deposition transcripts?

A    No.

Q    I think we're back on track.  Let's go to opinion number one.  It seems to be a pretty simple proposition:  The landscape edging did not protrude into the sidewalk, correct?

A    Yes.

Q    I don't believe that's a disputed fact in this case.  Have you seen anything that causes that to be disputed?

A    I think there's some contradictory statements.  Ms. Ingram herself kind of believed that it was a protrusion, I believe, and --

Q    Let's define "protrusion" then.  Let's make sure we're on the same page.

A    Okay.

Q    How do you define "protrusion"?

A    I think you would have to look at a

28

specific code to define "protrusion."

Q    That didn't help.  I'm trying to figure out -- I've never seen Ms. Ingram testify that the landscape edging stuck into the sidewalk, and that's a very untechnical term, but do you understand what I mean?

A    I do.

Q    I've never seen her testify to that.  I've never seen her claim that.

So I'm wondering if maybe we have a different understanding of what "protrusion" is.  I may be taking too simple of a view of a technical term.  That's all I'm trying to get at.

A    In the pedestrian walkway industry, we often define terms that may not be technical to the average user --

Q    Exactly.

A    -- but to us they have very important meanings.

Q    Very good.  What is the very important meaning of "protrusion"?

A    I don't believe that it is specifically defined in the ASTM F1637-13 standard.  However, the more recent version of the ASTM F1637 standard that

29

was published in 2019 --

Q    January I believe, wasn't it?

A    February.

Q    February.

A    -- does have a section 5.6.2 titled Protrusions.  We can use that as a definition.

Q    Okay.  Here's what I need to know first.  Your report uses "protrude."

A    Uh-huh.

Q    What definition are you using of the word "protrude" in this opinion?  Are you talking about does not come into the sidewalk, or are you talking about does not even come close enough to the edge of the sidewalk to be an issue?

A    It does not overlap the edge of the pedestrian walkway.

Q    Okay.  That's a basic understanding of protrusion, at least as I understand it.  Do you agree with that?

A    We can agree to that.

Q    Is the definition in ASTM F1637-19 of protrusion different in any way?

A    Sure.  It's more specific.

Q    Does it -- I've read it.  It's been a

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

**30**

little bit ago, but I didn't recall protrusion under that standard as meaning anything other than coming into the sidewalk. Have I misread that in your opinion?

A    I would prefer to specifically read what's stated in the standard.

Q    Sure.

A    Section 5.6.2 Protrusions in the ASTM F1637-19 standards states: Object should not be placed which obstruct or protrude into a walkway in a manner that creates a tripping or contact hazard. Objects in or protruding into walkways that are less than 3 feet high shall be made visually prominent in accordance with Section 11.

Q    So it talks about in and into the walkway, correct?

A    Yes.

Q    Which I think is the same way that you've used protrusion here, correct?

A    Yes.

Q    And have you seen anything where anybody claimed that the landscape edging here protruded into the sidewalk?

A    I don't specifically remember if there

**31**

is a document that says it's a protrusion.

Q    Because I don't believe that there is. I just want to make sure that I'm not missing something that you specifically recall.

A    Okay.

Q    Before that, you have a factual statement which says: The landscape edging does not extend all the way to the edge of the sidewalk but ends about 2 to 4 inches before the sidewalk edge, correct?

A    Yes.

Q    Do you know where you got the 4-inch measurement?

A    I interpreted that from the photographs that were provided with the tape measure in view at the incident site.

- - -

Thereupon, Deposition Exhibit 3 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    I will hand you Exhibit 3. Have you seen this photograph before?

A    Yes.

**32**

Q    That would be in the stack of photographs provided to you by defense counsel, correct?

A    Yes.

Q    It has a number at the bottom right-hand side, that full line says BSG-Burger King versus Ingram-Home Office File-000630.

A    Correct.

Q    Is the number 000630 like those numbers we were talking about Bate stamping earlier that we can also see on your Exhibit 2?

A    Correct.

Q    Do you recognize the area in question on Exhibit 3 as being the area that we are talking about of Ms. Ingram's fall?

A    Yes.

Q    And there is a tape measure placed in this image, correct?

A    Yes.

- - -

Thereupon, Deposition Exhibit 3A and 3B were marked for purposes of identification.

- - -

By Mr. Oliver:

**33**

Q    Let me hand you demonstrative Exhibits 3A and 3B simply because it may make my questions more easy to follow.

Can you see those?

A    I do.

Q    No great secret. You probably know that this is a feature as well, but in Adobe there is a measuring tool. Are you aware of that?

A    Yes.

Q    Have you ever used that tool before?

A    Yes.

Q    And so one of the things that happens, and it probably appears on that image, is the Adobe measuring tool comes up with a measurement that's on the 2D surface that it's looking at, and it puts it right there. I'm not representing to you that that's the actual measurement that we're talking about, okay?

A    Okay.

Q    It's upside down to me. What's that number?

A    Well, it was hard for me to read, but I believe it says 1.36 inches.

Q    Okay. I have left that in there because

Tamara Ingram vs Burger King, et al.                                                    Tara Amenson, Ph.D.

34

that measurement between red line and red line here along the edge of the tape measure in Exhibit 3B and also in Exhibit 3A and then the measurement between red line and red line showing from the edge of the landscape edging to the edge of the sidewalk, they have the same measurement, right, 1.36, 1.36?

A    Exhibit 3A says 1.02, and Exhibit 3B says 1.36.

Q    Bad question.

Looking at Exhibit 3A, what's the measurement along the measuring device?

A    In red arrows between the 4 foot and the 4 foot 2 inch marking it says 1.02 inch.

Q    And then can you tell what it is over here between the end of the landscape edging and the edge of the sidewalk?

A    It appears to say 1.02 inch.

Q    Then over at 3B, the two measuring lines, one showing the distance between the edge of the end of the landscape edging and the sidewalk and the other showing a measurement along the measuring stick, those two measurements have the same number, right?

A    They are both labeled 1.36 inch.

35

Q    That was more difficult than I intended it to be.  I apologize.

Basic point being, and if you want to, you can also take a piece of paper and just mark it out yourself, but those distances -- we'll talk about Exhibit 3B.  The distance from the end of the edging to the edge of the sidewalk, that red line to red line measurement appears to be the same distance as the red line to red line measurement shown along the measuring stick, correct?

A    Based on the Adobe software that you used to make those dimensions, yes.

Q    Based on Exhibit 3A and 3B, what would you say the distance is from the end of the landscape edging to the edge of the sidewalk?

A    Well, the first think I would want to know is how the Adobe software was calibrated because I've had some experience with imaging sciences and how dimensions are taken digitally such that if there hasn't been a calibration process, I don't know that these are dimensions are accurate.

What I do know is that the tape measure that is in view on both Exhibit 3A and 3B is probably relatively close to a true measurement, and that

36

those dimensions can be skewed depending on the angle that the photograph was taken.

Q    Let's do it the old fashion way then.

On Exhibit 3A, I'm going to take this little piece of exhibit note and we will mark this as Exhibit 3C.

- - -

Thereupon, Deposition Exhibit 3C was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Using the back side, do you agree that the end of that straight line is on that red line there at the end of the landscape edging?

A    Yes, the edge of the yellow Post-it Note is on the edge of the landscape edging.

Q    Would you put a blue pen mark where the edge of the sidewalk is, where the other red line is?

A    There's a bit of a shadow, but I believe the edge of the sidewalk is located there.

Q    Now, would you compare that against the measuring tape, wherever you want to?

With that comparison, what would you say the distance is between that landscape edging and the

37

edge of the sidewalk?

A    It is about 2 inches.

Q    Would you write approximately 2 inches on that exhibit?

A    Sure.

(Witness complies with request.)

- - -

Thereupon, Deposition Exhibit 3D was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Then I'll hand you Exhibit 3D.  Could you repeat that same process with Exhibit 3B?

A    On Exhibit 3B the angle the photograph is taken from is different than 3A such that there is a bit of a shadow on the landscape edging, and it is difficult to see where the top rolled edge is such that if we look at maybe the top outer most diameter to the edge of the sidewalk, it is similar to what is currently marked on Exhibit 3B with the red arrows. So we will try to mimic what's already in the red arrows.

Q    What is the distance between the landscape edging and the edge of the sidewalk as

38

shown in Exhibit 3B?

A    I get approximately 3 inches.

Q    Would you write that on the exhibit, please?  Back side is fine or wherever.

A    I think I'll write in on the front side so I can delineate where we're measuring from.

(Witness complies with request.)

Q    Sure.  That makes sense.

You first noted that the angle of the picture was different, I guess, maybe causing you some concern about what you were seeing, is that -- what were you telling us there?

A    It concerns me about what I can see in the photograph given that there are shadows on both Exhibit 3A and 3B, and it depends where you measure from and to for these dimensions.

So in trying to replicate what is already there using a red arrow, I measured close to that area.

Q    Looking at the Bate stamp numbers, Exhibit 3, Exhibit 3A, and Exhibit B3 are all from the same photograph, correct?

A    Well, by golly, they are.

Q    Do you have any factual information in

39

this case that you can point to supporting that the landscape edging was 4 inches away from the edge of the sidewalk?

A    Repeat the question.

Q    So your report says that the landscape edging does not extend all the way to the edge of the sidewalk but ends 2 to 4 inches before the sidewalk edge.  Is there anything you can point to in your file or in your review of this case that supports the 4-inch number?

A    I could go through all the photographs and do the same thing that we just did using some photogrammetry and see if I can find the 4-inch one.  I do not specifically remember which photographs I used when I made those dimensions.

Q    Let me ask you this:  Have you done comparisons like we just did looking at the photographs and the measuring tapes that are in them?

A    Yes.  In fact, I used Post-it Notes similar to the technique we just used to form Exhibit 3C and D, and that's how I obtained my dimensions.

Q    Now, I think when I asked you to do it, you told me that there were problems in doing it that way and things that left you uncertain, correct?

40

A    Yes.

Q    Were you able to overcome that uncertainty in your original analysis?

A    No.  That's why I put that it was about 2 to 4 inches.

Q    Is there any fact that you can point to other than your own previous comparisons of photographs that would support the 4-inch number?  I'm not trying to argue with you.  I just want to make sure that there's nothing else that we need to point to.

A    I don't believe so.

Q    Opinion number two:  For Ms. Ingram to trip over the landscape edging in the location that she testified to, she would have to be traveling a pathway outside the provided 6-foot-wide pedestrian walkway.

Correct, that's your opinion?

A    That is my opinion.

Q    Can you tell me what facts in this case and what analysis in this case goes into that opinion?

A    The first thing I would like to say is based on the photographs that were provided, the

41

walkway in the area where the incident occurred was apparently wider than 6 feet.  So that is a greater distance that she would have had to safely traverse to enter the Burger King restaurant at the incident cite.

The landscape edging is as we've identified in Exhibits 3A and 3B, which are the same photo, I was looking at them at a different orientation which confused me slightly, the distance from the landscape edging to the edge of the sidewalk, depending on where you measure it from, could be between 1 inches and potentially 3 inches.

So to encounter that, one would have to be over the edge of the walkway surface with their foot.

Q    Okay.  Let me first make sure I understand your opinion as written in your report.  And it could be a difference in interpreting, which is one of the reasons we have to do these depositions is to make sure we are interpreting correctly.

As I read your opinion two, I understood it to be saying that the only way that Ms. Ingram could come into contact with the edging would be to walk off of the sidewalk entirely.  Have I over read

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

42

your opinion?

A    I would say you have over read my opinion such that a portion of her foot, if it were to encounter that landscape edging, would have to be outside the pedestrian pathway.

Q    So she could be -- her other foot, at least, could be on the sidewalk and her right foot still encounter the edging?

A    Correct.

Q    We'll cover that a little bit more in a moment.

Looking at your report, when you authored your report at the very bottom of Page 1, it appeared to me that you relied on these statements of fact:  Ms. Ingram testified that she ran across the parking lot, and as she approached the Burger King entrance, her right foot tripped on the landscape edging about 10 to 12 inches away from the edge of the sidewalk.  Based on the provided photographs, the pedestrian walkway was measured to be about 6 feet wide in front of the entrance.

Did I read that correctly?

A    Yes.

Q    Were those the facts that you were

43

primarily relying upon in reaching opinion two?

A    Yes.

Q    Any others?

A    Not at that time.

Q    Any others since then?

A    Well, I've been presented with a photograph of the footwear that she was wearing at the time.

Q    Okay.

A    And it was my observation that the footwear she had on at the time may have been oversized for her foot size.

Q    I thought when we talked about the footwear pictures a moment ago you didn't draw any conclusions from them?

A    I have not formed any opinions from them, but I've definitely considered them as it relates to this case.

Q    Have you drawn any professional opinions regarding those photographs?

A    Not at this point in time.

Q    So let me ask you this:  Ms. Ingram testified that her right foot tripped on the landscape edging about 10 to 12 inches away from the

44

edge of the sidewalk.  Can you tell me where you got that.

A    There were some photographs provided that I believe the manager pointed out where Ms. Ingram said she tripped.

Q    Can I maybe help you?

A    Sure.

- - -

Thereupon, Deposition Exhibits 4 and 5 were marked for purposes of identification.

- - -

By Mr. Oliver:

Q    I will hand you Exhibit 4 and Exhibit 5. Are those the photographs you're talking about?

A    Yes.

Q    Did you rely on anything else in coming to the factual statement that Ms. Ingram testified that her foot tripped on the landscape edging about 10 to 12 inches away from the edge of the sidewalk?

A    I rely on all the documents that are provided to me at the time.

Q    But specific to a measurement of 10 to 12 inches.

A    I relied on these two, Exhibit 4 and 5.

45

Q    Do you know who wrote the verbiage in the yellow boxes and blue boxes that appear on Exhibits 4 and 5?

A    No.

Q    You said that you reviewed the deposition of Sherrice Key before you wrote your report, correct?

A    Yes.

Q    Did you see that Sherrice Key testified that she did not see Ms. Ingram fall?

A    Yes.

Q    Did you see that Ms. Sherrice Key testified that she did not see Ms. Ingram on the ground?

A    I believe so.

Q    Did you see that Ms. Sherrice Key testified that Ms. Ingram did not specifically tell her where she tripped?

A    I don't specifically remember that.

Q    Did you see that Ms. Key testified that she did not provide the information on Exhibits 4 and 5 to anyone, that she didn't make those statements?

A    I don't recall seeing that either.

Q    If Ms. Key denies knowing the

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

46

information that's attributed to her or denies making those statements, that would be a substantial fact issue in your analysis, wouldn't it?

A    Yes.

Q    Would it change your opinion two?

A    It would not change my opinion two, but it might change the basis for opinion two.

Q    What would the basis be for opinion two without the 10- to 12-inch measurement fact?

A    Considering the footwear that Ms. Ingram was wearing and the additional testimony that I reviewed.

Q    As we sit here today, you haven't analyzed or formed any conclusions about the footwear, correct?

A    Correct.

Q    Did you -- you reviewed Tamara Ingram's deposition before you authored your report in Exhibit 1, correct?

A    Yes.

Q    Did you see that Ms. Ingram testified that she walked along -- or ran or jogged along the sidewalk as she approached the Burger King entrance?

A    Yes.

47

Q    Did you see that she did not testify that she went off the sidewalk?

A    I did see that.

Q    Did you see that in response to Mr. Jones's questions, she put circles on a variety of photographs of the scene indicating that her foot contacted the end of the edging?  Do you recall seeing those?

A    Yes.

Q    Did you consider the fact then that, according to Ms. Ingram's testimony, her foot did not contact the edging 10 to 12 inches away from the edge of the sidewalk?

A    Yes, I did consider that.

Q    What did you do with that information after you considered it?

A    I still formulated the opinion that she would have had to have at least one foot off the edge of the sidewalk in the pedestrian walkway that was provided to her to encounter the landscape edging.

Q    You still relied on the fact that it was 10 to 12 inches away from the edge.  Did you disbelieve Ms. Ingram's testimony?

A    No, I did not.

48

Q    You just felt that Exhibits 4 and 5 were more reliable?

A    Not necessarily.  It may have been an error that I didn't put in specifically what Ms. Ingram stated.

Q    Fair enough.  May have been an error. We all make mistakes.

A    We do.

Q    I do too.  I'll probably make some before we are done today.

All right, Dr. Amenson.  Let's talk about this.  If I understand what you're telling us with opinion two, and I'm trying to formulate this in simple terms or laymen's terms, but if I misstate it in any way, correct me.  I'm just trying to make sure I understand what the real simple explanation will be when we're at trial.

If I understand your opinion two, you're saying that a person walking on the sidewalk approaching this entryway door at Burger King, this entryway door that's at issue, could not in your opinion come in contact with that edging.  Is that what we're saying?

A    Let me continue with your statement

49

with:  Unless a portion of their foot was off the pedestrian walkway surface.

Q    What portion of their foot would have to be off the walkway surface?

A    Well, it depends what direction they're going.  In this situation, she is entering.  So it is logical to assume that maybe her right foot is off the edge of the walkway surface.

Q    Okay.

- - -

Thereupon, Deposition Exhibit 6 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Dr. Amenson, I am handing you Exhibit 6, and it may or may not add anything to our discussion at this exact moment, if at all, but it helps maybe orient things.

Exhibit 6 is a photograph of the entryway in question, correct?

A    Yes.

Q    It shows the sidewalk in question and the landscape edging in question, correct?

A    Yes.

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

50

Q    In that photograph, the edging in question is on the right-hand side?

A    Looking at the photograph, yes.

Q    Looking at the photograph.

Do you understand that -- and unfortunately this won't translate very clearly to the record, but for me and you at least for this moment: Do you understand that at this Burger King there's a sidewalk that comes down this way, makes a turn, and then we see it here on this right-hand side finally, and then makes another turn that goes into the doorway. Do you understand that?

A    I do.

Q    And do you understand that that is the direction of approach that Ms. Ingram took?

A    Relatively speaking, yes.

Q    Just to make sure we're not missing something. Why do you say "relatively speaking"?

A    All I know is that she came from the Pizza Hut.

Q    Which would be over here to the direction we just pointed?

A    To the right of the photograph that we're looking at in Exhibit 6, and I do understand

51

that there's a pedestrian walkway provided there --

Q    Uh-huh.

A    -- next to the Burger King restaurant such that as you approach this south entrance on the Burger King restaurant, there is an angled sidewalk that may be part of an ADA accessible ramp. Then the landscape edging in question, looking at this photograph, is to the right side of the pedestrian walkway.

Q    Okay.

Let's look at demonstrative exhibit, we'll call it 6A since we're here.

- - -

Thereupon, Deposition Exhibit 6A was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    There is a red arrow drawn on Exhibit 6A, but it is otherwise the same photograph as Exhibit 6, correct?

A    I was checking that so that you don't trick me again. Yes.

Q    It's not my intention to trick you.

Same photograph, right?

52

A    Yes.

Q    All right. Is it your understanding that a person who comes down the long sidewalk that goes back toward the Pizza Hut and is making the slight turns to go into the front door could walk in the direction of that red arrow?

A    It's possible that any pedestrian approaching the entrance of the Burger King restaurant here on the south side could take various approaches to get to that entrance.

Q    Is it your understanding that is generally the direction of Ms. Ingram's travel?

A    In very general terms.

Q    Could someone traveling along that red arrow have their foot come into contact with the end of the edging if it's raised up above the surface of the sidewalk?

A    Anything is possible.

Q    Is it possible that their foot could come into contact with the raised edging if -- without their foot going off of the sidewalk?

A    No.

Q    Why not?

A    A portion of their foot would have to be

53

off of the sidewalk based on the dimensions that you and I discussed in Exhibit 3 such that maybe it's an inch, 2 inches, 3 inches away from the edge of the sidewalk where the landscape edge, the very end of the landscape edging is. So their foot has to be 1, 2, 3 inches off the edge of the pedestrian walkway surface to encounter that landscape edging.

- - -

Thereupon, Deposition Exhibit 7 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Hand you what's been marked as Exhibit 7. Have you seen that photograph before?

A    Yes.

Q    And it says: Approximate example of how Key found edging on Date of Loss 1, correct?

A    I believe that's how you would interpret DOL, yes.

Q    Do you believe that a person walking along the sidewalk making this angle turn to go toward the entry door there could have their foot come into contact with the end of the edging if it were in or near this condition?

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

**54**

A    Anything's possible.

Q    Do you believe that could happen without them going off of the sidewalk?

A    I do not believe that can happen unless a portion of their foot is off of the edge of the pedestrian walkway.

Q    When you say "a portion of their foot is off of the edge of the pedestrian walkway," we may be thinking about two different things.  Let me try to make sure.

If someone steps such that their foot while in the air or during its swing would pass over this unconcreted little corner, is that off the edge of the sidewalk in the way you're using it?

A    Absolutely.  If you want to talk about stance phase and swing phase and pedestrian walking ambulation, we can do that.

Q    We will.

A    Okay.

Q    But that's what you mean by off the edge of the sidewalk is that -- is that -- am I correct, is that what you mean by off the edge of the sidewalk?

A    Any portion of the foot extending beyond

**55**

the edge of the pedestrian walkway is off the edge of the sidewalk.

Q    Even while it's in the air mid-swing?

A    Absolutely.

Q    That may be one of those areas again of the way we commonly talk about things without your education versus technical terms.  When I think of off the sidewalk, I think someone means your foot actually went down off the edge of the sidewalk.

A    There are multiple phases to human ambulation, one of which is swing phase, one of which is stance phase, heel strike.  And your foot is not always in contact with the ground when you are -- in normal human ambulation.  Now, she was running, so that is a difference from normal human ambulation, walking.

Q    Running's not normal human ambulation?

A    No, normal human ambulation is walking.

Q    There's different types of walking, correct?

A    Absolutely.

Q    Slow walking, free walking, fast walking?

A    Absolutely.

**56**

Q    Is fast walking normal human ambulation?

A    No.

Q    Is slow walking normal human ambulation?

A    No.

Q    Free walking is, correct?

A    Yes.  There's a recognized speed that we accept in the industry as normal.

Q    What is that speed?

A    I'm trying to remember it off the top of my head.

Q    I could tell by your eyes you knew I was getting ready to ask.

A    I knew you were getting ready to ask, and I don't have the reference in front of me.  So I'm not going to miscite it.

Q    Fair enough.

Do you recall from Ms. Ingram's testimony at the time of her -- that she said she tripped, was she still running full speed?

A    I don't think she used the word "full speed."

Q    Did she maybe say she had already started slowing down?

A    I would have to look at her deposition

**57**

testimony.

Q    Does it matter --

A    Yeah, it matters.

Q    -- to you?

A    Yes, absolutely matters.

Q    In what way does it matter?

A    To understand what her ambulation was as she was approaching the entrance.

Q    So if she was starting to slow down as she came to that area, some changes to ambulation would be she's not going forward as fast, correct?

A    I would assume that her velocity has changed if she says she's slowing down.

Q    What else would be different?

A    I have not done a full biomechanical analysis of Ms. Ingram's human ambulation as she approached this walkway, and that's not part of my current opinions, but I can amend my opinions if I'm asked to.

Q    Why didn't you do a full biomechanical analysis?

A    I wasn't asked to.

Q    The scope of -- we all have as professionals scope of engagement.  When somebody

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

58

asks us to look at a project, we define what the scope's going to be, correct?

A    Yes.

Q    What was the scope of your engagement in this case?

A    To consult on the location of the edging relative to the pedestrian walkway.

Q    Okay.  What type of consultation would you have done under the scope as it was defined in this case?

A    To evaluate the distance of the edging relative to the pedestrian walkway, and the pedestrian walkway that was available to Ms. Ingram at the time.

Q    Anything else?

A    Industry practices related to maintenance of the pedestrian walkway.

Q    Anything else?

A    That was the scope that was defined for me on this matter.

Q    Thank you.

     Opinion three:  Had Ms. Ingram walked normally to the Burger King entrance, she would have had ample opportunity to discern the walkway

59

environment and could have safely traversed the sidewalk such that she would not have encountered the landscape edging located outside the provided pedestrian walkway.

     Did I read that correctly?

A    Yes.

Q    We've got this word "normally" here again, and we just talked about that.  So unnormal walking toward the entrance could have been slow walking, correct?

A    It could be.

Q    So what we're really talking about is not whether someone is normal or abnormal.  We're talking about the velocity, correct?

A    Yes.

Q    How fast was she running?

A    I don't know.

Q    What was her velocity?

A    I don't know.

Q    I think you told me you didn't know if she was still running full speed or was slowing down, correct?

A    Yes.

Q    So were you -- did you attempt to do any

60

analysis of her velocity and what she could see or how she could respond?

A    No.  The point of this opinion is that given normal human ambulation and the pace that somebody would be walking versus the pace that somebody may be running or even slowing down, that will change your ability and the timing that you have available to observe the environment around you.

     So if you're running, you may have less time to observe the environment around you; and if you're walking, you would have more time to observe that environment.

Q    Pretty common sense view, correct?

A    Actually it's not common sense.  There's a lot of scientific literature explaining these things.

Q    Tell me which way that understanding is not common sense.

A    Well, we know that human perception-reaction time is about 1.5 seconds, and that will change depending on what speed the body is moving.  So it could be increased or decreased depending on how fast the human is moving.

Q    But you didn't attempt in this case to

61

analyze what Ms. Ingram's perception rate could have been because you don't know her velocity either, correct?

A    Correct.

Q    You said that you read after you issued your report Mr. Fred Schneider's deposition transcript?

A    Yes.

Q    And you read Clay Barnes's opinion?

A    Yes.

Q    And you read the Oly-Ola materials?

A    Correct.

Q    From those sources, did you come to understand that this edging when installed down with the -- the two-part down to the ground and grass growing around it is actually intended not to be very visible?

A    No, I did not understand it that way.

Q    What did you understand?

A    And let's back up for a second such that I did not inspect the site, and I don't know exactly what the conditions may have been like before the incident occurred.  And if we're going to talk about levels of grass and levels of the lava rock that was

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

**62**

on the other side of the edging, we need to talk about the specific height of the grass, the height of the soil, the height of the lava rock relative to the one-inch round tubing on top of the landscape edging.

Q   All right.  Did you request that information from the defense in any part of your review or analysis of this case?

A   What specifically?

Q   Height of the grass, height of the lava rock, height of the soil.  I lost track of everything that --

A   No, I did not request all of that.

Q   But I think that is my point.  In order to know what someone could or could not or should or should not see about this edging, we have to understand how visible this edging was, don't we?

A   I would agree.

Q   Do you have any understanding how visible this edging was?

A   Only based on documents that have been provided to me such that I'm saying if somebody is normally walking toward that Burger King entrance, they would have had ample opportunity to discern the walkway environment if they're situationally aware of

**63**

the environment.

The second part of that is:  They could have safely traversed the sidewalk that was greater than 6 feet wide such that they would have -- or they would not have encountered the landscape edging located to the right side of the pedestrian walkway.

Q   The 6-foot wide reference keeps coming up.  Are you suggesting that it was improper for Ms. Ingram to walk along the right-hand edge of the sidewalk?

A   Most people, I would guess their surveillance footage, would not walk near the very edge of a sidewalk, just like we don't drive vehicles near the far edge of the pathway.  So she's stepping over the edge of the pedestrian pathway to encounter that edging.

Q   Are you critical of Ms. Ingram for walking along the right-hand edge of the sidewalk?

A   No.

Q   We do know that people do walk along the edge of sidewalks, correct?

A   It's possible.  People can walk all over the place.

Q   You have expertise in biomechanics, and

**64**

you have -- biomedical engineering, actually, and you have expertise in human factors according to your resume.  You also have expertise in safety engineering evaluations, and I believe that you are certified -- a board Certified Safety Professional.

Based upon all of those resources and background, would you agree that we know that sometimes people walk along the edge of sidewalks or -- let's just leave it at sidewalks for now?

A   I would say that the average user does not walk near the edge of a walkway.  So that would be an unusual circumstance.  It could happen, just like cars can drive on the edge of the highway or the roadway.

Q   Is there any literature to back up that it's unusual for people to walk along the edge of a sidewalk?

A   I could probably find some.

Q   Have you looked?

A   I have not looked.

Q   So in looking at this third opinion, we're not talking about whether it's normal or abnormal because what we're really talking about is velocity, correct?

**65**

A   That's part of it.

Q   Then you say she would have had ample opportunity to discern, but you haven't actually done any calculations about her -- the perception time in this case, correct?

A   Correct.

Q   And you don't have information or haven't looked for information regarding grass height or how this product would have or may have been installed and what somebody could have seen from a distance of this product versus right on it, correct?

A   Yes.

Q   I'm correct in that statement?

A   Yes, correct.

Q   And then when you say could have safely traversed the sidewalk such that she would have not encountered the landscape edging located outside the provided pedestrian walkway, are we actually just back to this point about if she's walking along the edge of the sidewalk coming up on that corner of the sidewalk that because of ambulation, her foot swing could travel outside the edge of the sidewalk?  Are we back to that point?

A   It could, yes.

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

**66**

Q     Is there anything else that I'm missing in my understanding of what your point is there?

A     The second part about could have safely traversed the sidewalk?

Q     Yes.

A     I would not expect somebody to be walking so close to the edge of the sidewalk. So the point is that if they were in a reasonable distance away from the edge of the sidewalk, she would not encounter the landscape edging.

Q     But you can't point to any literature that talks about whether it's unusual or not unusual for someone to walk along the edge of the sidewalk?

A     I can find some if you allow me the time to do it. I will say that I'm fairly certain that when we design pedestrian walkway surfaces, we don't consider very much that people are going to be walking with the side of their upper arm against the wall, and therefore --

Q     There's no wall here.

A     I understand. But that would be walking close to the edge of a pedestrian walkway.

Q     With something that prohibits that --

A     Right.

**67**

Q     -- because you don't want to drag your arm along the wall.

What about a sidewalk where there's nothing like a wall that is prohibiting you from walking along the edge?

A     Right. I would say under normal situations, people do not walk along the edge of the sidewalk.

Q     Okay. We talked a moment ago about ASTM F1637-19, correct?

A     Yes.

Q     Included in that standard now is a standard for considering items that are along the edge of a sidewalk, isn't it?

A     Protrusions specifically, I think you're referring to.

Q     Isn't there a section below Protrusions about considering items that are along the edge of the sidewalk?

A     Edges, 5.6.3.

Q     Could you read that into the record, please?

A     Yes. So ASTM F1637-19, Section 5.6.3, Edges: When walkways are adjacent to areas that

**68**

include hazards to safe use, the edges or limits of the walkway shall be made conspicuous or be guarded. Where hazards adjacent to walkways pose a significant risk of harm to pedestrians who may inadvertently fall off a walkway edge, consider eliminating the hazards or providing effective guards along the walkway edge.

There is a note below that that provides examples of adjacent hazards posing a significant risk of harm include areas of high vehicle traffic, machinery areas, and elevation drops in excess of 12 inches.

Q     Okay. Doesn't that standard assume people who are walking close to the edge of a sidewalk? Why else be concerned about it, correct?

A     It considers people walking on pedestrian walkways. That is not just sidewalks, okay? So this can be many different environments, interior and exterior environments.

Q     But it could also be exterior sidewalks, correct?

A     It does not delineate between one or the other. It does not use the word "sidewalks."

Q     That ASTM standard does not apply to

**69**

sidewalks? Because I thought you said that you had reviewed it in reviewing this case with regard to sidewalks.

A     I have reviewed the ASTM F1637 standard, and Section 1 refers to the scope such that Section 1.1 states: This practice covers design and construction guidelines and minimum maintenance criteria for new and existing buildings and structures. This practice is intended to provide reasonably safe walking surfaces for pedestrians wearing ordinary footwear. These guidelines may not be adequate for those with certain mobility impairments.

It does not specifically refer to sidewalks. But if we go down to the terminology section, which is Item 3, it has definitions in the ASTM F1646 standard which include sidewalk.

Q     Okay. So now going back over to the provision on edges, giving consideration to dangers along the edges of an exterior sidewalk would be included in that provision, correct?

A     It could be.

Q     Okay. And so doesn't that assume that people might be walking along the edge of a sidewalk?

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

70

A    Based on my understanding of the ASTM F13 committee, which I sit on and I vote on these standards, that was not the intent of this section.

Q    That's not how it reads to you?

A    Well, it specifically has a note below it because there was disagreement within the pedestrian walkway committee that gives examples of what Section 5.6.3 Edges is referring to, and it does not say sidewalks.

Q    One of those would be a drop off of, what was it, 12 inches?

A    Excess of 12 inches.

Q    Excess of 12 inches.

So specifically included in this standard would be if we've got an exterior sidewalk, like the one that we're talking about, and there's a hole 13 inches deep right along the edge of the sidewalk, correct?

A    Yes.

Q    And this standard says that should be remedied?

A    It says it should be made conspicuous or be guarded.

Q    Made conspicuous or be guarded.

71

Nevertheless, if this standard is concerned about a sidewalk such as the one we're talking about and a hole right next to the edge 13 inches deep, then the assumption is that sometimes people walk along the edges of sidewalks and, in fact, step off of them, correct?

A    I disagree.  That is not the intent of this section in the standard.  That is based on my involvement with the ASTM F13 committee.

Q    Then what is the intent?

A    The intent, which had to be specified because there was disagreement within the pedestrian walkway community, is that it includes things like high vehicle traffic, machinery areas, and elevations that drop in excess of 12 inches, which we do not have in this case.

Q    Let's talk generally, though, because I want to understand what this standard is because what guide us down this road was the statement that it's unusual for people to walk along the edge of a sidewalk.  I'm having trouble with that.

A    Okay.

Q    In part because I've read this ASTM standard, which to me, as I read it, seems to assume

72

that.  Now you're on that committee, and I get that.  So I want to make sure that I fully understand everything that we can understand about this.

That standard is concerned about drops in elevation in excess of 12 inches on the edge of a sidewalk, correct?

A    Potentially.

Q    A specific example that it gives in that standard, correct?

A    That is part of the note down here below the section, and it is often found that the notes are not enforced.  So they are recommendations, they are additional descriptions that support a section, but they're not specifically enforced.

And ASTM standards are industry recommended guidelines.  So unless they've been adopted by the International Building Code or the Kentucky Building Code, this is just a recommendation.  This is not law.  It doesn't hold the weight of the law, and it's a recommendation.

Q    Okay.  When you initially authored your report, you didn't look at the building codes or the Paducah city ordinances.  Instead, you looked at the ASTM and ANSI standards and I think one other,

73

correct?

A    Yes.

Q    Was it ISO?  We've got your report.  We don't have to guess.

A    It's the ANSI and ASSE.

Q    ASSE.

A    Right.

Q    So you relied upon them in doing your report?

A    Right.  And the point there is that they don't talk about landscape edging in this sort of situation.

Q    But they do talk about, at least in their current form, dangers along the edge of a sidewalk, correct?

A    Yes.

Q    The assumption is that those dangers can exist because people are known to let their foot swing outside the edge of a sidewalk, correct?

A    That's possible, yes.

Q    And that would be something that was known even before this standard was written, correct?

A    Could be.

Q    Have you seen the testimony of Fred

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

74

Schneider that the defendants in this case knew that that was a risk even before this landscape edging was installed?

A    I believe so.

Q    Do you know if there were any warnings on this property saying don't walk along the edge of the sidewalk?

A    I'm not aware of any warnings that say such, and I wouldn't expect there to be any warnings in this environment.

Q    Why not?

A    Well, again, I do a lot of cases that involve human factors, warnings and labels, and one of the problems we have with warnings and labels that if we over warn people, they tend to ignore the warnings.

So in this environment, there is no reason to warn that there is landscape edging there because it is a different color from the grass and the lava rock, and you wouldn't normally expect somebody to be walking outside of the greater than 6-foot wide pedestrian walkway that's provided to them.

Q    Okay.  We're back to this point then

75

that it's somehow abnormal to walk along the edge of a sidewalk.  Let's leave it at this:  Is that what you intend to tell jury in Paducah, Kentucky that people who walk along the right-hand side or left-hand edge of a sidewalk are abnormal?

A    I would say that it is not normal.

Q    Okay.

A    It is unusual.

Q    Your basis for that would be, so that they can understand?

A    I can pull some additional literature to support that statement.

Q    But as we sit here today, your basis for that statement would be?

A    My experience with human ambulation and pedestrian walkways.

            - - -

            Recess taken.

            - - -

By Mr. Oliver:

Q    Dr. Amenson, I believe we were ready to talk about opinion number four, correct?

A    Yes.

Q    And that opinion is that Burger King

76

followed industry recommended practices for safe pedestrian walkways by having a maintenance procedure that included periodic walkway checks and cleanups, correct?

A    Yes.

Q    And that is talking about the travel path?

A    Yes.

Q    And did you review their travel path policies?

A    I believe there were some documents provided recently with the other transcripts that I reviewed that had some descriptions about the travel path policies.

Q    Probably was an exhibit to some of the -- to Sherrice Key or Cathy Boer or Joe Neikirk depositions, something like that?

A    Yes, the employees of Burger King.

Q    Beyond that, have you looked at them or had any discussions with anyone at Burger King about them?

A    No.

Q    And we sent a notice for your deposition today requesting that you bring your -- all your

77

terms, and it appears that you have because we've already looked at some, correct?

A    Yes.

Q    Could you tell us what else you have in your file so that we know if there's anything else we need to talk about today here before we move on?

A    I have my C.V., my federal rule, the invoices.

Q    Can I see your federal rule?

MR. JONES:    That list of cases you've testified in is normally produced.

A    Correct.

Q    I knew what she was talking about.

Is this an extra copy?

A    Sure.

Q    Then you've got invoices?

A    I do have invoices.

Q    Okay.  We will probably talk about those at the end --

A    Okay.

Q    -- so just keep those handy.

A    Okay.

Q    Do you have extra copies already?

A    I do.

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

78

Q    Hand me the extra copies if you've got them, and we'll be ready to go.

A    (Providing.)

Q    Thank you.

What else do you have?

A    Just my fee schedule and my C.V.

Q    Do you have extra copies of your fee schedule?

A    I do.

(Providing.)

Q    Thank you.

A    Other than the documents I have reviewed when we first opened the matter, we have a matter folder, and it simply has our retention agreement in it and the written correspondence letters from Boehl, Stopher & Graves.

Q    Do you have extra copies of those?

A    These are all originals.

Q    Do you mind if I take a look at them?

A    I do not mind.

Q    I'm going to hand you this file back with the correspondence and the retention agreement and the initial opening documents. We may request some copies of those in a moment.

79

Let me ask you this first, and the reason I'm handing it back is because I figured you might have to refer to it: When were you first retained in this matter?

A    According to our retention agreement, it was March 26, 2019.

Q    You issued your report three days later?

A    Correct, March 29, 2019.

Q    How much time did you spend reviewing this matter?

A    As much as I could.

Q    How much time did you spend reviewing this matter before you issued your report, is what I mean?

A    About ten hours.

Q    On what day?

A    The 28th and 29th of March.

Q    You're taking that from your invoices, correct?

A    Yes.

Q    A copy of which you've already given me, and we'll get into the record here before we're done.

A    Correct.

Q    What else do you have with you here

80

today?

A    I think that's it. Everything else is listed on Exhibit 2.

Q    So we've identified on Exhibit 2 the things that you reviewed, we've talked about what else you've brought with you today. Do you have any notes or e-mails regarding your work, your review, or your analysis in this case that we haven't looked at?

A    No.

Q    Do you typically make notes as you go through a review or analysis?

A    Not typically.

Q    And by "notes" I would also mean typed into a computer, regardless if they're electronic, nonelectronic?

A    I don't have any on this case.

Q    We've also been provided, Dr. Amenson, prior to your testimony this morning a copy of your curriculum vitae, which if it's okay with you I'm going to call resume --

A    Sure.

Q    -- because that's a more comfortable word for me.

- - -

81

Thereupon, Deposition Exhibit 8 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Can I hand you what we marked as Exhibit 8. That is the version that we have been provided, and you know, of course, my next question is going to be: Is there a more current version or are there any updates, additions, or corrections that need to be made?

A    Yes, I have a copy here.

Q    Can you hand me that. Is this my copy?

A    Sure.

- - -

Thereupon, Deposition Exhibit 8A was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    We've made that 8A. I haven't had an opportunity to study 8A before we got here today, so can you help me, can you identify where the differences or changes are?

A    Yes, I can. The first thing is I dropped a certification, the CPST certification, I

82

did not renew.

Q    What is CPST?

A    It is the Certified Child Passenger Safety Technician.

Q    Thank you.

A    And the other addition would be on Page 4 under Seminars and Additional Education, I recently attended the ASTM FO8 meeting, Sixth International Symposium on Safety in Ice Hockey, that was in May of 2019, and while I was there, I also attended other ASTM meetings.

Q    All right.  Anything else?

A    I believe that is it.

Q    Dr. Amenson, since we have not met before, I'd like to spend a good bit of time going over your resume and your background, your education, your field of expertise to make sure we understand what your role was in this case, how you might explain your background to the jury at trial in this case, how you do things, et cetera.

As we peel those layers back, we may at times come back to this specific case and talk a little bit more for clarification or it may hit on something we may need to talk about some more, but

83

oftentimes I'm just going to be talking in general trying to understand what you do.

A    Okay.

Q    Is that fair?

A    Yes.

Q    Let's start off with real basic and kind ease into this.

You have a doctorate in biomedical engineering from Wayne State University in Detroit, Michigan, correct?

A    Yes.

Q    Did you pursue any particular focus or specialty of study or research in your biomedical engineering training while at Wayne State?

A    I did.  I studied impact biomechanics, so how the body responds to impact.

Q    Looking at your resume and the jobs that you first pursued after Wayne State, was that specific or primarily focused on automobile crashes?

A    So it is in the sense that if you want to work with crash test dummies and cadavers, that is the area of expertise that has the most funding, it's the automotive environment.

The second most popular location would

84

be the sports and athletic equipment arena.  So I did choose to continue to study human cadavers and crash test dummies and how the body responds to impacts.

Q    They do some really interesting and fascinating testing and studies with those cadavers, but also there's a lot of issues, as I understand it, in the field about increasing our ability to create dummies that even better simulate the human reactions to events, correct?

A    Absolutely.

Q    Were you involved in things like that?

A    Yes.

Q    Fascinating work.

A    It is.

Q    You became Dr. Amenson in 2008, correct?

A    Yes.

Q    And just so there is no confusion, just in case we end up reading your testimony at trial instead of you coming live, you have and have earned the title of doctor, but that's not medical doctor, correct?

A    Correct.  And I guess I should correct the record such that I was Dr. Troxel in 2008, and later in 2008 became Dr. Amenson.

85

Q    I apologize.  I missed that.

Okay.  You've work for SEA, Ltd. since 2014, correct?

A    Yes.

Q    We'll get into more specifics about your training, education, and background in a moment, but just to be sure we're on the same page, in looking at your resume, we do not see any specific training, education, or experience in landscape installation or landscape design, correct?

A    Yes.

Q    Have you ever worked as a landscaper for any industry?

A    I wouldn't say I specifically worked as a landscaper; however, a lot of the playground safety specifications involve the landscape surrounding public playgrounds, and I've been involved with that committee for a while.

My father was a home builder, and I was raised around construction sites, and I am a gardener myself, that is my hobby, and I enjoy doing a lot of home improvement.

Q    Do you have any experience as distinguished from education or research in landscape

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

86

design or installation using the type of product that's at issue here?

A   Yes, I actually do on my own personal residence.

Q   Very good.  Tell me what that is.

A   So I recently redesigned my asphalt driveway to accommodate a concrete driveway, and what happened was the water that was applied to the driveway after a heavy rainstorm would redirect into a flower bed once we had the concrete driveway installed.  In an effort to prevent the mulch from washing down the driveway every time it rained, I did install landscape edging that had stakes, and I also installed gravel on the other side of the landscape edging.

So actually a very similar situation to what we have here.  I had concrete, I had stone, and then I had landscape edging, and I had wood mulch.

Q   Was it the black plastic landscape edging?

A   So in that particular area, I installed the metal edging, but I have black landscape edging up further on my residential lot that is abutting the concrete edge of the driveway near the garage doors.

87

Q   Did you use the stakes when you put it in?

A   Yes, I always use the stakes.

Q   Dr. Amenson, to assist the jury either in this transcript or at trial, I could envision it being helpful to provide a definition or some deeper understanding of your specialty starting with a broad understanding of biomedical engineering.  So I need to make sure I understand what it is you would tell us, what we would be talking about so that I don't have any surprises there.

And so to help with that, I've done some research through university websites, seeing what different schools say.  So let's see if we can get on the same page; and if not, correct it where it's necessary.

So Michigan Technological University, I found this statement:  Biomedical engineering is the application of the principles and problem-solving techniques of engineering to biology and medicine. Is that a correct statement?

A   Sure.

Q   Biology is the scientific study of living organisms, such as the human body, physiology,

88

anatomy things, like that, correct?

A   Yes.

Q   Physiology is the study primarily of how we as humans, how we adapt to stresses and physical activity, diseases, things like that, correct?

A   Yes.  And it's also how the body functions.

Q   Physiology is a lot about how the human body moves, correct?

A   That is one area of expertise, human physiology.

Q   Are these all things that you studied?

A   I would say biomechanics is a better way to explain how people move, human movement, and I've definitely studied all of those.

Q   Would you agree that your training in biomedical engineering would include applying the principles and problem-solving techniques of engineering to matters such as the movement of the human body?

A   Yes.

Q   This would include what we know about how humans walk, jog, and run, correct?

A   Yes.

89

Q   And your field of study also includes an understanding of human behaviors, correct?

A   Yes.

Q   With respect to human behavior, are you trained in psychology?

A   So I took everything up through abnormal psych in undergrad.  I took a sports psychology class, I took basic psychology 101.  So I have had academic training in psychology, yes.

Q   Beyond undergrad?

A   I'm trying to remember as part of my public health curriculum if I had any psychology based courses, and I honestly don't remember.

Q   Did you have any psychology classes beyond the 101 level?

A   Yes, absolutely.  Abnormal psych, I think, was a 500 or 600, which was the highest.

Q   I noticed on your resume talking about undergrad that you went to Colorado State University, correct?

A   Yes.

Q   And your degree in 2000 from that school was exercise and sport science?

A   Correct.

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

90

Q    While at Colorado State, as I read your resume, you worked as an exercise science research assistant performing research activities related to biomechanics, kinesiology, and athletic training, correct?

A    Yes.

Q    And so, again, a little bit of definition work. Kinesiology is the study of the mechanics of body movements, correct?

A    Yes.

Q    Kinesiology in particular would concern itself with such things as stride length and step length, correct?

A    Yes.

Q    In the case that brings us here today, did you undertake to analyze Ms. Ingram's stride length or step length?

A    Only generally speaking.

Q    When?

A    Before I wrote the report.

Q    What did you do?

A    I just understood from her deposition transcript, her movement as she was approaching the entrance such that she was running or walking at a

91

fast pace.

Q    Did you -- do those considerations look at stride length or step length, or were you just looking at her velocity?

A    Just generally speaking, I was taking in consideration that she was quickly approaching the entrance.

Q    Then I see on your resume, although it may not have a lot to do with this case, but you've worked as a personal fitness trainer?

A    Yes.

Q    You also worked as a bicycle mechanic at one point, which I found to be extremely cool.

A    That was my very first job.

Q    Good for you.

And then you also worked as a corporate health and fitness advisor in Toledo, Ohio.

A    Yes.

Q    So you've lived and worked in health and exercise fields in several urban environments, including San Francisco Bay area; Las Vegas, Nevada; Toledo, Ohio. Would you agree that it's fairly common that people run or job on sidewalks?

A    Yes.

92

Q    Another definition relative to your field that might come up and that might be helpful to the jury in its understanding of your testimony is kinematics. We've touched on kinematics, I believe, a little bit earlier, correct?

A    Yes.

Q    Kinematics is the branch of mechanics concerned with the motion of objects without reference to the forces which cause the motion, correct?

A    Yes.

Q    Comes to us out of the branch of science more generally known as physics?

A    Yes.

Q    In simple terms, then, how would you describe kinematics?

A    How the body moves without considering the forces of velocity involved with that motion.

Q    Anything simpler that you can say about it?

A    Just how the body moves.

Q    So also in simple terms, how would you describe the role of kinematics relative to the type of work that you do?

93

A    I like to consider kinematics in the analyses I do, but it depends on the scope of the work.

Q    The scope of your engagement in the instant case did or did not include looking at kinematics?

A    So in very broad terms, it did involve looking at kinematics such that I took into considerations her motion as she approached the south entrance of the Burger King restaurant.

Q    You didn't look at calculating stride length or step length or some of the other things that we've discussed, correct?

A    Yes.

Q    Correct statement?

A    Correct.

Q    So we were talking about understanding biomedical engineering, and we discussed in your field of expertise a person with your training seeks to apply the principles and problem-solving techniques of engineering to issues of human movement and activities, right?

A    Sure.

Q    When you are trying to figure out what

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

94

happened in an event, one of the principles and problem-solving techniques of engineering that a biomedical engineer would typically undertake is a correct understanding of the kinematics of an event. Would you agree with that statement?

A    I would broadly agree with that statement such that you said typically we would evaluate that, but it depends what the scope of my project is.

Q    And would you say -- and I know we just discussed this, but I want to make sure I ask the question this way.  Would you say that you undertook to analyze the kinematics of Ms. Ingram's fall in this case?

A    I analyzed them from the respect that I had to evaluate the location of the landscape edging relative to the pedestrian walkway and where she could have been to encounter that landscape edging.

Q    Beyond that?

A    No.

Q    As a biomedical engineer, you are also -- excuse me, are you also qualified to assess injuries suffered in an event and compare them to how an event occurred in an effort to determine the

95

causal connection, if any, between the event and the injuries experienced?

A    Absolutely.

Q    In the instant case, have you analyzed the injuries suffered by Tamara Ingram in the fall in question?

A    No.

Q    Are you aware of what her injuries were?

A    Based on the evidence that's been provided to me.  I have not reviewed medical records.

Q    So generally aware?

A    Yes.

Q    So would I be correct in saying that you hold no opinions as to what caused Ms. Ingram's injuries in this case?

A    Correct, I have not done that analysis.

Q    Just to be sure, have you seen anything in your review of this case that causes you to dispute that Ms. Ingram was injured in the fall in question?

A    No.

Q    So let's go back to the resume.  You describe your current position as including performance of, quote, safety engineering

96

evaluations, incident analyses and injury biomechanics investigations, close quote, including with regard to pedestrians; is that correct?

A    Yes.

Q    If you'll look at the folder we talked about a moment ago that has your -- the engagement in this case, what was the scope of engagement as listed?

A    The scope of the project is incident analysis.

Q    I want to go through these and make sure I know if there's a difference.

A    Okay.

Q    Is a safety engineering evaluation the same as a risk assessment evaluation?

A    It could be.

Q    Are there ways in which they are different?

A    They can be.  It really depends on the scope of the project and what you're working on.

Q    Generally speaking, can you give me some kind of description so that I can kind of understand how they're the same or not the same?

A    So a risk assessment would be

97

potentially evaluating what risk an individual may have in using a product, for instance, versus a safety assessment that may just look at an overall product as an engineer might use it, as the public might use it, as an actual designer may use it.  So they can be different.  They can be similar.

Q    A lot of overlap, but the edges -- around the edges may be a little bit off here and there?

A    They could be.  And it really depends on the scope of the risk assessment versus the safety analysis.

Q    Is a safety engineering evaluation the same thing as an incident analysis as used in your resume?

A    It can be, yes.

Q    All right.  You're qualified to do risk assessment evaluations, correct?

A    Yes.

Q    Have you ever done them as part of your employment at any place of employment?

A    Yes.

Q    Where?

A    I currently do them here at SEA.

98

Q    A risk assessment evaluation is typically focused on -- or one of the things it be focused on, maybe that's a better way to say it, could be a physical site or location, a piece of machinery or a process such as a worksite evaluation for safety, correct?

A    Yes.

Q    Does a safety -- I think you've told me already.  A safety engineering evaluation can look at that same issue, physical sites and locations and risks?

A    Yes.

Q    Prior to this case, have you ever performed a safety engineering evaluation or a risk assessment of areas in and around a public space such as outside a business open to the public?

A    Yes.

Q    Can you tell me some examples?

A    Most of my experience is with public playgrounds.  So those can be in various locations.  They can be in park settings, they can be in industrial settings.

Q    Has your -- with your background, I know that there's been different employers but there's

99

also different professional affiliations, you're on the ASTM committees and things like that.  So I can envision different ways in which you might be looking at playgrounds, and that's what I want to make sure I understand.

Have you ever worked as a consultant evaluating or assessing risk on a playground for a client?

A    Absolutely.

Q    And that is looking at are children who are -- who we might anticipate using this area going to be safe in this area.  Is that a fair explanation?

A    Yes.

Q    One of the considerations there would be trip-and-fall hazards, correct?

A    Absolutely.

Q    Have you ever done a risk assessment or safety engineering evaluation with regard to public spaces for adults?

A    Yes.

Q    Example?

A    My goodness.  Industrial work spaces, parking lots, parking garages, parking structures.  It's always hard to remember all the things that

100

you've done.

Q    Sidewalks?

A    Definitely sidewalks as part of, you know, commercial settings, residential settings.

Q    So, again, the consideration is:  Is this area that we're looking at considering the people who might be anticipated to walk around or move in this area safe?

A    Yes.

Q    One of the concerns would be trip-and-fall and slip-and-fall hazards, correct?

A    Yes.

Q    In performing a risk assessment analysis of a site or a safety engineering evaluation of a site for a specific client, can information from the client or owner of the area in question regarding its practices be relevant to the analysis?

A    Yes.

Q    In what way?

A    Such that they should be taken into consideration during the analysis.

Q    With regard to the matter that brings us here today, did you obtain information regarding the defendants' practices relative to landscape design?

101

A    Based on the deposition transcript and exhibits that were provided, yes.

Q    Did you have that information before you issued your written report?

A    I only had Earl Christian and what he said in his transcript and exhibits.

Q    I believe his testimony was that he was not involved in any way in landscape design or the installation, correct?

A    Right.

Q    Relative to the matter that brings us here today, did you obtain information regarding the defendants' practices relative to edging installation?

A    After I read the report, yes.

Q    From the deposition transcripts?

A    Yes.

Q    Concerning the case that we are here about today, did you obtain information regarding the defendants' practices relative to inspection of the edging in question?

A    Yes, I believe that was Sherrice Key's testimony.

Q    Anything else?

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

102

A    In Earl Christian.

Q    Anything else?

A    After the report, Fred Schneider was one of the transcripts that I really paid attention to related to the landscape edging design maintenance.

Q    Anything else?

A    Larry Nelson, Joe Neikirk, John Drury.

Q    You're going to say all of them?

A    Pretty much.

Q    Anything specific that you can recall or point to?

A    I just remember that the employees would do those travel path walks periodically throughout the day; and if I recall correctly, they did it almost every hour, such that nobody observed an issue with the landscape edging involved in this incident.

Q    Do you recall that those employees knew to specifically look at the landscape edging?

A    I don't recall that.

Q    Do you know if those employees were ever advised that they should look at the landscape edging?

A    I don't recall.

Q    Do you recall if there were ever

103

internal communications with the defendants between management and key players involved regarding the landscape edging and keeping an eye on it?

A    Not specifically.

Q    Generally, do you recall?

A    I think the recommendation was to walk the premises and observe the environment, but not specifically look directly at the landscape edging.

Q    Okay.  Do you know who designed the landscaping in question?

A    I believe it was Fred Schneider or Larry Nelson.

Q    Do you know who installed the edging in question?

A    I think that was Fred Schneider.

Q    Do you know how the edging was installed?

A    Based on the testimony that was provided by Fred, yes.

Q    Did Fred's description of how the edging was installed match up with the document from Oly-Ola that we looked at earlier that will be an exhibit later in your deposition?

A    So I did not make that direct

104

comparison, but my basic understanding is that his application and installation of the edging was representative of what is currently available on the website for Oly-Ola as to how to install the edging.

So I would be cautious that when the edging was actually installed in this incident site location, I don't know what the recommendations were at that point in time.  What I printed off recently is what they currently recommend for the edging.

Q    And that recommendation included at least that the round 1-inch tube on top be put about halfway down into the soil, correct?

A    Yes.

Q    And Fred Schneider testified that he didn't do that, didn't he?

A    I think he said something about the half-inch tubing maybe not being in line with the soil line.  The soil or the grass or the lava rock, I don't remember.

Q    Do you know how long the edging in question had been in the ground at the time of Ms. Ingram's fall?

A    Well, again, based on Mr. Christian's testimony, he said at least seven years.  But I

105

believe on Fred Schneider's deposition it was over 20 years.

Q    Over 25 years, I believe.  Is that consistent with what you recall?

A    Yes.

Q    Switching back again to general understandings as opposed to specific with the instant case for a few minutes.

When performing a risk assessment analysis or safety engineering evaluation, is it relevant to know what the client or owner of the property knows or appreciates already about potential risks?

A    Yes.

Q    How so?

A    That you should know what the trends are if there are any trends.

Q    So if the owner of the property already knows or understands a risk, then that is something that needs to be paid attention to, correct?

A    And considered in your evaluation, yes.

Q    With regard to the instant case, do you know if the defendants appreciated prior to Ms. Ingram's fall any risks relative to pedestrians and

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

106

the landscape edging that was used?

A   I don't know.

Q   You've read Fred Schneider's deposition, sworn deposition testimony from May 28, 2019, correct?

A   Yes.

Q   Are you aware that Mr. Schneider designed and installed the landscaping, including the edging in question?  I think you said yes?

A   Correct.

Q   Are you aware that Mr. Schneider was aware that the type of black plastic edging used at this restaurant was known to come out of the ground over time, particularly if not installed correctly?

A   Yes.  I would say that most landscape edging in a free stall environment should be known to potentially rise and fall with the change in weather conditions.

Q   Are you aware that Mr. Schneider testified that it was very easy to add stakes to the edging to hold it down even after the edging had already been installed?

A   Yes.

Q   Are you aware that Mr. Schneider

107

testified that he had an abundant supply of unused stakes and that his crew used to carry surplus stakes in their trucks as they went to the defendants' various properties?

A   Yes.

Q   Are you aware that Mr. Schneider testified that the edging in question had been in place for at least more than 20 years, let's use that number?

A   Fair enough.  Sure.

Q   Are you aware that in Mr. Schneider's document production during his testimony there was a document suggesting a 15-year lifespan on plastic edging before it might crack, rot, or disintegrate?

A   That may be true.

Q   Have you done any research or does your education, background, or experience include any knowledge of the lifespan of this type of product in the ground?

A   No, other than the documents that have been provided in this case.

Q   Do you have any reason to dispute that this product might have a 15-year lifespan before it starts to crack, rot, or disintegrate?

108

A   No.

Q   You don't dispute that?

A   I don't dispute that.

Q   Are you aware that Mr. Schneider, who has been with Midamerica Hotels Corporation in the horticulture division for, I think, something like 35 years, testified that he was unaware -- or excuse me, that he was aware that customers to their restaurants were sometimes in a hurry?

A   Yes.

Q   Are you aware that Mr. Schneider testified that customers to his employer's fast food restaurants sometimes walk fast as they are coming and going from the restaurants?

A   Yes.

Q   Are you aware that Mr. Schneider testified that he had seen customers running as they came and went from the defendants' restaurants?

A   Yes.  And I think he also stated that there's no pedestrian path crossing that grassy area near the incident site, which would be indicative of repeated pedestrian traffic.

Q   Are you aware that Mr. Schneider testified that it was known that customers sometimes

109

left the sidewalk or cut through the grass as they came and went from his employer's restaurants?

A   Yes.

Q   Are you aware that Mr. Schneider testified that the landscape edging is installed such that the black -- such that the black tube on top, which is about an inch tall, is placed down against the dirt instead of being buried halfway in the dirt?

A   That sounds familiar.

Q   Are you aware that Mr. Schneider testified that the grass next to the edging is mowed as a matter of company policy such that the grass is three inches high?

A   That sounds familiar.

Q   Are you aware that Mr. Schneider testified that the edging is installed such that a person would not see the edging below the height of the grass from a distance?

A   Yes.

Q   Are you aware that Schneider testified that knowing that the landscape edging if it came up out of the ground could present a tripping hazard?

A   Yes.

Q   As a safety professional, if you were

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

**110**

providing a site risk assessment or safety engineering evaluation of the area in question and the property owner told you that it was aware of all the points we have just discussed from Mr. Schneider's sworn testimony and knowing that this issue is in an area used by customers of the business, then you would advise the client pursuant to risk assessment standards and protocol that the risk needs to be remedied?

A     First of all, I would have a discussion about how safety is defined and what safe is.

Q     Okay.

A     In the industry of safety engineering, safe is generally defined as an acceptable level of risk such that no matter how well we design something, whether it be a product or a premise, we can not prevent all incidents from occurring or all exposures from occurring.

Our goal as safety professionals is to try to minimize or reduce the probability of injury, the probability of occurrence such that I could do an incident analysis and identify that there's a transition from the grass to the landscape edging to the lava rock, but there's a greater than 6-foot wide

**111**

pedestrian walkway that's available to somebody coming and going from that means of egress.

If we consider codes, which are the rule of the land here in the United States, and there's nothing in the codes or International Building Code or the Kentucky Building Code that gives us an indication that this is a potential hazard that should be remedied.

Q     Just because something has not made it into a code or standard yet doesn't mean that it's not an identifiable risk hazard, correct?

A     Yes.

Q     So let's go back to the question: As a safety professional, if you were providing a site risk assessment or safety engineering evaluation of the area in question and the property owner told you that it was aware of all of the points that we have just discussed from Mr. Schneider's testimony, I think you told me that knowledge of the owner matters and it's pertinent?

A     Yes.

Q     And knowing that this is an area used by customers of a business instead of maybe, like, workers who are familiar with the area, what would

**112**

you advise the client pursuant to risk assessment standards and protocol?

A     I would advise the client that this is an acceptable level of risk to have landscape edging between the grass and the lava rock such that there is separation between those two surfaces and that the landscape edging does not protrude into the walkway surface; therefore, it's okay to be there.

Q     And part of the risk assessment standards talk about how we determine what is an acceptable risk and what is not an acceptable risk?

A     Correct.

Q     Can you explain how that analysis is done?

A     It depends which standard you're referring to.

Q     How about the ANSI standard.

A     Which ANSI standard?  There are hundreds and thousands of ANSI standards.

Q     Well, I think there's one specific to how to do risk assessments and also how to design around risks, correct?

A     I would agree.

Q     ANSI Z690.3 and also Z590.3, correct?

**113**

A     I'm not sure.  I would really like to see the definition or the titles on each one of those standards.  They sound vaguely familiar to me.

Q     Well, Your written report says that you reviewed ASTM and ANSI and ASSE standards before writing your report.  Did you review those standards?

A     I'm not sure if those were the specific standards I reviewed.  I probably reviewed the ones that were more specific to walkway surfaces.

Q     Did you review any that had to do with risk assessment or safety engineering evaluation of walkway surfaces?

A     Oh, I think most of the ones I reviewed had to do with that, yes.

Q     Would any of them help you know what -- how we would go about determining what is an acceptable risk or an unacceptable risk under the facts that we're discussing?

A     Not the ones that I reviewed prior to writing my report.

Q     Do you -- have you ever used or looked at such standards or guidelines before?

A     Yes, I have.

Q     Based upon what you know, your

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

114

education, experience, and background, can you tell me how it is that we would figure out if this is an acceptable risk or an unacceptable risk?

A       We could use the industry recommended practice to do that.

Q       Which industry recommended practice is that?

A       It could be an ASTM standards, it could be an ANSI standard, it could be an American Society of Safety Engineers, which is now the American Society of Safety Professionals.  These are all recommended practices in the industry.  So unless they've been adopted by a code, they are industry recommended practices.

Q       Okay.

A       They do not have to be followed by law.

Q       Which practice would you apply with regard to the type of area that we're talking about in this case?

A       I haven't done that analysis, and I'm not sure at this point in time.

Q       Do you agree that one of the general recommendations with regard to risk assessments for business owners, property owners is that risk

115

assessments be done continually?

A       I would say periodically.  Not continuously.  It depends how you define continuously.

Q       It does.  That we keep --

A       Every second of the day, I wouldn't expect that.

Q       No.  But it's a process that we go through over and over again.  We don't do it once and then say, we're good for 20 years?

A       Yes.

Q       So we do it over and over again as we go about our business?

A       Periodically, yes.

Q       Actually I think I like periodically better because I view it the way you do.

A       Yes.

Q       Do you agree that also one of the general recommendations is that potential risks, even if viewed as a tolerable risk, be acknowledged, be openly discussed with the key players within the business and be monitored and reevaluated regularly?

A       I would say that would be a recommended industry practice, yes.

116

Q       Standard practice?

A       I don't know if it's a standard practice, but it's industry recommended.

Q       Take a look back at Exhibit 6.  We are talking about the landscape edging on the right-hand side of the sidewalk seen in that photograph, correct?

A       That's what we've been talking about, yes.

Q       I will represent to you that it is my understanding that that is the intended position of that edging by the defendants and that is the position it was in after it was fixed by, I believe, Earl Christian, okay?

A       Okay.

Q       Would you take a look at the edging on the left-hand side of the sidewalk?

A       Yes.

Q       Do you agree that edging is raised up higher?

A       I would say I can't tell by looking at this image.  There are definitely shadows in view here, and I'm not sure the pixilation even in the image would skew the view of the edging.

117

Q       Does it look the same as the edging on the other side of the sidewalk?

A       In what sense?

Q       Height.

A       I would say that's difficult to determine.  The reason I'm saying that is because I can see that there is a shadow coming from the right side of the image such that the sun may be toward the right side of this image casting a shadow toward the left.  You can really identify that on the vertical wall abutting the edge of the glass windows and you can see it over top of the entryway.

Q       So looking at the photographs of this scene makes it difficult to properly analyze what we're seeing and what may be there, correct?

A       Yes.

Q       And you didn't go to this site and do a personal inspection, did you?

A       That is correct, I did not.

Q       You relied on the photographs, right?

A       Yes.

Q       Photographs have the same problems that you're telling me are keeping you from answering my question with regard to Exhibit 6, correct?

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

118

A    Yes.  Unfortunately, the fact is we're so late after this incident has occurred that whatever condition it is in now, we will not know what the condition was prior to the incident.

Q    The only people that would know that maybe were the people who were on scene taking these photographs and these measurements at the time it was done, correct?

A    Yes.

Q    Have you spoken with those people?

A    No.

Q    Do you know who they are?

A    Only the ones that have been deposed and stated they were there.

Q    Do you know if any of them are the ones who took these photographs and made these measurements?

A    I thought that maybe Fred said he took some photographs or was it Larry Nelson or Earl Christian?  It was Earl Christian, I believe.

Q    I will represent to you that the photographs, particularly the ones that carry the designation BSG-Burger King versus Ingram-Home Office File were not taken by Earl Christian, but were

119

rather taken by maybe a Mr. David Byer or a Mr. Clayton James.

MR. JONES:    Taken some weeks after the incident.

Q    Are you familiar with either of those gentlemen?

A    Those names don't sound familiar to me.

Q    They both work for Cincinnati Insurance. Are you familiar with Cincinnati Insurance?

A    Yes.

Q    Have you had any contact with Cincinnati Insurance regarding this case?

A    No.

Q    Dr. Amenson, do you know if the defendants appreciated prior to Ms. Ingram's fall any risks relative to pedestrians and landscape edging that was placed close to the edge of the sidewalk?

A    No, I don't believe so.

Q    In addition to those points already discussed, are you aware that Fred Schneider as the designer/installer of the defendants' landscape and head of the horticulture division testified that he knew well prior to the date of Ms. Ingram's fall that objects along the edge of a sidewalk can present a

120

tripping hazard?

A    That sounds familiar.

Q    Are you aware that Mr. Schneider testified that he knew well prior to the date of Ms. Ingram's fall that landscape edging that comes right up next to the edge of a sidewalk could be hit by a customer's foot if the customer was walking along the edge of the sidewalk?

A    Yes.

Q    Are you aware that Mr. Schneider testified that he knew and understood prior to Ms. Ingram's fall that edging that comes right up next to the edge of the sidewalk could be a tripping hazard?

A    Yes.

Q    Are you aware that according to Mr. Schneider's testimony, the defendants understood, even before the edging in question was installed, that something placed along the edge of a sidewalk could pose a tripping hazard to customers, and that they would attempt to factor this understanding in when installing landscape in order to minimize all risk to the public?

A    That sounds familiar.

Q    Are you aware that Mr. Schneider

121

testified to his knowledge that consideration should be given to what is placed along the side of a sidewalk with regard to safety?

A    Yes.

Q    Are you aware that Mr. Schneider testified that one of the reasons the defendants installed edging the way that they did was because of consideration of whether the edging might become a tripping hazard to someone who is walking by on the sidewalk?

A    Yes.

Q    Are you aware that Mr. Schneider testified to his understanding that if the edging came to be sticking up higher than the sidewalk walking surface, then it could be a tripping hazard?

A    Yes.

Q    Are you aware that Mr. Schneider testified that it is his employer's policy to identify and fix landscape edging that has come up out of the ground?

A    Yes.

Q    Are you aware that Mr. Schneider testified that the edging in question with respect to Ms. Ingram's fall came to within two or three inches

Tamara Ingram vs Burger King, et al.                                      Tara Amenson, Ph.D.

122

of the edge of the sidewalk?

A    Yes.

Q    As a safety professional, if you were providing a site risk assessment or safety engineering evaluation of the area in question and the property owner told you that it was aware of all these points that we have just discussed from Mr. Schneider's testimony and, again, knowing that this is in an area used by customers of the business, then would you advise the client pursuant to risk assessment standards and protocol that this is a risk that needs to be remedied?

A    So I don't dispute that this is a potential tripping hazard, and that question hasn't been asked yet, but I think it's time that we discuss it.

Q    It was coming up very soon.  You got ahead of me.  But go ahead.

A    So I don't dispute that this is a potential tripping hazard.  But to have a human's foot engage with that landscape edging in the position that it was in, 2 to 3 inches away from the pedestrian walkway edge, somebody's foot would have to be partially off the pedestrian walkway surface to

123

encounter that landscape edging.

Q    You don't disagree, though, that the defendants appreciated that this was a potential tripping hazard even before Ms. Ingram's fall according to Mr. Schneider's testimony?

A    I understand Mr. Schneider's testimony. I don't know what they appreciated.

Q    He says that's what they appreciated, right?

A    That is correct.

Q    So if you have a client as a safety professional who tells you that they appreciate these risks, would you tell them then that is a risk that needs to be remedied?

A    I would tell them that they have to establish what an acceptable level of risk is, and we can use building code to do that, we can use industry standard of care.  There's different ways you can establish what the acceptable level of risk is.

Q    In this case, if you were asked by these defendants that question, which standard would you apply?

A    I don't know because I haven't gone through all the standards to figure out which one I

124

would apply.  I haven't done that analysis.

Q    Okay.  You've done this long enough.  I appreciated your being good natured and understanding.

When performing a risk assessment analysis or safety engineering evaluation, is it relevant to know what risk assessment procedures the client is already following?

A    It can be, yes.

Q    When performing a risk assessment analysis or safety engineering evaluation, is it appropriate to assess whether those procedures are following the most current standards on how to perform risk assessments?

A    Yes, but I would say it's also important to look at historical standards, codes, and guidelines to understand what the changes are and why those changes have been made.

Q    I think what you mean by that, but because I think, that means I'm assuming.  Let me not assume.

When you talk about considering historical standards, are you talking about in that instance where we're looking back at time, judging

125

somebody's conduct at a historical point in time, then we should look at the historical standards that apply then?  Is that what you're telling me?

A    Yes.

Q    Do you mean anything else by that statement, or have I correctly interpreted it?

A    I think we can agree that's a correct interpretation.

Q    We're on the same page.  Thanks.

Guidance on performing risk assessments as well as guidance on prevention through design and redesign are publicly available in ANSI Z690.3 and ANSI Z590.3, correct?

A    I'd have to look at the titles of those standards again.  I review so many different standards with the work that I do, that I can't memorize all of the titles.

Q    Okay.  Do you agree that ANSI has put forth risk assessment guidelines?

A    I believe they have, yes.

Q    These are publicly available?

A    I'm not sure if they're publicly available, but I believe you can pay and purchase them.

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

126

Q    So a business owner such as the defendants here could purchase those guidelines?

A    I believe so.

Q    And then ANSI also publishes, and I believe it's Z590.3, but also publishes materials regarding how to design and redesign around identified hazards, correct?

A    I believe so.  There are many different industry standards and codes that recommend how to design specific features.

Q    Is that information that can be purchased by members of the public?

A    Generally speaking, yes, but I will also say within the work that I do that sometimes you have to be a member of an organization in order to purchase something.

Q    And that's what I'm getting at.  Which ones are available to anybody versus those that are available to only people who have signed up for a membership?

A    I don't know.  I mean, I tried to print off the 2015 International Building Code, and I had to do screen captures because it's a read-only version online.  I think you have to be a member or

127

pay to actually access the 2015 International Building Code.

Q    ANSI, however, makes their materials available for purchase by anybody, correct?

A    I believe so.

Q    Do you agree that the basic principles of risk assessment are to identify, analyze, and evaluate?

A    Potential hazards, yes.

Q    As a safety professional, would you agree that every business that invites large numbers of customers to its property on a daily basis needs to engage in risk assessments?

A    Sure.

Q    They need to do that with frequency?

A    I would say frequency has to be defined.

Q    How would you define an acceptable level of frequency for the type of businesses we're talking about?

A    I have not done that analysis.  I don't know.

Q    All right.  In our research, we found some discussion of why companies fail to perform risk assessments that actually manage to identify and

128

mitigate risks.  One of those suggested reasons was because regulations did not mandate the assessment.

As a safety professional, do you believe that companies, such as the defendants here, should perform risk assessments relative to customer safety, specifically, trip-and-fall risks, even if not mandated by regulation?

A    Yes, and I don't have any evidence that says they didn't do that.

Q    If a risk is known or identified that falls outside what regulations or standards cover, do you agree that the business appreciating the risk should still engage in the process of risk assessment as we have discussed it?

A    Sure.

Q    Where a risk is known or appreciated, the mere fact that a regulation or standard does not require remediation is not the end of the discussion, correct?

A    Yes.

Q    It's no excuse?

A    It's not the end of the discussion.

Q    Do you agree that companies' risk assessment procedures or practices are not always

129

effective?

A    Yes.

Q    Based on your experience, training, education, and professional affiliations, do you have any views on the why companies' risk assessment efforts don't always manage to actually identify and mitigate risks?

A    No.

Q    None?

A    We could be here for the rest of the day.

Q    We could be.  Do you have any?

A    No, not in this case.

Q    There are methodologies for performing risk assessments, correct?

A    Yes.

Q    Such as ANSI guidelines?

A    Yes.

Q    Have you analyzed in this case whether the defendants had implemented a risk assessment procedure or policy?

A    No.

Q    Have you ever analyzed whether the defendants' risk assessment procedures or policies

130

met the recommendations of ANSI or any other acceptable standards that might be out there?

A    No.

Q    Have you analyzed whether the defendants' risk assessment procedures or policies were effective?

A    I have not evaluated their risk assessment procedures.

Q    Going back to your resume.  Is there a difference between a safety engineering evaluation and an injury biomechanics investigation?

A    Yes.

Q    In simple terms, can you explain what that is?

A    I would say that a safety evaluation would be, as we discussed previously, where you evaluate what potential hazards would be.

An injury biomechanics evaluation would be determining how the injuries could occur given the incident.

Q    Let me see if we're on the same page.  My basic impression, then, is that a safety engineering evaluation, at least in the context that brings us here today, okay, would look at the area of

131

the incident and the type of activities that could reasonably be anticipated to take place there; whereas, an injury biomechanics investigation would look more at how a specific injury event occurred considering what caused the person to fall, how they fell, how they were injured, things like that.  Is that correct?

A    That's reasonable.  I mean, a safety evaluation should also consider some of the basic principles of how a person fell and where they fell, but I wouldn't expect the safety analysis to get into the evaluation of how the injuries occurred and what forces were involved and what the direction was.

Q    So an incident investigation looks at a specific incident.  A risk assessment or safety engineering evaluation looks at an area more broadly and says, what could happen when different people or different things take place here?

A    It may or may not.  It depends on the scope: If you're asked to specifically look at one area or if you're specifically asked to look at a broader range of options.

Q    I think I understand.  Thank you for working through those.

132

Did your review in the instant case include a risk assessment or safety engineering evaluation?

A    No.

Q    Did your review in the instant case include an injury biomechanics investigation?

A    Not specifically, no.

Q    Is there any significant difference between an incident analysis and an injury biomechanics investigation?

A    Okay.  So the terminology "incident analysis" is a general terminology that can be used here at SEA to evaluate numerous different types of incidents and accidents.  So it's common practice here at SEA to be broad when we first get the case in such that we call it simply an accident analysis or an incident analysis.

Oftentimes what I've seen with accident analysis is it's used in the vehicular environment.  So we have accident reconstruction as it relates to vehicles.

We use the terminology "incident analysis" here at SEA to evaluate other types of incidents that have occurred.

133

Q    As you know, one of the pertinent issues with regard to expert testimony is what type of analysis did you do or not do, what type of methodologies did you use or not use.  And so I'm trying to use the language of your resume and make sure that we are defining exactly what it is that you did and didn't do.

A    Okay.

Q    Can you cut to the punch line and tell me?

A    Yes, I can.

Q    Absolutely.  Go for it.

A    So with every case that I get, I use the scientific method to evaluate the case such that I first have to identify what the problem is, and then I have to form hypotheses, and then I have to perform the necessary research and investigation to evaluate those hypotheses and do the analysis and have some conclusions as it relates to the incident itself.  So that is standard practice within SEA, and that's what I did on this incident.

Q    All right.  What hypotheses did you look at in this case and seek to prove or disprove?

A    Okay.  So some of the hypotheses I

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

134

considered in this case were the location of the landscape edging relative to the walkway surface. That's how I initially came up with the opinion that the landscape edging is off the walkway surface. It does not protrude into the walkway surface. So I took into consideration all of the information that was provided to me in forming my hypotheses and opinions based on that.

I also considered the fact that in order for Ms. Ingram to trip over that landscape edging that was located 1, 2, 3 inches beyond the edge of the walkway surface, that she had to have some portion of her foot off the walkway surface. Whether it's in swing phase, stance phase, heel strike, toe off, she had to have some portion of her right foot off the walkway surface to encounter that landscape edging.

Furthermore, the next hypothesis that I had is what the environment was like such that there was greater than 6 feet of walkway surface available to her and the fact that she was running contributed to her inability to have maybe enough time to evaluate the walkway surface that was available to her.

135

So there's multiple hypotheses, there's multiple problems that I evaluated and considered in forming my opinions.

Q    And if there's no dispute that the edging is 2 to 3 inches away from the edge of the sidewalk, then there's no dispute about that. It's just a fact, right?

A    But it's the primary topic of discussion.

Q    Well, what I'm trying to figure out is the difference between those things that are facts in this case, and there's a few in your report we've had to correct because there wasn't a correct factual basis for them.

What I'm trying to discern between what is fact and then what you are adding as an expert that may be outside of established fact or admitted fact or even common sense.

So when it comes to that the edging didn't protrude into the sidewalk, I don't think there's any dispute about that, is there?

A    I don't know that there's a dispute, but it's obviously a primary topic of discussion related to this case such that there are industry standards

136

and guidelines and codes that may or may not talk about protrusions into the pedestrian walkway. That's where an expert comes in, and it's not just common sense.

Q    But if there's no claim that the edging protruded into the sidewalk, what else is there to say about it as an expert?

A    That the pedestrian walkway is accepted as safe, and it meets the industry recommended practice.

Q    I believe you didn't do a risk assessment or safety engineering evaluation of this case, correct?

A    I did an analysis of the entire case based on the information that I had available to me prior to writing this report.

Q    I think you told me you didn't do a risk assessment or safety engineering evaluation, correct?

A    It's a safety engineering evaluation, incident analysis. They can be the same thing.

Q    Didn't you tell me a minute ago you didn't do one here?

A    I did an incident analysis, whether you want to call it a safety engineering evaluation,

137

either one. They're very similar.

Q    I'm confused. Did you do a risk assessment or safety engineering evaluation of this site or not?

A    I did not do a risk assessment. You could say that I did a safety engineering evaluation based on the information that was provided to me, which is part of the incident analysis.

Q    Okay. Part of the information that you primarily relied upon were the photographs provided to you, correct?

A    Yes.

Q    I think you told me that those photographs aren't acceptable for you to rely on as we sit here today, correct?

A    They are acceptable for me to rely on, and that's the only information we have available based on this case, so we have to rely on them.

Q    Looking at Exhibit 6, is the edging on the left-hand side of sidewalk higher, out of the ground than the edging on the other side?

A    I have no opinion on the edging on the left-hand side of the sidewalk based on Exhibit 6. I wasn't asked to evaluate that, and I can't tell from

Tamara Ingram vs Burger King, et al.                                     Tara Amenson, Ph.D.

138

this photograph based on the shading and shadowing that's caused by the sunlight at the time of day that this image was taken whether or not that edging is higher than the right side, and I wouldn't give an opinion specifically on the edging in this -- on the right side of the sidewalk other than I can see that there's a gap between the end of the edging and the edge of the walkway surface. I can't tell if it's at the right level from this photograph.

Q    Okay. In your review of the case that brings us here today, Dr. Amenson, have you seen anything that causes you to dispute that Ms. Ingram's fall was caused by her foot coming into contact with the landscape edging in question?

A    No.

Q    Your resume lists you have expertise in human factors, safety practices, hazard identification, and warning labels, correct?

A    Yes.

Q    Would you agree that human factors pertains to the study of human abilities and limitations as related to the issues of design, safety, and performance?

A    Yes, and I wasn't asked to do a human

139

factors analysis in this matter.

Q    Okay. Does any -- do any aspects of the opinions that you have expressed in this case take into consideration human factors?

A    Well, I would say that any case that involves a human has to consider human factors.

Q    All right.

A    But to be asked specifically to do a human factors analysis would be a different opinion than what I have provided here.

Q    Okay. You're capable of doing human factors analysis, correct?

A    Absolutely.

Q    Just to help the jury understand what in the world we're talking about because human factors analysis, although it uses basic words may be a little foreign to those of us outside our fields.

I find the history of it to be helpful in understanding it. And it's my understand that human factors really took off as a field around World War II as we discovered that our pilots with fatigue and stress in the cockpit were having difficulty with the controls at times. Is that basically right?

A    Yes.

140

Q    We discovered that it's important to make the knobs different shapes and sizes and make them distinct from each other so that a pilot who's fatigued or stressed doesn't grab the wrong control and engage the wrong flight mechanism on the plane, correct?

A    Yes. I'm impressed that you know that.

Q    I told you I geek out on this stuff. I find it interesting.

Do you maintain any particular competency in the field area of human factors by virtue of your training or experience?

A    I would say that the Certified Safety Professional certification and the Associate Safety Professional certification absolutely consider human factors.

The English XL certification, so the CXLT, also has to evaluate human factors as it relates to slips, trips, and falls.

So, yes, I have several certifications that evaluate human factors and how they relate to certain safety issues.

Q    Okay. But there are different aspects of human factors analysis. There's some that focus

141

more on the psychology of human beings, others that focus maybe a little bit more on the science and --

A    Ergonomics.

Q    -- ergonomics of the body and things like that, correct?

A    Yes.

Q    Where is your particular -- based upon your education and your experience, where is your particular area of competency?

A    So given my academic background and my experience in the industry, I have the ability to have a broad range of doing human factors analyses. My public health degree allows me to do a lot of different types of analyses because it is very broad. It covers public health. That could be in a healthcare setting, that could be in a public playground for children.

So I can't think of one specific area, but I have done evaluations on ergonomics and different types of human factors as it relates to warnings, labels, psychology, human perception-reaction response time.

Q    Cool. All right.

What are some of the things that we know

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

142

from the study of human factors that applies to pedestrians, particularly walking surface pedestrians?

A    Oh, boy, that's a really broad question.

Q    Let me narrow it down.

Do pedestrians always see and perceive changes in elevation around a walkway?

A    No.

Q    That's been known for some time, correct?

A    Yes.

Q    We've known that for at least 25 years, right?

A    Probably.

Q    Do pedestrians always see things that might cause them to trip, particularly when they are in a hurry, they're busy, fatigued, stressed?

A    No, and that's why you and I both have this job.

Q    And that's something we have known for a long time, correct?

A    Yes.

Q    More than 25 years?

A    Probably.

143

Q    Particularly when going in and out of public businesses where there are a lot of other people, are pedestrians sometimes distracted?

A    Yes.

Q    They tend to be looking at the entryway or door handle, for example?

A    They could be looking at all kinds of places, including down at their cell phones.

Q    And we've known that for a long time, correct?

A    Yes.

Q    At least more than 25 years?

A    So that brings up the topic of situational awareness, which has been a term in the human factors industry for many, many years.

Q    One you used earlier?

A    Yes.

Q    Did you apply a situational awareness analysis in this case?

A    I did not.

Q    But I think you told me a moment ago that situational awareness was part of the basis of your determination that if Ms. Ingram had been walking like a normal human being instead of running,

144

that she would have seen this edging, right?

A    So there can be some crossover between biomechanics, human factors, safety engineering analysis, and we talked about earlier as well.  Such that there may be some crossover here with you want to call it an incident analysis or a safety engineering analysis or a human factors analysis or an ergonomics analysis.  I think we have some crossover here.

Q    Did you -- in doing any of your evaluation or analysis in this case, did you attempt to consider and reconcile whether Ms. Ingram might not have been able to see this edging or might not have been able to appreciate the variation in height that may have been present or may have been focused appropriately on reaching for the door handle instead of looking down, did you consider any of that?

A    So I believe Ms. Ingram's testimony is that she did not see the landscape edging before the incident occurred, but she saw it after the incident occurred.

Q    Right.  So did you -- any of those points that I just mentioned, did you take them into consideration and attempt to analyze them and

145

reconcile them or put them away?

A    I took into consideration her testimony that she did not see it, but the point I would like to make is that it was there to be seen.

Q    Well, do you recall Fred Schneider's testimony that it was not there to be seen?

A    I do recall that.

Q    So on what basis do you say it was there to be seen?

A    It's open and obvious.  There's nothing hiding it.

Q    Is that ultimately what your opinion here is that it's open and obvious?

A    No, my opinions are stated in my report.

Q    Point being, I think, and you told me this earlier, you acknowledged it.  You didn't do any evaluations on her velocity, her step length, her stride length, what her time perceptions might have been.  Any of those things, correct?

A    Yes, correct.

Can we take a break?

Q    Absolutely.

- - -

Recess taken.

146

By Mr. Oliver:

Q    Dr. Amenson, when did you first become actively involved in the field of slip-and-fall or trip-and-fall analysis?

A    I would say it goes all the way back to my undergraduate days.

Q    Is it fair to say that you took up this field more regularly when you first became employed by SEA, Ltd.?

A    No.  Because human impact biomechanics as a basis to understand human movement, you have to understand how humans walk, and my bachelor of science from Colorado State evaluated exercise and sports science such that you have to understand how somebody walks before you can understand how they run as a runner or jogger or a pole vaulter or a football player.

Q    Let's talk about SEA, Ltd.  What is your role here?

A    I'm a senior technical consultant.

Q    Is that primarily employment as a litigation consultant?

A    I would say it's probably maybe 70

147

percent litigation based, but we also do research here.

Q    What research are you involved in here?

A    I do a lot of product development research that does involve safety evaluations, risk assessments, hazard analyses.  Very random things because of my broad background.

Q    A lot of your background is in automotive racing, I mean, it's pretty cool.  We're not going to get to go over it all here, but NASCAR and Indy cars, I believe it was.

A    Right.

Q    Is a lot of your product work here still in automotive?  I think you were child safety restraint certified at one time --

A    I was.

Q    -- and different things.

A    So I wouldn't say it's primarily automotive based.  And again, just going back.  The automotive industry is where it all started, studying injury biomechanics.  That's where the history is.  That's where they really started looking at animal models and human models to understand how people are injured and what the injury thresholds are.

148

Q    Right.

A    So in an effort to study that and understand that, I did focus more on the automotive field because that's where the research was happening.

Q    Right.

A    Like I said, now we're looking at military situations where there's more research, we're looking at sports and recreational environments where they're doing more research.  So it's evolving, and there are definitely programs now in academia where you can study sports-related impact biomechanics as opposed to automotive impact biomechanics.

Q    In fact, the sports biomechanics with professional sports, NFL, major league baseball, NBA, all that being what it is and how much money is involved, that's become a huge deal, correct?

A    Are you suggesting that I change careers?

Q    I'm saying if I had your brain, that's what I would be doing, but it's up to you.

Do you know what percentage of your work as a litigation consultant has been for the defense

149

as opposed to the injured party?

A    So it really various, but over time I would say it's about 80 percent defense work and 20 percent plaintiff work.

Q    We have been provided a list of the cases in which you have given testimony before.  Have we marked that yet?

A    I don't think we have.

- - -

Thereupon, Deposition Exhibit 9 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    I marked as Exhibit 9 your list of cases and ask you to verify for the record that is your list of cases, Exhibit 9.

A    I believe it is correct.

Q    Can you identify which of those cases, if any, involved you testifying for the injured party?

A    As time goes on and the older I get, it's more difficult to do this.

The Rippetoe versus Gritts Fun Farm was on behalf of the injured party.  I think my

Tamara Ingram vs Burger King, et al.

Tara Amenson, Ph.D.

150

deposition and trial testimony, that may be the only plaintiff matter that I actually testified to.

Q    Okay.  Can you identify which of the cases listed there, if any, involved a trip and fall as distinguished from a slip and fall or other mechanism?

MR. JONES:    I'm sorry.  Slip and fall versus?

Q    I'm asking which one of those -- which of these cases involved a trip and fall.

A    I believe it's the Lucas versus Ohio Valley Medical Center was a trip-and-fall event.

Q    Any others?

A    I don't think so.

Q    Has your testimony ever been limited by the Court?

A    No.

Q    Have you ever been prohibited from testifying as an expert by the Court?

A    No.  Not that I'm aware of.

Q    That's fair.

So that we don't forget, I will mark as Exhibit 10 your Fee/Cost Summary.

- - -

151

Thereupon, Deposition Exhibit 10 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Is that what that is?

A    Yes.

- - -

Thereupon, Deposition Exhibit 11 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    And I will mark as Exhibit 11 your invoices.

Are these all of your invoices in this matter to date?

A    To date they are.  So there's work in progress that has not been invoiced.

Q    Sitting here with me now?

A    Yes.

Q    Is that an otherwise complete invoice from you?

A    So it is a complete invoice as of the date in the upper right-hand corner that says April 18, 2019, and as we discussed previously in Exhibit

152

2, I reviewed a lot of other documents after April.

Q    Do you have an invoice for your time since April?

A    I do not.

Q    Can you obtain one before we leave?

A    I don't think so because I asked for it right before my deposition, and they did not have it. So I do have my work in progress as of July 9th, 2019, $1,585.

Q    On top of --

A    On top of this, yes.

Q    Dr. Amenson, we have gone into some depth in your background and resume and work that you did here, and I think in the course of that discussion have answered several other questions that might arise, and so I'm going to leave that for another day, the remainder of that.

But I wanted to ask you about this:  Are you familiar with the work of Dr. Mary Pat Murray in the field of kinesiology and human locomotion, in particular, her research on walking patterns, gait and the way we walk?

A    The last name Murray sounds familiar.

- - -

153

Thereupon, Deposition Exhibit 12 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Hand you Exhibit 12.  One of the studies that Dr. Murray helped author was "Kinematic and EMG Patterns During Slow, Free, and Fast Walking," and I provided you a copy here as Exhibit 12.  Are you familiar with this study?

A    I don't believe I've ever read this study.

Q    It was initially published in the Journal of Orthopedic Research in 1984, correct?

A    Yes.

Q    Would you agree that this work is an authoritative source in the field of human walking?

MR. JONES:    Objection.  She said she didn't read it.

A    So as previously stated, I have not read this journal article, and it may or may not be an authoritative source.  I don't know.

Q    The Journal of Orthopedic Research is a recognized authoritative source, correct?

A    I believe it is.

154

Q    Does it require peer reviewed in order to published?

A    I'm not sure, but I would guess it probably is.

Q    And so the likelihood that this Exhibit 12 has been peer reviewed is at least pretty high, correct?

A    It's possible.  And I would also like to say that a lot of research has been done since 1984 that may contradict this research.

Q    Are you familiar with this research?

A    I am familiar with newer research, yes.

Q    Then if we see something that contradicts, you can point it out to us, correct?

A    Potentially.

Q    If you would take a look and go ahead and skim the description of the study that was done and the methods, basically the first two pages, and then I'll have some questions for you.

A    I'm not comfortable just skimming the first two pages.  So we can either take a break and I can read it --

Q    Okay.

A    Okay.  First two pages?

155

Q    The whole thing, if you want to.  It's up to you.  Whatever your comfort level is.

A    What are you going to ask me questions about?  just the first two pages?  Table 1, in particular?

Q    Uh-huh.

A    I would like to read everything up to Table 1, at least.

Q    Okay.  Let's take a break.

- - -

Recess taken.

- - -

By Mr. Oliver:

Q    Okay.

A    I have read up to the Results section, and the paragraph title is Stride Dimensions and Temporal Components, which I have read, and that refers to Table 1.

Q    Just for the record, can you identify what pages we're talking about, what you have read?

A    Pages 272 and 273.

Q    Okay.  Dr. Amenson, I notice that you requested a notebook and pen and took quite a few notes as you read, correct?

156

A    It's about a half page of notes.

Q    Is that so you can help make sure that you understand what you're reading?

A    That's because this is the first time reading this article, and I'm under the gun.  So, yes, I wrote down some notes.

Q    Can we attach your notes as Exhibit 13?

A    Sure.

- - -

Thereupon, Deposition Exhibit 13 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    So you have had a chance to review at least the introduction to what this study is about, correct?

A    Yes.

Q    Do you agree -- at least my understanding is that this study looked at normal women during slow walking, free walking, and fast walking, and then, I think, went on to try to compare those results to the walking of disabled persons; is that correct?

A    That is the general understanding.

157

There were three speeds that participants were asked to walk at.  One was defined as their own comfortable speed, the other was defined as a slow speed, and the third one was defined as fast as safely possible.

Q    The women in this study ranged in height from 161 centimeters to 170 centimeters?

A    Correct.

Q    Then Table 1, I believe, sets forth the average stride dimensions and temporal components for the women's study, correct?

A    That is the title of Table 1, yes.

Q    And is that your understanding of the type of information that's to be reflected there from this study?

A    Yes.

Q    If you look on Page 2 under the heading Results, I think it points out to us that stride length in this Table 1 is reported as the sum of two consecutive steps, correct?

A    The first sentence of the paragraph reads:  For every subject, decreases from one speed to another were accompanied by decreases in stride length (the sum of two consecutive steps), cadence, and swing time as a percent of the cycle and by

Tamara Ingram vs Burger King, et al.                                     Tara Amenson, Ph.D.

158

increases in stance time as a percent of the cycle (Table 1)."

Q    As I understand it, and tell me if I'm correct about this, stride length is the measure of two consecutive steps; whereas when we're talking about the measure of just one step, we call it step length, correct?

A    Yes.

Q    According to Table 1, at slow walking, the average stride length of two consecutive steps was 111.4 centimeters, plus or minus 3 centimeters, correct?

A    Yes.

Q    So then the step length would equate to approximately 55.7 centimeters or half the number in the table, correct?

A    I would prefer to read the rest of the article to confirm that.

Q    Okay. Let's do that.

A    Okay.

- - -

Recess taken.

- - -

By Mr. Oliver:

159

Q    Dr. Amenson, have you had an opportunity to review the rest of the report?

A    I skimmed the rest of the paper.

Q    So we said that stride length is the measure of two consecutive steps and step length is the measure of just one step, correct?

A    Yes.

Q    And so in the table what's reported is stride length or two consecutive steps, correct?

A    Yes.

Q    And so is it a fair proposition to say that one step would be roughly half the number of the two consecutive steps?

A    Yes. They did not define it in the paper, but that is reasonable.

Q    So according to the table, if it's slow walking, the average stride length of two consecutive steps was 111.4 centimeters plus or minus 3 centimeters?

A    Yes.

Q    The step length then, it's reasonable to say, would equate to approximately 55.7 centimeters or half the number in the table, correct?

A    Yes.

160

Q    And according to the table at slow walking, stride length was an average of 65 percent of the test subject's body height, correct?

A    Yes.

Q    Looking across those entries in Table 1 with free walking, the average stride length increased to 140.7 centimeters plus or minus 2.8 centimeters, and with fast walking increased to 165.9 centimeters plus or minus 3.7 centimeters, correct?

A    Yes.

Q    Likewise, the stride length as a percentage of body height increased with the speed being 85 percent of body height with free walking and 100 percent of height at fast walking, correct?

A    Yes.

Q    Based upon your education and training, does stride length tend to increase even more as we run, or is the fast walk measure being at 100 percent of body height also roughly the same with running?

A    It could be roughly the same with running.

Q    How about jogging, any difference based upon your education and training?

A    Well, it's important to evaluate the

161

velocity here too when we're talking about running versus jogging. So I would prefer to evaluate other studies that have looked at normal running speeds, normal jogging speeds to make that comparison.

Q    Okay. This study stops at fast walking?

A    Correct. Fast as safely possible.

Q    You like that definition?

A    I do.

Q    I appreciate that.

A    I do.

Q    Are you able to convert the centimeter measures that we have discussed into inches for us so that the jury might better understand the measurements?

A    I could do that.

Q    So let's focus on the entries for fast walking.

A    Okay.

Q    165.9 centimeters plus or minus 3.7 centimeters means we're working with a range of 162.2 centimeters to 169.6 centimeters, correct?

A    I'll trust your math, yes.

Q    I'm a lawyer. It's not good to trust my math. If I was good at math, I would be sitting in

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

162

the science fields.

A    That's reasonable.

Q    162.2 centimeters, if I've done it correctly, is equivalent to 63.8 inches.

A    That seems about right.

Q    And 169.6 centimeters is equivalent to 66.7 inches.

A    Okay.

Q    Does that sound right?

A    Sounds reasonable.

Q    But, again, these measurements are actually for the stride length of two consecutive steps as opposed to the step length of just one step, correct?

A    Yes.

Q    So this study tells us or suggests in Table 1 that out of a group of normal healthy women as studied by Dr. Murray and company, the average stride length of two consecutive steps at a fast walking pace was 63.8 inches to 66.7 inches?

A    Yes.

Q    So, again, we can draw from this that a single step likely had a length of around 31.9 inches to 33.35 inches?

163

A    If you say so.

Q    Does that math -- half of 63.9 and half of 66.7 would be one step?

A    Okay.

Q    Now, the study says that stride length at fast walking averages 100 percent of the individual woman's height, correct?

A    Yes.

Q    Of course that's an average?

A    Yes.

Q    Do you know how tall Tamara Ingram is?

A    I don't remember off the top of my head.

Q    I'll represent to you she's right at 5 feet tall.

A    Okay.

Q    That's 60 inches, correct?

A    Yes.

Q    Do you agree that at least this study from Dr. Murray would suggest that Ms. Ingram's stride length at fast walking for two consecutive steps would probably be about 60 inches or 100 percent of her body height?

A    That sounds about right. I haven't done the analysis myself. So I'm trusting what you're

164

telling me, and I'm following you, yes.

Q    Is it consistent with what you're seeing there and also consistent with your education and training in this field?

A    Yes.

Q    So, again, if we looked at this number for one step only, then we have a strong suggestion that at a fast walking pace, not a run but a fast walking pace, Tamara Ingram's step length would be about 30 inches. Is that fair to say?

A    I don't remember how old Tamara Ingram was either. I would want to know that because you need to evaluate the person's age and their height and their weight to make a good comparison. I mean, we can be general here and assume some things.

Q    Is age and health because, you know, look, a healthy person will stride normally or vigorously if they need to. Whereas, and I don't mean any disrespect, but we all know older people tend to shuffle a little bit and things like that. Is that part of what you're talking about?

A    Yes. And footwear contributions as well.

Q    And the testimony here is that Tamara

165

Ingram ran from her place of work next door over to the Burger King, which I'll tell you is a pretty good little distance.

A    Okay.

Q    So are you willing to assume with me that she's pretty physically able?

A    Sure.

Q    So assuming pretty physically able, average normal female, 30-inch step length sound reasonable?

A    I think that's reasonable.

Q    Step length is the distance between ground contacts of the same foot measured from heel position to heel position for one step, correct?

A    If we're going to get into a biomechanical analysis of her stance, I have not done that, and we are only using this as a reference.

Q    Okay. Well, I'm also asking you based upon your experience, education, and training, what you said you have applied in this case.

A    I do, but I have not performed that analysis on this specific incident. So these are very general hypothetical analyses that we're doing.

Q    But this question is just definition.

166

A    Okay.

Q    Is step -- am I correct that step length is the distance between ground contacts of the same foot measured from heel position to heel position for one step?

A    Yes.

- - -

Thereupon, Deposition Exhibit 14 was marked for purposes of identification.

- - -

By Mr. Oliver:

Q    Hand you what has been marked as Exhibit 14.  I'll represent to you that this was another one of the photographs taken by the investigators for the defendants showing measurements after Ms. Ingram's fall.  Was this photograph included among the photographs sent to you before you wrote your report in this case?

A    I believe so.

Q    It would be confirmed by the numbers listed on your earlier exhibit?

A    Yes.

Q    Fair enough.

Do you recall seeing this picture?

167

A    Yes.

Q    Okay.  Did you perform any analysis on this picture with regard to step length or stride length?

A    No.

Q    Do you know is there an average step length for a woman who is free walking or walking normally?

A    Yes, and I would say it depends on which literature you're referring to.

Q    I'm asking you if there is one that's kind of accepted in your field.

A    No.  It's really dependent on the resource that you're referring to.

Q    I've seen some that say 26.4 inches.  Is that one of the --

A    It seems reasonable.

Q    I think that was maybe on some of the exercise websites or something, but I don't recall correctly.

A    Okay.

Q    Looking at Exhibit 14, do you agree, Dr. Amenson, that a customer's right foot, if the customer is walking along the right-hand side of this

168

sidewalk with a 26- to 30-inch step length could come in contact with the edging?

A    Yes.

Q    Do you agree that this could happen even if the customer's actual foot contacts or foot strikes never went off the concrete?

A    Is she levitating?

Q    What do you mean?

A    Her foot never left the concrete.

Q    That was a very bad question.

Do you agree that a person's foot could come in contact with the edging even though they were otherwise always placing their foot on the concrete when they pushed off or landed?  Is that a better way of phrasing it?

A    That's better.

Q    Thank you.  Sorry about that.  It's been a long day.

A    That's okay.

Q    Do you agree that can happen?

A    Yes.

- - -

Thereupon, Deposition Exhibit 14A was marked for purposes of identification.

169

- - -

By Mr. Oliver:

Q    Let's take a look at Exhibit 14A.  This is a demonstrative exhibit.

If the black oval drawn on this photograph in Exhibit 14, which, by the way, I'll represent to you is the same photograph as Exhibit 14 but with some imagery added, do you agree that the path of travel indicated there would take this customer's foot over the end of the landscape edging in question?

A    Yes, and it would have to be off the edge of the walkway surface to do that.

Q    Although this customer's feet always landed on the concrete, correct?

A    I don't know that.

MR. JONES:    Objection, form.

Q    In the example, if each oval drawn on the photograph represented a customer's footstep, that's the hypothetical.

A    Okay.  Could you start that again now that I know we're doing a hypothetical.

Q    If the black ovals drawn on Exhibit 14A represent a customer's footsteps, do you agree that

170

the path of travel would take this customer's foot over the end of the landscape edging in question?

MR. JONES: Object to the form. You can answer.

A    Based on the diagram that's been presented to me, not knowing how big those black ovals are, if we step those black ovals through the dashed red lines that appear to be corresponding with the edge of the walkway surface and the edge of the landscape edging, it appears that a portion of the black oval would come in contact with the edge of the landscape edging and the edge of the walkway surface.

Q    Okay. So if the black oval as drawn on this photograph represented a customer's footstep, it is correct that the path of travel indicated would take the customer's foot over the end of the landscape edging in question?

A    Yes.

Q    That would happen even though the customer's actual footsteps were only on concrete as indicated in demonstrative Exhibit 14A, wouldn't it?

A    No, it wouldn't happen only if their foot was on concrete. There foot could have been on the grass as well.

171

Q    But as drawn in 14A is what I'm asking you. Those ovals are only on concrete, right?

A    No. I would argue that the oval on the right-hand side, a portion of it is over the edge of the pedestrian walkway.

Q    Okay. Is it your testimony that there is no way that a person could be stepping only on concrete and come in contact with that edging?

A    It is my opinion as stated in my report that in order for a pedestrian to encounter that walkway edging identified by the edge of the landscape edging, a portion of their foot would have to be off of the pedestrian walkway surface, which is delineated by the edge of the concrete sidewalk.

Q    And that was -- and we talked about that. That was during the swing of the leg that you thought that that would happen. What I'm trying to understand --

A    That was not my testimony.

Q    Okay. Are you saying that they would actually have to step on the edging in order to contact it?

A    What are you defining as the edging? The edge of the pedestrian walkway or the landscape

172

edging?

Q    We're talking about the landscape edging.

A    Okay. What is your question?

Q    My question is: Could a person walking toward this entryway in question step on the concrete and step on the concrete and still have their foot travel over the end of the edging in a way that it could contact the edging if the edging was above the sidewalk surface?

A    Yes, but a portion of their foot still has to be beyond the edge of the walkway surface.

Q    And that's during -- and maybe I might not be using the right term. But that's during when the foot is in its swinging motion, correct?

A    It can be at any point during the walking phase.

Q    But if they are stepping only on concrete as shown here. So they step here on concrete, right?

A    Okay. So we're going to get detailed here. Is this heel strike?

Q    Yes.

A    Okay.

173

Q    And that's toe.

A    Okay.

Q    And the foot swings, and that's heel strike and that's toe.

A    Okay.

Q    So they've only stepped on concrete, right?

A    A portion of the foot identified on the right-hand side black oval indicates that it is partially off of the walkway surface.

Q    Okay. Well, if you back it up just a hair, then it would be on the concrete, right?

A    It appears that it would be on the concrete if you moved it back.

Q    So step on concrete and step on concrete, and the foot would still travel over the end of the edging, which I think we have agreed on, right?

A    It could, yes.

Q    And it could come in contact with the edging if the edging is above the surface of the sidewalk. We've agreed on that?

A    So here's the thing. With foot clearance as we walk, there's a certain distance that

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

174

our foot clears every time we walk. Just like every time we walk, our foot slips a little bit.

As she's running, and the journal article you just produced actually talks about this, with knee flexion and hip flexion as you are running, you should be lifting your foot up higher such that it's entirely possible that if she's running, she shouldn't have even encountered that if she cut that edge because she's lifting her foot up higher than that landscape edging is and she tripped on something else.

Q    Have you done an analysis to know how high her foot would have been up?

A    No.

Q    So what I'm asking you is that is it possible that a person could step on the concrete, swing their same foot forward to step on concrete and have their foot come in contact with that edging if that edging is raised above the surface height of the sidewalk?

A    How high is the edging raised up?

Q    Let's be hypothetical and say 5 inches.

A    I don't know.

Q    Okay.  Four inches?

175

A    I don't know.

Q    Ten inches?

A    I don't know.  I haven't done the analysis.

Q    Okay.  Remember earlier when we did measurements between the red lines that had been placed on a photograph using Adobe?

A    Yes.

Q    Could you -- I'll hand you another piece of paper.  If we need to make it an exhibit, we will. But could you tell me what the step length is as indicated on that photograph?

A    Based on Exhibit 14A, I'm using the step length that was provided to me that's labeled 2.42 inches.  I think that should be feet.

Q    Remember, this is the same Adobe measurement where it comes out different, right?

A    Okay.

Q    So look at the red line along the line measure and it's got 2.42 inches also, right?

A    Yes, I see it.

Q    Comparing that distance to the measuring tape that's in the photograph, can you tell us what that step length would be?

176

A    Step length versus stride length?

Q    Uh-huh.  Step length is one step, right?

A    Right.  So it would be half of the stride length, which I don't have a tool to really measure this other than what's provided in the photograph, which is very blurry and pixilated and taken at an angle, so I am estimating my step length.

MR. JONES:    You actually mean that step length, not your step length?

A    The step length that's been provided in Exhibit 14A.

Q    Do you see -- do you agree that the red line along the measuring tape is 26 inches?

A    The red line that extends from the wall of the building onto the measurement tape, which is near the edge of the walkway, appears to have an arrow that goes to about 26 inches.

Q    And do you agree that line is the same length as the line that is drawn from the heel position of one step to the heel position of the next step on this demonstrative exhibit?

A    Yes.

Q    Indicating a heel-to-heel length of 26 inches, correct?

177

A    Yes.

Q    And that is less than what we talked about the average step length at fast walking for a normal healthy woman from Table 1 of Dr. Murray's study, correct?

A    Based on one article, yes.

Q    I think you told me that there's also 26.4 is another average number that's out there in some of the literature, right?

A    You told me that, and I agreed to it based on my understanding of the current literature.

Q    Fair enough.

So do you agree that the hypothetical steps demonstrated only for demonstrative purposes in Exhibit 14A have a step length of 26 inches?

A    Based on this photograph, yes.

Q    Neither step is off of the sidewalk other than maybe, I think you're critical of my drawing abilities, but primarily not off the sidewalk, right?

A    As you would be critical of my drawing abilities, there is a portion of the right-hand oval that is partially off of the edge of the walkway that's been provided, and this all has just been

Tamara Ingram vs Burger King, et al.                                Tara Amenson, Ph.D.

178

presented to me and I'm doing the analysis on the fly.

Q     Okay.  And that oval that's maybe a little bit off the edge of the sidewalk there -- and you make a fair point.  It's been a long day.  I think we're both being a little bit punchy with each other, and I don't mean to be.

But you could back that oval up to where it was fully on the concrete and still be under 30 inches, couldn't you?

A     I'm not sure.  I haven't done the analysis.

Q     Can you see what you think?

A     Can I have another Post-it Note, please.

Q     Yeah.  Let's make this -- I think you made some notes on it, in all fairness, so we have it later -- 14B.

- - -

Thereupon, Deposition Exhibit 14B and 14C were marked for purposes of identification.

- - -

By Mr. Oliver:

Q     I'll hand this one to you, and I put a

179

label on the back called 14C so we can keep up with it.

A     Could you please restate your question.

Q     I'm asking if you can back that oval up a little bit so that it was -- the part that you're objecting that's off the edge could be on the edge and it'd still be under 30 inches.

A     Could you give me another Post-it note that's not folded in half, or I can use my paper.  I'm trying to see through the paper.

Q     Oh, okay.  I'll tell you what.  We'll withdraw the Post-it Note as 14C and mark your paper as 14C when you get done.

A     Fair enough.

Do you have a light colored screen on your phone that I can use to put underneath it?

Q     I probably do.

A     And I'm supposed to back this up so that it's not on the pedestrian walkway?

Q     All I'm asking ultimately is if you disagree that the thing -- the point that you're objecting to about the edge of the front toe there being off the walkway a little bit, that could be backed up enough to correct that issue and we would

180

still be underneath -- at or under 30 inches.  Do you agree with that?

A     Okay.  So if we back the right black oval up to 30 inches, we could definitely make it so that it's still on the pedestrian walkway.

Q     And the path of travel still going over the edge of the landscape edging, right, the end there?

A     It's possible.

Q     Let's mark that as 14C, your piece of paper.

- - -

Thereupon, Deposition Exhibit 14C was remarked for purposes of identification.

- - -

By Mr. Oliver:

Q     As you pointed out to me, Dr. Amenson, you did not analyze this potential scenario before today, correct?

A     Correct.

Q     Is there any particular reason why not?

A     I wasn't asked to.

Q     So it was outside the scope of what you were doing in this case?

181

A     Yes.

Q     If the facts establish that Tamara Ingram did not leave the sidewalk and that her footsteps were the same or close to the same as what's indicated or what we've discussed about with 14A, would your opinions as expressed in this case change in any way?

A     Could you repeat the question?

Q     Sure.  If the facts establish that Tamara Ingram did not leave the sidewalk inasmuch as she didn't put her feet down in the grass, okay, but rather that her feet steps fell like or somewhat like what is demonstrated as a hypothetical in Exhibit 14A or backed up a little bit to 30 inches as we discussed, would that impact your opinions as expressed in this case in any way?

A     So I stand by my opinion that a portion of her foot would have to be beyond the edge of the walkway surface in order to encounter the edge of the landscape edging.

Q     Okay.  Do you think that it is unusual that a person walking down this sidewalk going along the edge of Burger King and then making these two corners to go to the door might step in the way

182

demonstrated in Exhibit 14A?

A    I would say it's not the normal pathway that pedestrians would take.

Q    Okay.  What is that based on?

A    That is based on the fact that there is not a worn surface over the grassy area indicating that pedestrians are cutting this corner and encountering the corner of the landscape edging.

Q    In our example, though, we don't have footsteps on the grass.  The footsteps are only on the concrete.  So what else would that be based on?

A    I still stand by the fact that the photo you provided to me in the Exhibit 14A, that a portion of the right side black oval is over the edge of the pedestrian walkway surface.

Q    We also said we could back it up and still be within -- at or within 30 inches.

A    That is correct.

Q    So we're talking about steps only on the concrete.  Is it abnormal or unusual that someone approaching the way that these sidewalks are designed might step such that their foot would go off -- swing outside the edge of the sidewalk?

A    It's possible that a pedestrian's foot

183

could swing beyond the edge of the sidewalk as they are traversing the walkway.

Q    And do you think that -- do you have any opinion as to whether that would be normal or unnormal for somebody to walk and approach the store that way?

A    I would say that it would be an unusual situation to walk near the edge of the pedestrian walkway such that a portion of your foot is overhanging the edge of the walkway surface.

Q    You were hired in this case by Mr. Jones by Boehl, Stopher & Graves, correct?

A    Yes.

Q    Have you ever worked with Mr. Jones or anyone in his law firm Boehl, Stopher & Graves before?

A    I have never worked with Mr. Jones before, but I have worked for other individuals at Boehl, Stopher & Graves.

Q    Do you recall how many times?

A    I don't.

Q    Have you ever provided -- have you ever before provided review analysis opinions or other work in any matter involving any of the named

184

defendants in this case?

A    No.

Q    Have you ever before provided review analysis opinions or other work in any matter involving Cincinnati Insurance before to your knowledge?

A    Not to my knowledge, but oftentimes I don't know.

Q    We've already put the exhibits in.  Can you tell me, or maybe you have to look back, what are you charging for your review for the defendants in this case?  Is it 300 and something an hour?

A    Well, my hourly rate for everything is 305, yes.

Q    So whatever you do in this case, review, analysis, testify, whatever it is, it's $305 an hour?

A    Correct.  Yes.

Q    You've already told us what your total bill is or close to is to date for the defendants?

A    Yes.

Q    Then you, I believe, are also charging us on behalf of Ms. Ingram for your time here today, correct?

A    Yes, I received a retainer for four

185

hours.

Q    The retainer was for -- was that a little over $1,200?

A    Yes.

Q    And that covers four hours?

A    Yes.

Q    Which we haven't gone beyond, but we're real close to, right?

A    That is correct.

Q    Dr. Amenson, you've been very pleasant. I greatly appreciate it.  I thank you for your time today.

MR. JONES:   I have a few questions.

- - -

DIRECT EXAMINATION

By Mr. Jones:

Q    Dr. Amenson, is it your opinion that on the date of loss in this case, which was March 4, 2017, that the premises operated by the defendant, which we're going to call Burger King, was in a reasonably safe condition?

A    Yes.

Q    Is one of the ways you can remedy a landscape trip hazard by providing a flat sidewalk

Tamara Ingram vs Burger King, et al.                                      Tara Amenson, Ph.D.

186

for someone to use to get entry into the building?

A    Absolutely.

Q    And is that what Burger King did?

A    Yes, and it's greater than 6 feet wide.

Q    You've looked at the footwear used by the plaintiff in this case, and have you compared it to size -- the measurements and the size of her feet?

A    Yes.

Q    I don't know if it requires expert testimony.  Does it look like the type of footwear one would typically use when running from Pizza Hut to Burger King?

A    Well, I'm not sure about the typical footwear that would be worn by someone running. However, what I did observe from the photographs that were provided to me of Ms. Ingram's foot with a sock on it relative to the boot-style footwear she was wearing is that there was a dimensional discrepancy between her foot size, which I want to say was about 8, 8-and-a-half inches from toe to heel, versus the boot, which was, I believe, greater than 10 inches from toe to heel.

Q    Again, can the size of whatever you put around your foot as you're making it move through the

187

travel path, can that affect, I guess, the functionality of how you walk?

A    Absolutely.  Footwear is a contributing factor to many slip, trip, and fall events.

Q    The ANSI standard of 2019 that we've been talking about that discusses the protrusion, that did not exist --

A    ASTM.

Q    ASTM.  All right.  The ASTM standard, right, that 2019 standard that discusses protrusion, it didn't exist on March 4, 2017, did it?

A    Correct.  It was published in February of 2019.

Q    Just give us a general -- what -- for you to be able to offer an opinion that, hey, this premises, this entry into Burger King, the way they've designed it is safe, reasonably safe, what qualifies you to give that opinion?

A    I would say my background in biomechanics and evaluating personal injuries, safety of environments and the impact biomechanics academic training that I have, evaluating incident scenarios, how they occur, what the outcomes could potentially be based on the incident as its described.

188

And I obtained the Certified Safety Professional certification from the Board of Certified Safety Professionals, as well as the Associate Safety Professional certification such that that focuses on evaluating potential hazards, identifying them, determining what should or should not be done to overcome them or prevent injuries or exposures from occurring based on that potential hazard.

And I also have the English XL certification, which allows me to evaluate slip, trip and fall events, which on both the ASP, CSP and CXLT certification have to be renewed periodically. The CXLT certification is -- I believe it's once every three years, and the ASP and CSP certifications are also the same.

So having said that, you have to keep up with continuing education and credits to renew those certifications such that you have to be familiar with the current industry standards, guidelines, recommendations, research to renew those certifications.

Q    The process coming up with your opinions, it sounds like you reviewed five documents:

189

One is the three standards, the ASTM standards, the ANSI standards, A-N-S-I, and the ASSE standards?

A    Correct.

Q    So that's three.  Along with the Kentucky Building Code, that's four?

A    Right.

Q    And then looked at the Paducah ordinances or Paducah Building Code?

A    Correct.

Q    All right.  Based upon your review of those five documents, along with your training and education and the photographs, that's what in part you base your opinion upon that the premises at Burger King were reasonably safe on March 4, 2017?

A    Yes.

- - -

RECROSS-EXAMINATION

By Mr. Oliver:

Q    Dr. Amenson, we went through your written report and identified the four opinions set forth there.  I didn't see one that opined that the premises themselves were in reasonably safe condition.  Which one says that?

A    The fourth opinion states:  Burger King

**190**

followed industry recommended practices for safe pedestrian walkways by having a maintenance procedure that included periodic walkway checks and cleanups.

So within that, I'm talking about safe pedestrian walkways. There's no specific opinion that says this walkway was reasonably safe.

Q    Okay. And in order to look at an area such as a sidewalk and the landscaping area in question and arrive at a conclusion about whether that area is reasonably safe and presents a reasonably safe condition, wouldn't you be doing a risk assessment or safety engineering evaluation?

A    You could, or you could also look at what the industry standard of care is and what the code requirements are such that if there's no code requirement to not have landscape edging in that location, it's accepted in the industry as reasonably safe.

Q    Okay. In your earlier testimony didn't you tell me that just because there's not a code requirement or a standard doesn't mean that something is not a hazard that needs to be remedied?

A    It's possible that something needs to be remedied even if there isn't a code related to it,

**191**

but it's not mandatory based on law.

Q    It's not a complete risk assessment or a complete safety engineering evaluation to simply look at and only look at standards and building codes, is it?

A    It could be. It depends on what you're looking at.

Q    But if there can be hazards present that are not addressed by regulations or standards, then how can we just stop at looking at the regulations and standards?

A    Because we have to evaluate what the industry recommended practice is. And as I stated previously, even if we look at the industry practices, they cannot prevent against all potential injuries or exposures from occurring.

So as safety engineers, we do the best we can to design things, to manufacture, to produce things such that we will not cause exposures or injuries to occur in the human population. But it definitely happens.

Q    Okay. But regardless, in this case, you're not claiming to have done a risk assessment or safety engineering evaluation or at least not beyond

**192**

just looking at the ASTM, ANSI, and ASSE standards, right, and the building ordinances?

MR. JONES:    And the pictures.

A    I would say that I did not perform a risk assessment.

In terms of a safety engineering analysis, that could be equally considered the same as an incident analysis. We call it an incident analysis here at SEA as part of a forensic investigation. It could also be referred to as a safety engineering analysis in a different environment.

Q    And then you gave Mr. Jones the opinion as we sit here today that the premises in question on the date in question was in reasonably safe condition, correct?

A    Yes.

Q    I believe you told me earlier that a safety assessment would conclude that that edging, landscape edging was a tripping hazard, correct?

A    Yes.

Q    You can have a tripping hazard in an area, but still be a reasonably safe area?

A    Yes.

**193**

Q    I thought that's where we were going.

And that is back to the issue then of risk tolerance is what I want to call it, but I don't think that's the technical term. Can you help me out there?

A    Well, a risk assessment would be evaluating the entire environment for exposure to potential hazards.

Q    So you can opine that this was a reasonably safe area even though there was a hazard, tripping hazard within it because part of the analysis also considers whether the risk presented is an acceptable risk or an unacceptable risk?

A    Yes.

Q    But you haven't done an analysis of whether this risk was acceptable or unacceptable, correct?

A    I've done enough of an incident analysis to know what the code requires and what the industry recommended practices were at the time of the incident in 2017.

So the new code -- I'm sorry. The new standard, the ASTM F1637-19, was not even available at the time this incident occurred in 2017.

194

So it's incorrect to try to apply the 2019 standard to an event that occurred in 2017 because it didn't exist.

Q    Okay.

A    So based on my incident analysis of the applicable codes and industry recommended practices, this area where the incident occurred was reasonably safe based on all of the information that I reviewed and my own research investigation.

Q    Okay.  I thought earlier when I tried to ask you what are the guidelines or how do we do a determination of whether something's an acceptable risk or not, you couldn't tell me because it depended on which one's applied?

A    In terms of industry standard of care?

Q    Yes.

A    Yes.

Q    Which ones did you apply here?

A    The ASTM F1637-13 standard and the International Building Code and the Kentucky Building Code.

Q    And ASTM F1637 was in existence at the time that this sidewalk was designed, and also at the time that the landscaping was installed, correct?

195

A    I'm not sure I know really when the landscaping was installed.  I thought I saw a date of 1999.

Q    Okay.  I believe that this particular standard, F1637, goes back to the nineties, doesn't it, when it was originally put together?

A    I might be able to tell you that.

All right.  F1637-13 in the bottom left-hand corner states that it was originally approved in 1995.

Q    Okay.  And then it has been updated or modified periodically as time went on, correct?

A    As most ASTM standards are.

Q    And I think you told me earlier in your testimony that just because a standard hasn't stated something or caught up with something doesn't mean that the proposition is true or untrue, correct?

A    Yes.

Q    And I believe you told me that you saw Mr. Schneider's deposition that at least these defendants knew that something such as landscape edging placed close to the edge of a sidewalk could be a risk, correct?

A    Yes.

196

Q    I think you told me in doing risk assessments and safety engineering evaluations, that it's pertinent to take into consideration what the owner of the property knows about its own risks, correct?

A    Yes.  And I would like to point out that the ASTM F1637 standard, Section 1.2 specifically states that conformance with this practice will not alleviate all hazards.  However, conformance will reduce certain pedestrian risks.

Q    I think there's also verbiage in those scope definitions there, 1.1, 1.2, 1.3, 1.4, something to the effect of, hey, just because we've written this here doesn't mean that's the end of your inquiry, property owner.  Is that fair?

A    That's a generalization, but yes.

Q    So if these defendants already knew about the risk of items placed near the edge of a sidewalk, if the ASTM standard has been in place in some form since 1995, if it is true that just because it hasn't yet been modified to specifically state something, that doesn't mean that proposition's not true.  And if we are saying that, you know, this scope of this standard itself says this isn't meant

197

to cover everything.  So if all those things are true, okay, then in what way did your application of some methodology or standard bring you around to the conclusion that the recognized tripping hazard in this case was at an acceptable level?

A    Because it is not in any code requiring that hazard to not be in that location.

Q    Anything else?

A    No.

Q    Okay.  But you didn't do an analysis to see if someone as set forth in Exhibit 14A could step on the sidewalk and only on the sidewalk and still have their foot come in contact with the edging?

A    I did not do that analysis.

Q    You mentioned your English XL certification as part of your overall background and understanding that would help you in this case, I believe.

A    Yes.

Q    Isn't that actually a certification with regard to use of a tribometer?

A    Well, it's a very nice certification in the sense that it doesn't just evaluate the English XL Tribometer, but it provides history of different

Tamara Ingram vs Burger King, et al.                                    Tara Amenson, Ph.D.

198

tribometers, different walkway surfaces and how we came up with the reference surfaces to evaluate slip resistance.

Q    Tribometers measure slip resistance, correct?

A    Yes.

Q    Is there a testing instrument in your field that would be applicable to this type of trip and fall?

A    No.

Q    Okay.  What about good old fashion measuring sticks?

A    What about them?

Q    Well, we've used some photographs here already that have measurements in them.  That's an old fashion tool that can be used in a trip and fall, correct?

A    Yes.

Q    But not technical or special to your field would be the difference, right?

A    Correct.

Q    Okay.  A level could be used?

A    You could evaluate the level of the surface, yes.

199

Q    Maybe some kind of square or something that could tell you the degree of an angle?

A    If we want to get really technical, we could use a FARO scanner and do a 3D laser scan of the entire surface.

Q    So there is a technical tool that can be used?

A    It's a technical tool that can be used broadly.  It's not specific to trip events.

Q    What would it do?

A    The FARO scanner?

Q    Yes.  Completely not familiar with it.

A    The FARO scanner is a 3D laser system that essentially sends a laser out from the device and it bounces off of all the surfaces and it collects that data such that it will give you an X, Y, and Z coordinate in space.

So you have a reference space, and the laser collects the data in that reference space such that we can actually use that digital data to take measurements from it.

Q    So then we wouldn't have the problem where we're having to pull out sticky notes and measure things, right?

200

A    Right.  We would have a three-dimensional model.

Q    And we would be able to analyze it in a lot more detail how this fall might have happened, correct?

A    Yes, absolutely.

Q    Did you use that instrument in this case?

A    No.

Q    Have you used that instrument in trip-and-fall cases in the past?

A    I think so.

Q    Why was it not used here?

A    Wasn't asked to do it.

Q    Did you make it known that it was an option?

A    No.

Q    Why not?

A    Didn't even have a chance to inspect it and didn't feel that it would be relevant at this point in time given the scope of the work.

Q    I believe you testified that you concluded that there was a dimensional discrepancy between Ms. Ingram's bare feet as photographed by

201

defendants' counsel and her boot as photographed by defendants' counsel, correct?

A    Yes.

MR. JONES:    If I said bare feet, I think she's got socks on.

Q    The picture of the boot is measured from the outside sole, correct?

A    I believe so.

Q    Do you have any knowledge, education, experience, or training that tells you whether or not the correct way to measure whether a shoe fits is from the outside sole or from the inside?

A    Well, as I worked at a bicycle shop and we have cycling shoes that clip into bicycles, I actually did have to evaluate people's feet and the fit with a bicycle shoe.

Q    Good.  All right.

Do we have any measurements here that allow us to a scientific degree of acceptability to make any conclusions about whether or not this boot was the right size for Ms. Ingram?

A    I think we could do that.  I haven't done that analysis, but we could

Q    You haven't done it before now?

**202**

A    Not in this case.

Q    All right.  I think those are all my questions.

Anything else?

MR. JONES:  No.

Q    Dr. Amenson, thank you.

- - -

Thereupon, Deposition Exhibit 15 was marked for purposes of identification.

- - -

(Signature not waived.)

- - -

Thereupon, at 1:21 p.m., on Friday, July 12, 2019, the deposition was concluded.

- - -

**203**

A F F I D A V I T

State of            :

SS:

County of           :

I, Tara T. Amenson, Ph.D., do hereby certify that I have read the foregoing transcript of my deposition given on Friday, July 12, 2019; that together with the correction page attached hereto noting changes in form or substance, if any, it is true and correct.

_____
Tara T. Amenson, Ph.D.

I do hereby certify that the foregoing transcript of the deposition of Tara T. Amenson, Ph.D. was submitted to the witness for reading and signing; that after she had stated to the undersigned Notary Public that she had read and examined her deposition, she signed the same in my presence on the _____ of _____, 2019.

_____
Notary Public

My Commission Expires _____.

- - -

**204**

CERTIFICATE

STATE OF OHIO      )
                   )  SS:
COUNTY OF MADISON  )

I, Denise L. Shoemaker, a Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named Tara T. Amenson, Ph.D. was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the deposition then given by her was by me reduced to stenotype in the presence of said witness, afterward transcribed upon a computer; that the foregoing is a true and correct transcript of the deposition so given by her; that the deposition was taken at the time and place in the caption specified and was completed without adjournment; and that I am in no way related to or employed by any attorney or party hereto, or financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at London, Ohio, _____ day of July 2019.

*Denise L. Shoemaker*
Denise L. Shoemaker,
Notary Public-State of Ohio
My Commission Expires:  January 27, 2023.

- - -



7001 Buffalo Parkway
Columbus, OH 43229
614.888.4160 • 800.782.6851
Fax 614.885.8014
www.SEAlimited.com

March 29, 2019

Boehl Stopher & Graves, LLP
Attention: Mr. Edwin A. Jones
410 Broadway
Paducah, KY 42001

            Re:    Incident Analysis
                   Tamara Ingram v. Burger King #11281, et al.
                   Commonwealth of Kentucky, McCracken Circuit Court
                   Civil Action No. 18-CI-00150
                   S-E-A Matter No. 01.094175

Dear Mr. Jones:

You have requested that SEA, Ltd. (S-E-A) Senior Technical Consultant Tara T. Amenson, Ph.D., provide investigative and consultation services relative to the above-referenced matter. As part of her investigation, Dr. Amenson reviewed provided discovery materials including, but not necessarily limited to, Complaint; deposition transcripts and exhibits of Earl Christian, Tamara Ingram, and Sherrice Key; and photographs of the incident site. Dr. Amenson also researched applicable ASTM, ANSI, and ASSE standards related to pedestrian walkway safety.

According to the discovery information provided, the subject incident occurred around 11:00 a.m. on March 4, 2017 near the entrance to the Burger King restaurant located at 3226 Irvin Cobb Drive in Paducah, Kentucky. Ms. Tamara Ingram reportedly injured her face, wrist/arm, and other body parts when she tripped about 5 feet in front of the entrance. Based on the provided color photographs, there is black plastic landscape edging with a rolled top edge separating the grass from the red lava rock soil cover. The landscape edging does not extend all the way to the edge of the sidewalk but ends about 2 to 4 inches before the sidewalk edge. Based on the provided evidence, **the landscape edging to the right side of the entrance did not protrude into the pedestrian walkway.**

Ms. Ingram testified that she ran across the parking lot, from the Pizza Hut where she was working, to the Burger King next door, and as she approached the Burger King entrance, her right foot tripped on the landscape edging about 10 to 12 inches away from the edge of the



EXHIBIT

Mr. Edwin A. Jones
March 29, 2019
Page 2

sidewalk. Based on the provided photographs, the pedestrian walkway was measured to be about 6 feet wide in front of the entrance. For Ms. Ingram to trip over the landscape edging in the location that she testified to, she would have to be traveling a pathway outside the provided 6-foot-wide pedestrian walkway. The provided evidence indicates that the landscape edging is normally maintained such that the rolled top edge is flush with the ground but after the incident occurred, the rolled top edge was raised above the ground plane. Ms. Ingram testified that it was a beautiful sunny day when the incident occurred. Based on the provided evidence, Ms. Ingram chose to run towards the Burger King entrance and her right foot was not on the pedestrian walkway when the trip event was initiated. Ms. Ingram's view of the Burger King entrance was not obstructed by weather conditions or other invitees. Had Ms. Ingram walked normally to the Burger King entrance, she would have had ample opportunity to discern the walkway environment and could have safely traversed the sidewalk such that she would not have encountered the landscape edging located outside the provided pedestrian walkway.

Mr. Earl Christian, maintenance technician, testified that when he arrived onsite within an hour after the incident occurred, the landscape edging was pulled up, it isn't ordinarily sticking up, and he fixed it by reseating the edging such that the rolled edge was just above the ground. Mr. Christian further testified that the landscape edging had been there at least seven years, he visited the subject restaurant two or three times a week for maintenance, and this incident was the first time he had ever seen the edging raised up. The testimonial evidence from Mr. Christian and Ms. Sherrice Key, Burger King Manager at the time of the subject incident, indicates that Burger King had a maintenance program that included 'travel path' surveys. The travel path procedures included walking the premises, at regular intervals, to inspect and clean up the area. There is no evidence that Burger King had any notice of the landscape edging being elevated before Ms. Ingram's incident and there were no witnesses that saw Ms. Ingram trip and fall. Based on the testimonial evidence of Burger King's employees, Burger King followed industry recommended practices for safe pedestrian walkways by having a maintenance procedure that included periodic walkway checks and clean ups.

S-E-A hereby certifies the opinions and conclusions expressed herein have been formulated within a reasonable degree of professional certainty. They are based upon the application of reliable principles and scientific methodologies to all the facts known by S-E-A when this report was issued, as well as knowledge, skill, experience, training, and/or education. Should additional information be discovered, S-E-A reserves the right to appropriately amend or augment these findings.

Report Prepared By:

*Tara T. Amenson*

Tara T. Amenson, Ph.D.
Senior Technical Consultant

Report Reviewed By:

Paul W. Dorothy, Ph.D.
Senior Technical Consultant

01.094175 Ingram v. Burger King

Documents reviewed by Amenson before report authored on 3/29/19

- Complaint
- Provided color photographs number IMG_8003 through 8007
- Provided black and white photographs 000522 through 000535
- Provided black and white photographs 000619 through 000644
- Deposition transcript and exhibits of
  - Sherrice Key taken on January 29, 2019
  - Tamara Ingram taken on January 29, 2019
  - Earl Christian taken on March 4, 2019


Documents reviewed by Amenson after report authored on 3/29/19

- Deposition transcript and exhibits of
  - John Drury taken on May 28, 2019
  - Larry Nelson taken on May 28, 2019
  - Fred Schneider taken on May 28, 2019
  - Cathy Boer taken on March 4, 2019
  - Joe Neikirk taken on March 4, 2019
  - Karen Suggs taken on January 29, 2019
- Expert report of Clay Barnes dated May 13, 2019
- Provided color photographs of Ms. Ingram's foot and footwear

References:
- ASTM F1637-13 and -19 Standard Practice for Safe Walking Surfaces
- DiPilla, S., "Slip, Trip, and Fall Prevention: A Practical Handbook," Revised Second Edition, 2010, CRC Press, pp. 71-72 and 313-314
- Oly Ola website
- 2015 International Building Code, Chapter 10: Means of Egress adopted by the Kentucky Building Code
- Paducah, Kentucky Code of Ordinances website



EXHIBIT

2



EXHIBIT

tabbies'

SIU Photo: Edging is approx. 5 feet from building- 2 of 2

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000630

SIU Photo: Edging is approx. 5 feet from building- 2 of 2

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000630



tabbles*

EXHIBIT

3A



SIU Photo: Edging is approx. 5 feet from building- 2 of 2

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000630

EXHIBIT

tabbies









Yellow Box: Indicates approx. location of claimant as observed by Sherrice Key.

Blue Pen- The claimant told the manager she tripped over the edging in the area indicated by the point of the pen.

SIU Photo: Info from Sherrice Key (SIU notes included)

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000622

EXHIBIT

4



Yellow Box: Indicates approx. location of claimant as observed by Sherice Key.

Blue Pen- The claimant told the manager she tripped over the edging in the area indicated by the point of the pen.

SIU Photo: Fall area (SIU notes included)

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000624

tabbles
EXHIBIT



SIU Photo: Entrance on south side of building

**BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000620**

EXHIBIT

6



SIU Photo: Entrance on south side of building

**BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000620**

EXHIBIT

6A



SIU Photo: Approx. example of how Key found edging on DOL-1

**BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000626**

EXHIBIT

7



7001 Buffalo Parkway
Columbus, Ohio 43229
614.888.4160 · 800.782.6851
Fax 614.885.8014
www.SEAlimited.com

## Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPST, CPSI, CXLT

*tamenson@SEAlimited.com*

### Education

*Wayne State University*
Ph.D.
Biomedical Engineering
2008

*Detroit, Michigan*

*Wayne State University*
Master of Science
Biomedical Engineering
2007

*Detroit, Michigan*

*Northwest Ohio Consortium for Public Health*
Master of Public Health
Healthcare Administration and Management
2003

*Toledo, Ohio*

*Colorado State University*
Bachelor of Science
Exercise and Sport Science
Concentration: Sports Biomechanics and Athletic Training
2000

*Fort Collins, Colorado*

### Experience

**Senior Technical Consultant**
*SEA, Ltd.*

**2017 to Present**
*Columbus, Ohio*

**Technical Consultant**
*SEA, Ltd.*

**2014 to 2017**
*Columbus, Ohio*

Responsible for safety engineering evaluations, incident analyses, and injury biomechanics investigations involving products, premises, equipment, worksites, vehicles, and pedestrians. Expertise in human factors, safety practices, hazard identification, and warning labels. Performs biomechanical analyses of injury mechanisms and their relationship to accident sources including slip, trip, and fall events, playground and family fun center activities, swimming pools,



EXHIBIT

tabbies

Professional Resume
Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPST, CPSI, CXLT (2/2019)                    Page 2

and exercise facilities.  Applies research from industry recommended practices, consensus standards, codes, and regulations to evaluate incidents.

**Research Scientist**                                                      2008 to 2014
*TRC, Inc., for NHTSA VRTC*                                          *East Liberty, Ohio*
Contracted Research Scientist in the biomechanics and crashworthiness research divisions. Coordinated and implemented the ongoing research required to amend FMVSS No. 213 to improve the representative rear seat cushions during sled testing.  Performed FMVSS No. 225 research to improve the ease of use for lower anchorages and tethers (LATCH) in child restraint systems.  Brain rotational injury criterion (BRIC) research using crash dummies and dynamic impact devices.  Sled test and full-scale crash test experience with instrumented post-mortem human subjects and crash test dummies.  Technical and administrative management of safety projects, including proposal preparation, project budgeting, test plan development, data collection and analysis, report writing, and presentation of results to management.

**Test Engineer**                                                          2008 to 2008
*MGA Research*                                                          *Troy, Michigan*
Responsible for dynamic impact testing on automotive, sports, and military products.

**Independent Safety Consultant**                                          2008 to 2008
*NASCAR Research and Development Center*                        *Concord, North Carolina*
Evaluated crash data, safety devices and systems, including field data from crash events.

**Academic Research Experience**                                          2003 to 2008
*Wayne State University*                                              *Detroit, Michigan*
Dissertation research focused on spinal injury causation and mitigation during frontal impacts in Indianapolis-type racing cars.  MADYMO Race Car Driver Model (RCDM) development and validation using real world crash pulses.

**Corporate Health and Fitness Advisor**                                  2001 to 2003
*Harris Health Trends, Inc.*                                          *Toledo, Ohio*
Designed and implemented corporate wellness programs to improve health, reduce the risk of injury, and prevent or control disease through exercise and fitness.

**Personal Fitness Trainer**                                              2000 to 2001
*24 Hour Fitness*                                                    *Las Vegas, Nevada*
*AXIS Performance Center*                                          *Menlo Park, California*
American College of Sports Medicine (ACSM) Certified Personal Trainer, with the ability to develop safe and effective customized personal health and fitness programs using biomechanics and functional exercise principles.  Coordinated and instructed group pilates/yoga and cycling/spinning classes.

**Exercise Science Research Assistant**                                    1997 to 2000
*Colorado State University*                                        *Fort Collins, Colorado*
Performed research activities related to exercise and sport science, sport psychology, biomechanics, kinesiology, and athletic training as an undergraduate student.

Professional Resume
Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPST, CPSI, CXLT (2/2019)

Page 3

## Bicycle Sales Associate and Mechanic
*Bikeworks*                                                    **1994 to 1997**
*Rock 'N Road Cyclery*                                         *Sylvania, Ohio*
                                                              *Fort Collins, Colorado*
Responsible for addressing customer needs by assisting with bicycle selection and fit. Also advised customers to purchase safety products to enhance their visibility on the road. Performed basic bicycle maintenance procedures as a mechanic.

## Honors
2006 - Society of Automotive Engineers (SAE), Ralph H. Isbrandt Automotive Safety Engineering Award

## Certifications
Certified Safety Professional (CSP), Board of Certified Safety Professionals, Certification No. CSP-30083, Certification received June 20, 2015
Associate Safety Professional (ASP), Board of Certified Safety Professionals, Certificate No. ASP-20104, Certification received December 6, 2014
Certified Child Passenger Safety Technician (CPST), Safe Kids Worldwide, Renewal Certification received biannually between 2007 and 2019, Certification No. T649989
Certified Playground Safety Inspector (CPSI), National Recreation and Park Association, Certificate No. 43230-1021, October 1, 2015 through 2021
Professional Association of Diving Instructors (PADI) Open Water Diver certified
Certified XL Tribometrist (CXLT), Excel Tribometers, Certification No. 1606604, Certification received June 29, 2016

## Publications
Kloppenborg N., Amenson T., Wernik J., Wiechel, J., "Vehicle and Occupant Response in Low-Speed Go-Kart Crash Tests," ASME 2015 International Mechanical Engineering Congress and Exposition, American Society of Mechanical Engineers, IMECE2015-53585, 2015

Amenson, T., and Sullivan, L.K., "Dynamic Evaluation of LATCH Lower Anchor Spacing Requirements and Effect of Tether Anchor Location on Tether and Lower Anchor Loads," *NHTSA/USDOT Research Report*, Docket No. NHTSA-2014-0123, December 2013

Rhule, H., Suntay, B., Herriott, R., Amenson, T., Stricklin, J., and Bolte, J., "Response of PMHS to High- and Low-Speed Oblique and Lateral Pneumatic Ram Impacts," *Stapp Car Crash Journal*, Volume 55, pp. 281-315, 2011

Amenson, T., Xu, G., Brown, P. and Salaani, K., "CrashStar: A post-processing program for chestband data analysis," proceedings of the 37th *International Workshop on Human Subjects for Biomechanical Research*, November 2009

Amenson, T., Begeman, P., Melvin, J., and Grimm, M., "Development of the MADYMO Race Car Driver Model for Frontal Impact Simulation and Thoracolumbar Spine Injury Prediction in Indianapolis-type Racing Car Drivers," *SAE Motorsports Engineering Conference*, Society of Automotive Engineers (SAE) Paper 2008-01-2975, 2008

Professional Resume
Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPST, CPSI, CXLT (2/2019)

Page 4

Troxel, T., Melvin, J., Begeman, P., and Grimm, M., "Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers," *SAE Motorsports Engineering Conference,* Society of Automotive Engineers (SAE) Paper 2006-01-3633, 2006

Begeman, P., Melvin, J. and Troxel, T., "Frequency Response and Coupling of Earpiece Accelerometers in the Human Head," *SAE Motorsports Engineering Conference,* Society of Automotive Engineers (SAE) Paper No. 2006-01-3657, 2006

## Professional Affiliations

American Society of Safety Professionals (ASSP)
> Central Ohio Chapter
>> Chapter Delegate 2018 – 2019
>> President 2017 – 2018
>> Vice President 2016 – 2017

International Council of Motorsports Sciences (ICMS)
> Member, Board of Directors, April 2017 – December 2020

American Society for Testing and Materials (ASTM)  - Committee Member
> F08 Sports Equipment, Playing Surfaces, and Facilities
> F15 Consumer Products
> F13 Pedestrian/Walkway Safety and Footwear
> F24 Amusement Rides and Devices
> F27 Snow and Water Sports
> D13.63 Committee on Bath Mats

Society of Automotive Engineers (SAE) 2004 – 2018
Human Factors and Ergonomics Society (HFES) 2019

## Seminars and Additional Education

- 2018 – International Council of Motorsports Sciences, Annual Congress
- 2018 – Ohio Child Passenger Safety Conference
- 2017 – American Society of Safety Engineers, Safety 2017 Conference
- 2017 – International Council of Motorsports Sciences, Annual Congress
- 2017 – Mitigating Risk of Legionella Bacteria webinar, presented by EVAPCO, Baltimore Aircoil Company, and SPX Cooling Technologies
- 2016 – Ohio Bureau of Workers' Compensation, "Powered Industrial Trucks, Developing a Training Program"
- 2016 – International Council of Motorsports Sciences, Annual Congress

## Courses Taught/Presentations

- "Keeping Your Defense Afloat:  Biomechanics in a Fluid Environment," Defense Research Institute, Recreational Products session, San Diego, California, February 7-9, 2018
- "Prevention and Analysis of Back Injury Claims:  Did We Really Cause All This Damage?" National Retail and Restaurant Defense Association, General Session Dallas, Texas, October 2017
- Amenson, T., and Dunn, A., Utilizing Cutting-Edge Forensic Visual Technology to Defend Your Case, Transportation Lawyers Association 2017 Annual Conference, Santa Fe, New Mexico, April 2017
- Amenson, T., Spinal Motion During Race Car Driver Extrication, International Council of Motorsports Sciences 2016 Annual Congress, Indianapolis, Indiana, December 2016

Professional Resume
Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPST, CPSI, CXLT (2/2019)

Page 5

- Amenson, T., Women in Engineering Summer Program, sponsored by The Ohio State University, Honda, and Transportation Research Center, June 2010
- Amenson, T., CrashStar: A post-processing program for chestband data analysis, 2009 NHTSA Injury Biomechanics Workshop, Savannah, Georgia, November 2009
- Troxel, T., Dynamic Response of Child Passenger Safety, 2008 Ohio Occupant Protection Conference, Newark, Ohio, July 2008
- Troxel, T., Development of the MADYMO Race Car Driver Model for Frontal Impact Simulation and Thoracolumbar Spine Injury Prediction in Indianapolis-type Racing Car Drivers, International Council of Motorsports Sciences 2008 Meeting, Indianapolis, Indiana, July 2008
- Troxel, T., Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers During Frontal Impacts, Wayne State University Biomedical Engineering Center Open House, Detroit, Michigan, April 2008
- Troxel, T., Biomechanical Analysis of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers During Frontal Impacts, Wayne State University Biomedical Engineering Center, Public Ph.D. Dissertation Defense, Detroit, Michigan, April 2008
- Troxel, T., Guest Lecture- Public Health Senior Seminar Series- Road Traffic Injury Control and Prevention-Northwest Ohio Consortium for Public Health, Toledo, Ohio, February 2007
- Troxel, T., Critical Review of SFI Specification 38.1: Head and Neck Restraint Systems, SAE Motorsports Conference, Dearborn, Michigan, December 2006
- Troxel, T., Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers during Frontal Impacts, SAE Motorsports Conference, Dearborn, Michigan, December 2006

## Selected Report Titles

*The following reports are for NHTSA-USDOT, Vehicle Research and Test Center, unless noted:*

"Evaluation of LATCH Usability Procedure," November 2013
"Frontal Sled Tests to Measure and Evaluate Loads on Child Restraint Anchorages," 2013
"LATCH Frontal Sled Tests to Assess Lower Anchor Load Requirements," 2013
"Hybrid III 95th Male PADI User's Manual," 2010



7001 Buffalo Parkway
Columbus, Ohio 43229
614.888.4160 • 800.782.6851
Fax 614.885.8014
www.SEAlimited.com

# Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPSI, CXLT
*tamenson@SEAlimited.com*

## Education

*Wayne State University*
Ph.D.
Biomedical Engineering
2008

*Detroit, Michigan*

*Wayne State University*
Master of Science
Biomedical Engineering
2007

*Detroit, Michigan*

*Northwest Ohio Consortium for Public Health*
Master of Public Health
Healthcare Administration and Management
2003

*Toledo, Ohio*

*Colorado State University*
Bachelor of Science
Exercise and Sport Science
Concentration: Sports Biomechanics and Athletic Training
2000

*Fort Collins, Colorado*

## Experience

**Senior Technical Consultant**
*SEA, Ltd.*

**2017 to Present**
*Columbus, Ohio*

**Technical Consultant**
*SEA, Ltd.*

**2014 to 2017**
*Columbus, Ohio*

Responsible for safety engineering evaluations, incident analyses, and injury biomechanics investigations involving products, premises, equipment, worksites, vehicles, and pedestrians. Expertise in human factors, safety practices, hazard identification, and warning labels. Performs biomechanical analyses of injury mechanisms and their relationship to accident sources including slip, trip, and fall events, playground and family fun center activities, swimming pools,


EXHIBIT
8A

and exercise facilities. Applies research from industry recommended practices, consensus standards, codes, and regulations to evaluate incidents.

## Research Scientist

*TRC, Inc., for NHTSA VRTC*                                               **2008 to 2014**
*East Liberty, Ohio*

Contracted Research Scientist in the biomechanics and crashworthiness research divisions. Coordinated and implemented the ongoing research required to amend FMVSS No. 213 to improve the representative rear seat cushions during sled testing. Performed FMVSS No. 225 research to improve the ease of use for lower anchorages and tethers (LATCH) in child restraint systems. Brain rotational injury criterion (BRIC) research using crash dummies and dynamic impact devices. Sled test and full-scale crash test experience with instrumented post-mortem human subjects and crash test dummies. Technical and administrative management of safety projects, including proposal preparation, project budgeting, test plan development, data collection and analysis, report writing, and presentation of results to management.

## Test Engineer

*MGA Research*                                                            **2008 to 2008**
*Troy, Michigan*

Responsible for dynamic impact testing on automotive, sports, and military products.

## Independent Safety Consultant

*NASCAR Research and Development Center*                                   **2008 to 2008**
*Concord, North Carolina*

Evaluated crash data, safety devices and systems, including field data from crash events.

## Academic Research Experience

*Wayne State University*                                                   **2003 to 2008**
*Detroit, Michigan*

Dissertation research focused on spinal injury causation and mitigation during frontal impacts in Indianapolis-type racing cars. MADYMO Race Car Driver Model (RCDM) development and validation using real world crash pulses.

## Corporate Health and Fitness Advisor

*Harris Health Trends, Inc.*                                              **2001 to 2003**
*Toledo, Ohio*

Designed and implemented corporate wellness programs to improve health, reduce the risk of injury, and prevent or control disease through exercise and fitness.

## Personal Fitness Trainer

*24 Hour Fitness*                                                         **2000 to 2001**
*Las Vegas, Nevada*
*AXIS Performance Center*
*Menlo Park, California*

American College of Sports Medicine (ACSM) Certified Personal Trainer, with the ability to develop safe and effective customized personal health and fitness programs using biomechanics and functional exercise principles. Coordinated and instructed group pilates/yoga and cycling/spinning classes.

## Exercise Science Research Assistant

*Colorado State University*                                               **1997 to 2000**
*Fort Collins, Colorado*

Performed research activities related to exercise and sport science, sport psychology, biomechanics, kinesiology, and athletic training as an undergraduate student.

## Bicycle Sales Associate and Mechanic

*Bikeworks*

*Rock 'N Road Cyclery*

**1994 to 1997**

*Sylvania, Ohio*

*Fort Collins, Colorado*

Responsible for addressing customer needs by assisting with bicycle selection and fit. Also advised customers to purchase safety products to enhance their visibility on the road. Performed basic bicycle maintenance procedures as a mechanic.

## Honors

2006 - Society of Automotive Engineers (SAE), Ralph H. Isbrandt Automotive Safety
Engineering Award

## Certifications

Certified Safety Professional (CSP), Board of Certified Safety Professionals,
Certification No. CSP-30083, Certification received June 20, 2015

Associate Safety Professional (ASP), Board of Certified Safety Professionals,
Certificate No. ASP-20104, Certification received December 6, 2014

Certified Child Passenger Safety Technician (CPST), Safe Kids Worldwide, 2007 to 2019,
Certification No. T649989

Certified Playground Safety Inspector (CPSI), National Recreation and Park Association,
Certificate No. 43230-1021, October 1, 2015 through 2021

Professional Association of Diving Instructors (PADI) Open Water Diver certified

Certified XL Tribometrist (CXLT), Excel Tribometers, Certification No. 1606604,
Certification received June 29, 2016

## Publications

Kloppenborg N., Amenson T., Wernik J., Wiechel, J., "Vehicle and Occupant Response in Low-Speed Go-Kart Crash Tests," ASME 2015 International Mechanical Engineering Congress and Exposition, American Society of Mechanical Engineers, IMECE2015-53585, 2015

Amenson, T., and Sullivan, L.K., "Dynamic Evaluation of LATCH Lower Anchor Spacing Requirements and Effect of Tether Anchor Location on Tether and Lower Anchor Loads," *NHTSA/USDOT Research Report*, Docket No. NHTSA-2014-0123, December 2013

Rhule, H., Suntay, B., Herriott, R., Amenson, T., Stricklin, J., and Bolte, J., "Response of PMHS to High- and Low-Speed Oblique and Lateral Pneumatic Ram Impacts," *Stapp Car Crash Journal*, Volume 55, pp. 281-315, 2011

Amenson, T., Xu, G., Brown, P. and Salaani, K., "CrashStar: A post-processing program for chestband data analysis," proceedings of the 37th *International Workshop on Human Subjects for Biomechanical Research*, November 2009

Amenson, T., Begeman, P., Melvin, J., and Grimm, M., "Development of the MADYMO Race Car Driver Model for Frontal Impact Simulation and Thoracolumbar Spine Injury Prediction in Indianapolis-type Racing Car Drivers," *SAE Motorsports Engineering Conference*, Society of Automotive Engineers (SAE) Paper 2008-01-2975, 2008

Troxel, T., Melvin, J., Begeman, P., and Grimm, M., "Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers," *SAE Motorsports Engineering Conference,* Society of Automotive Engineers (SAE) Paper 2006-01-3633, 2006

Begeman, P., Melvin, J. and Troxel, T., "Frequency Response and Coupling of Earpiece Accelerometers in the Human Head," *SAE Motorsports Engineering Conference,* Society of Automotive Engineers (SAE) Paper No. 2006-01-3657, 2006

## Professional Affiliations

American Society of Safety Professionals (ASSP)
    Central Ohio Chapter
        Chapter Delegate 2018 – 2019
        President 2017 – 2018
        Vice President 2016 – 2017
International Council of Motorsports Sciences (ICMS)
    Member, Board of Directors, April 2017 – December 2020
American Society for Testing and Materials (ASTM) - Committee Member
    F08 Sports Equipment, Playing Surfaces, and Facilities
    F15 Consumer Products
    F13 Pedestrian/Walkway Safety and Footwear
    F24 Amusement Rides and Devices
    F27 Snow and Water Sports
    D13.63 Committee on Bath Mats
Society of Automotive Engineers (SAE) 2004 – 2018
Human Factors and Ergonomics Society (HFES) 2019

## Seminars and Additional Education

- 2019 – ASTM F08 – Sixth International Symposium on Safety in Ice Hockey, May 2019, Denver, Colorado
- 2018 – International Council of Motorsports Sciences, Annual Congress
- 2018 – Ohio Child Passenger Safety Conference
- 2017 – American Society of Safety Engineers, Safety 2017 Conference
- 2017 – International Council of Motorsports Sciences, Annual Congress
- 2017 – Mitigating Risk of Legionella Bacteria webinar, presented by EVAPCO, Baltimore Aircoil Company, and SPX Cooling Technologies
- 2016 – Ohio Bureau of Workers' Compensation, "Powered Industrial Trucks, Developing a Training Program"
- 2016 – International Council of Motorsports Sciences, Annual Congress

## Courses Taught/Presentations

- "Keeping Your Defense Afloat: Biomechanics in a Fluid Environment," Defense Research Institute, Recreational Products session, San Diego, California, February 2018
- "Prevention and Analysis of Back Injury Claims: Did We Really Cause All This Damage?" National Retail and Restaurant Defense Association, General Session Dallas, Texas, October 2017
- Amenson, T., and Dunn, A., Utilizing Cutting-Edge Forensic Visual Technology to Defend Your Case, Transportation Lawyers Association 2017 Annual Conference, Santa Fe, New Mexico, April 2017

Professional Resume
Tara T. Amenson, Ph.D., M.P.H., ASP, CSP, CPSI, CXLT (5/2019)                                    Page 5

- Amenson, T., Spinal Motion During Race Car Driver Extrication, International Council of Motorsports Sciences 2016 Annual Congress, Indianapolis, Indiana, December 2016
- Amenson, T., Women in Engineering Summer Program, sponsored by The Ohio State University, Honda, and Transportation Research Center, June 2010
- Amenson, T., CrashStar: A post-processing program for chestband data analysis, 2009 NHTSA Injury Biomechanics Workshop, Savannah, Georgia, November 2009
- Troxel, T., Dynamic Response of Child Passenger Safety, 2008 Ohio Occupant Protection Conference, Newark, Ohio, July 2008
- Troxel, T., Development of the MADYMO Race Car Driver Model for Frontal Impact Simulation and Thoracolumbar Spine Injury Prediction in Indianapolis-type Racing Car Drivers, International Council of Motorsports Sciences 2008 Meeting, Indianapolis, Indiana, July 2008
- Troxel, T., Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers During Frontal Impacts, Wayne State University Biomedical Engineering Center Open House, Detroit, Michigan, April 2008
- Troxel, T., Biomechanical Analysis of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers During Frontal Impacts, Wayne State University Biomedical Engineering Center, Public Ph.D. Dissertation Defense, Detroit, Michigan, April 2008
- Troxel, T., Guest Lecture- Public Health Senior Seminar Series- Road Traffic Injury Control and Prevention-Northwest Ohio Consortium for Public Health, Toledo, Ohio, February 2007
- Troxel, T., Critical Review of SFI Specification 38.1: Head and Neck Restraint Systems, SAE Motorsports Conference, Dearborn, Michigan, December 2006
- Troxel, T., Biomechanical Investigation of Thoracolumbar Spine Fractures in Indianapolis-type Racing Car Drivers during Frontal Impacts, SAE Motorsports Conference, Dearborn, Michigan, December 2006

## Selected Report Titles
*The following reports are for NHTSA-USDOT, Vehicle Research and Test Center, unless noted:*

"Evaluation of LATCH Usability Procedure," November 2013
"Frontal Sled Tests to Measure and Evaluate Loads on Child Restraint Anchorages," 2013
"LATCH Frontal Sled Tests to Assess Lower Anchor Load Requirements," 2013
"Hybrid III 95th Male PADI User's Manual," 2010

# FEDERAL COURT QUERY
Tara T. Amenson
May 2015 – Present



SEA
Scientific Expert Analysis™

| Case Caption | Type | Date | Venue | Court No. |
|---|---|---|---|---|
| Bourg v. J.C. Penney Corporation, et al. | Trial | 5/2019 | In the Circuit Court of Harrison County, Mississippi, Second Judicial District | A2402-16-163 |
| Ward v. Carnival Corporation | Trial | 5/2019 | United States District Court, Southern District of Florida | 1:17-CV-24628-RNS |
| Followell v. The House of Boom, Kentucky, LLC | Trial | 4/2019 | State of Kentucky, Jefferson Circuit Court, Division 3 | 16-CI-06147 |
| Edwards v. Tristar Products, Inc. | Deposition | 3/2019 | In the United States District Court for the Northern District of Mississippi, Aberdeen Division | 1:18-CV-27-SA-DAS |
| Cunnison, et al. v. firstSTREET for Boomers & Beyond, et al. | Deposition | 1/2019 | District Court, Clark County, Nevada | A-16-731244-C |
| Allen v. Tristar Products, Inc. | Deposition | 12/2018 | In the United States District Court for the Northern District of Georgia, Atlanta Division | 1:16-cv-03030-TCB |
| Leffler v. Pho Asian Noodle House, et al. | Deposition | 11/2018 | In the Court of Common Pleas, Franklin County, Ohio | 17CV007818 |
| Despot v. Celebrity Cruises Inc. | Arbitration Hearing | 10/2018 | International Centre for Dispute Resolution, Miami, Florida | 01-16-0001-5958 |
| Morales v. World Fresh Market, LLC, et al. | Deposition | 9/2018 | In the Superior Court of the Virgin Islands, Division of St. Croix | SX-16-CV-280 |
| Lucas v. Ohio Valley Medical Center | Deposition | 7/2018 | In the Circuit Court of Ohio County, West Virginia | 16-C-406 |
| Rippetoe v. Gritts Fun Farm, LLC | Deposition | 10/2017 | In the Circuit Court of Putnam County, West Virginia | 16-C-216 |
| Estate of Ward v. Stewart | Deposition | 9/2017 | United States District Court, Northern District of New York | 7:15-cv-01023 |
| Niemantsverdriet v. Caterpillar, Inc., et al. | Deposition | 4/2017 | State of Indiana, Tippecanoe Superior Court I, County of Tippecanoe | 79D01-1504-CT-00037 |
| Randy Berliner v. Milwaukee Electric Tool Corporation, et al. | Deposition | 2/2017 | In the Circuit Court of Franklin County, State of Missouri | 14AB-CC00083 |
| Monday v. J.C. Penney Corporation, Inc., et al. | Deposition | 12/2016 | In the Circuit Court of Kanawha County, West Virginia | 15-C-1912 |
| Addison v. Gulf World Marine Park, Inc. | Deposition | 10/2016 | In the Circuit Court, Fourteenth Judicial Circuit of the State of Florida, In and For Bay County | 14-000837-CA |

**EXHIBIT**

tabbies

9

# FEDERAL COURT QUERY
Tara T. Amenson
May 2015 – Present



**S E A**
Scientific Expert Analysis™

| Case Caption | Type | Date | Venue | Court No. |
|---|---|---|---|---|
| Addison v. Gulf World Marine Park, Inc. | Trial Deposition | 10/2016 | In the Circuit Court, Fourteenth Judicial Circuit of the State of Florida, In and For Bay County | 14-000837-CA |



7001 Buffalo Parkway
Columbus, Ohio 43229
614.888.4160 • 800.782.6851
Fax 614.885.8014
www.SEAlimited.com

## FEE/COST SUMMARY

*Tara T. Amenson, Ph.D.*

Investigative and engineering analyses are conducted on a time-and-expense basis. SEA, Ltd. invoices for activities, including but not limited to, travel time, scene inspection, follow-up investigation, testing and analysis, documentation and report writing, court preparation, deposition and courtroom testimony. The hourly fee per individual is the same, regardless of the activity being performed on the project (travel, scene inspection, communication, deposition, trial, etc.). **The current billable rate per hour for** *Tara T. Amenson* **is $305.**

SEA, Ltd. also invoices for any out-of-pocket expenses on an actual cost basis. Other expenses may include, but are not limited to, travel costs, photographs, photocopies, police/fire/agency reports, postage, faxes, international long-distance telephone charges, supplies, equipment or tool rental when required, evidence storage fees, and special testing or laboratory services. Often, chemical laboratory charges are established on a fee-per-sample/per-test basis (i.e., fire debris by gas chromatography). Items not included in the fee-per-sample rate will either be quoted a rate and/or analysis performed at the chemist's regular hourly rate.



EXHIBIT

10

*This document is submitted in response to your request. This document is Privileged and Confidential. This document is not to be disseminated to any third party in any other manner or form than indicated. Rates listed are effective 1/1/19. Hourly rates may be subject to change. To ensure accuracy, please inquire about current rates.*

ATLANTA • BALTIMORE/WASHINGTON • CHARLOTTE • CHICAGO • CLEVELAND • COLUMBUS • DENVER • FORT LAUDERDALE • HOUSTON • ST. LOUIS • TAMPA

*00430311.17*



**Please Remit Payment To:**
SEA, Ltd.
P.O. Box 932837
Cleveland, OH 44193

•**Due Upon Receipt**•
www.SEAlimited.com
accounting@SEAlimited.com

| Invoice Date: | April 18, 2019 |
|---|---|
| S-E-A Matter No. | 01.094175 |
| S-E-A Invoice No. | 7570861 |
| Federal ID. No. | 72-1569235 |
| SEAlimited.com/W9 | |

Boehl Stopher & Graves, LLP
Edwin A. Jones, Esquire
410 Broadway
Paducah, KY 42001

**Matter Information**
Ingram v. Burger King, et al.
Loss Date 03/04/2017


EXHIBIT
11

| Total This Invoice: | | Amount |
|---|---|---|
| Total This Invoice | $ | 2,905.80 |

| Professional Services: | | Hours | Amount |
|---|---|---|---|
| Amenson, Tara | | | |
| 03/28/19 | Analysis & Investigation - trip and fall analysis | 1.50 | 457.50 |
| 03/28/19 | Review Documents & Photos - complaint, photographs | 1.50 | 457.50 |
| 03/28/19 | Report Preparation - write report | 1.70 | 518.50 |
| 03/28/19 | Deposition Review - Ingram, Christian, Key depos and exhibits | 3.70 | 1,128.50 |
| 03/29/19 | Client Contact - pc w/ ej re: report | 0.10 | 30.50 |
| 03/29/19 | Report Preparation - finalize report | 0.40 | 122.00 |
| Dorothy, Paul | | | |
| 03/28/19 | Technical Review | 0.30 | 97.50 |
| Kress, Kay | | | |
| 03/26/19 | Document File | 1.00 | 75.00 |
| 03/29/19 | Report Processing | 0.50 | 17.50 |
| | Total Professional Services | 10.70 $ | 2,904.50 |

| Expenses: | | Amount |
|---|---|---|
| | Postage | 1.30 |
| | Total Expenses | $ 1.30 |

| Total This Invoice: | Amount |
|---|---|

Corporate Address: 7001 Buffalo Parkway, Columbus, OH 43229 • 800-782-6851

ATLANTA • BALTIMORE/WASHINGTON • CHARLOTTE • CHICAGO • CLEVELAND • COLUMBUS • DENVER • FORT LAUDERDALE • HOUSTON • ST. LOUIS • TAMPA

Boehl Stopher & Graves, LLP
Ingram v. Burger King, et al.

| | |
|---|---|
| Invoice Date: | April 18, 2019 |
| S-E-A Matter No. | 01.094175 |
| S-E-A Invoice No. | 7570861 |

| Total This Invoice: | Amount |
|---|---|
| Total This Invoice | $ 2,905.80 |

Corporate Address: 7001 Buffalo Parkway, Columbus, OH  43229 • 800-782-6851

ATLANTA • BALTIMORE/WASHINGTON • CHARLOTTE • CHICAGO • CLEVELAND • COLUMBUS • DENVER • FORT LAUDERDALE • HOUSTON • ST. LOUIS • TAMPA

*Journal of Orthopaedic Research*
2:272–280, Raven Press, New York
© 1984 Orthopaedic Research Society

# Kinematic and EMG Patterns During Slow, Free, and Fast Walking

*†M. P. Murray, *L. A. Mollinger, *G. M. Gardner, and *S. B. Sepic

*Kinesiology Research Laboratory, Veterans Administration Medical Center, Wood (Milwaukee); †Departments of Anatomy and Physical Medicine and Rehabilitation, Medical College of Wisconsin, Milwaukee; and Program in Physical Therapy, Marquette University, Milwaukee, Wisconsin

Summary: Kinematics and electromyographic (EMG) activity were recorded in seven normal women during walking at slow, free, and fast speeds. Speed-related differences were found in the stride dimensions, temporal components, and most of the simultaneous displacement patterns of body segments measured. For most of the muscles tested, the amplitude of normalized EMG activity decreased as walking speed decreased. The findings emphasize the importance of accounting for the effect of speed itself on measurements of gait. Key Words: Normal slow walking—Electromyography—Gait kinematics.

Whereas normal individuals have the ability to vary their walking speed over a wide range of velocities, most disabled persons are limited to slower and more circumscribed ranges of walking speed. Many investigators have been interested in identifying the kinematic or electromyographic (EMG) changes that accompany a change in walking speed (1–3,5,6,8,9,14–17). However, a study of the speed-related changes in both kinematics and EMG is lacking.

The present study was designed to quantify multiple kinematic components and EMG patterns of normal women during slow, free, and fast walking. This information will provide further insight into whether the kinematic and EMG differences measured in the performance of disabled persons are related to their slower walking speed or to their disability.

Address correspondence and reprint requests to Dr. Gardner at Kinesiology Research Laboratory/151, Veterans Administration Medical Center, 5000 West National Avenue, Wood, Wisconsin 53193.

## METHODS

Kinematic and EMG recordings were obtained from seven normal healthy women while they walked at three speeds. The mean age of the subjects was 30 (20–36) years; the mean height, 165 (161–170) cm; and the mean weight, 57 (45–64) kg. Subjects were instructed to walk at their own comfortable speed, then at a slow speed as if taking a stroll, and then as fast as safely possible. The subjects walked continuously on an elliptical pathway at each walking speed and no less than six trials of kinematic and EMG recordings were made at each walking speed. The subjects wore tennis shoes.

Reflective targets were fastened to specific anatomic landmarks on each subject and the serial displacement patterns of walking were recorded by interrupted-light photography (10) at a rate of 20 exposures/s. The following measurements were made for each photograph: walking velocity; cadence; durations of the stance, swing, and double-limb-support periods; step and stride lengths; stride widths; foot angles; the patterns of sagittal plane rotation of the shoulder, elbow, pelvis, hip, knee and ankle;



vertical and lateral pathways of the head; and the vertical pathways of the heel and toe.

Both raw and full-wave rectified EMG signals were recorded simultaneously with the photographic data during each walking trial (Fig. 1). Surface electrode/preamplifier units (Motion Control, Inc., Salt Lake City, UT 84101) were placed over the following muscle groups: pretibial (over the anterior tibialis), calf (over the medial head of the gastrocnemius), quadriceps (over the rectus femoris), medial hamstrings, hip abductors, anterior hip adductors, gluteus maximus, and the erector spinae (over the iliocostalis lumborum). The electrodes were not moved between walking trials. The EMG signals were transmitted through an overhead cable system to isolation amplifiers and a light-beam recording oscillograph with a frequency response of 5,000 Hz. Raw EMG data were high-pass filtered (15 Hz cutoff) and then full-wave rectified and low-pass filtered (53.5 Hz cutoff). Foot switches allowed simultaneous recording of foot-floor contact timing with the EMG. The 35 mm diameter wafer switches were taped to the posterior and anterior aspects of the sole of the shoe. Preliminary testing comparing the foot switch method with an electronic walkway method with no time delay (7) showed that heel strike occurred sooner than shown on the records by an average of 0.04 to 0.06 s, depending on walking speed. Corrections were made on the records accordingly.

The authors studied all EMG records of each subject at a given speed and agreed on three cycles of EMG activity that appeared to be the most characteristic of the amplitude and duration of all EMG activity of that subject at that speed. The full-wave rectified signals of these characteristic cycles were quantified by manually measuring the area under each signal curve with a planimeter and dividing the area by the duration of the walking cycle. When all EMG values were quantified for a given muscle group of an individual, an average value of EMG activity was calculated for each speed. The maximum of these values, independent of walking speed, was designated as 1.00. The values for the other two walking speeds were normalized with respect to the maximum value.

Analysis of variance and Newman-Keuls tests were done to assess the significance of the differences in the amplitudes of the kinematics of gait and normalized EMG among the three walking speeds. Standard errors of all means were calculated by dividing the standard deviation by the square root of 7.

## RESULTS

### Stride Dimensions and Temporal Components

For every subject, decreases from one speed to another were accompanied by decreases in stride length (the sum of two consecutive steps), cadence, and swing time as a percent of the cycle and by increases in stance time as a percent of the cycle (Table 1). Most of the differences in stride dimensions and temporal components among walking speeds were statistically significant ($p < 0.01$); the exceptions were swing times between free and fast speeds, stride widths, and foot angles.

### Displacement Patterns of Walking

A summary of the speed-related differences in the amplitudes of displacement patterns that were sta-



FIG. 1. Recording of raw (A) and full-wave rectified (B) electromyographic (EMG) signals during fast walking for several muscles of the left lower extremity of a normal subject. The EMG signals were recorded simultaneously with foot-floor contact data (top channel).

274                                     *M. P. MURRAY ET AL.*

TABLE 1. *Average stride dimensions and temporal components*

| Gait components | No. | Slow | Free | Fast |
|---|---|---|---|---|
| Velocity (m/min) | 14 | 49.9 ± 2.5 | 85.0 ± 3.1 | 115.0 ± 3.6 |
| Cycle duration (s) | 14 | 1.38 ± 0.04 | 1.03 ± 0.02 | 0.90 ± 0.02 |
| Cadence (steps/min) | 14 | 87.5 ± 2.4 | 116.9 ± 2.2 | 134.3 ± 3.0 |
| Stride length (cm) | 14 | 111.4 ± 3.0 | 140.7 ± 2.8 | 165.9 ± 3.7 |
| Stride length (% of body height) | 14 | 65 | 85 | 100 |
| Stride width (cm) | 14 | 6.4 ± 1.0 | 7.6 ± 0.6 | 8.4 ± 1.3 |
| Foot angle (°) | 14 | 4.8 ± 1.0 | 4.7 ± 0.9 | 3.7 ± 1.0 |
| Stance (s) | 28 | 0.90 ± 0.03 | 0.62 ± 0.02 | 0.50 ± 0.02 |
| Swing (s) | 28 | 0.48 ± 0.01 | 0.41 ± 0.01 | 0.40 ± 0.01 |
| Stance (% cycle) | 28 | 65 | 60 | 56 |
| Swing (% cycle) | 28 | 35 | 40 | 44 |
| Double-limb support (s) | 28 | 0.21 ± 0.02 | 0.10 ± 0.01 | 0.05 ± 0.01 |

Mean ± SE.

tistically significant at least at the 95% level of confidence are given in Table 2.

### Vertical and Lateral Pathways of the Head (Fig. 2)

Within each walking cycle, the peaks in the vertical pathway of the head occur during single-limb support and the low points occur during double-limb support when one limb is outstretched forward and the other backward. Vertical head motion was least for slow walking and most for fast walking.

During the two single-limb-support periods in the cycle, as the head reaches its high points, it simultaneously shifts laterally toward the supportive limb. The mean total excursion of lateral head motion increased as walking speed decreased.

### Sagittal-Plane Rotation of the Pelvis, Hip, Knee, and Ankle (Fig. 3)

The total amplitude of anterior-posterior pelvic tilting averaged 6–7° for all three speeds.

The total excursion of hip flexion-extension decreased significantly with decreased walking speed (Table 2) as a result of less flexion when the thigh was directed forward and less extension when the thigh was directed backward. The timing of the reversal from hip extension to flexion varied with walking speed; the reversal occurred slightly after contralateral heel strike for slow walking and

TABLE 2. *Significant differences in displacement patterns with changes in walking speed*

| Gait components | Slow | Free | Fast |
|---|---|---|---|
| Vertical excursion of the head (cm)[a] | 3.6 ± 0.3 | 4.9 ± 0.2 | 6.2 ± 0.5 |
| Lateral excursion of the head (cm)[b] | 4.2 ± 0.4 | 3.2 ± 0.3 | 2.7 ± 0.3 |
| Hip flexion-extension used (°)[a] | 36 ± 1 | 43 ± 1 | 47 ± 1 |
| Knee position: ipsilateral heel strike (°)[b] | −3 ± 2 | 1 ± 2 | 4 ± 2 |
| Knee position: contralateral heel strike (°)[a] | 5 ± 1 | 10 ± 2 | 14 ± 2 |
| Knee flexion: stance ($Fl_1$) (°)[b] | 4 ± 3 | 13 ± 2 | 15 ± 2 |
| Ankle dorsiflexion: stance ($Fl_1$) (°)[b] | 79 ± 2 | 81 ± 1 | 83 ± 1 |
| Ankle plantar flexion: toe-off ($Ex_2$) (°)[c] | 111 ± 3 | 115 ± 2 | 118 ± 3 |
| Maximum heel elevation (cm)[a] | 23.3 ± 0.5 | 25.5 ± 0.6 | 27.1 ± 0.5 |
| Heel elevation at contralateral heel strike (cm)[a] | 3.7 ± 0.5 | 8.5 ± 0.8 | 12.5 ± 0.9 |
| Maximum toe elevation (cm)[a] | 11.2 ± 0.4 | 13.1 ± 0.4 | 15.7 ± 0.8 |
| Shoulder flexion-extension (°)[a] | 14 ± 2 | 29 ± 3 | 43 ± 4 |
| Elbow flexion-extension (°)[a] | 14 ± 1 | 28 ± 3 | 35 ± 3 |

Mean ± SE; number = 14.

[a] Differences among speeds are statistically significant, $p < 0.05$.
[b] Slow speed values differ significantly from those at the other two speeds, $p < 0.05$.
[c] Slow speed values differ significantly from those at fast speed only, $p < 0.05$.



SIU Photo: Edging is approx. 5 feet from building- 1 of 2

BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000628

EXHIBIT 14



SIU Photo: Edging is approx. 5 feet from building– 1 of 2

**BSG-BURGER KING V. INGRAM-HOME OFFICE FILE-000628**



PREFACE

This Code constitutes a recodification of the general and permanent ordinances of the City of Paducah, Kentucky.

Source materials used in the preparation of the Code were the 1997 Code Code, as supplemented through November 15, 2016, and ordinances subsequently adopted by the Board of Commissioners. The source of each section is included in the history note appearing in parentheses at the end thereof. Sections of the Code bear the same section numbers as found in the 1997 Code, as supplemented through November 15, 2016. The absence of such a note indicates that the section is new and was adopted for the first time with the adoption of the Code. By use of the comparative tables appearing in the back of this Code, the reader can certain ordinances included herein.

The chapters of the Code have been conveniently arranged in alphabetical order, and the various sections within each chapter have been catchlined to facilitate usage. Notes which tie related sections of the Code together and which refer to relevant state law have been included. A table listing the state law citations and setting forth their location within the Code is included at the back of this Code.

## Chapter and Section Numbering System

The chapter and section numbering system used in this Code is the same system used in many state and local government codes. Each section number consists of two parts separated by a dash. The figure before the dash refers to the chapter number, and the figure after the dash refers to the position of the section within the chapter. Thus, the second section of chapter 1 is numbered 1-2, and the first section of chapter 6 is 6-1. Under this system, each section is identified with its chapter, and at the same time new sections can be inserted in their proper place by using the decimal system for amendments. For example, if new material consisting of one section that would logically come between sections 6-1 and 6-2 is desired to be added, such new section would be numbered 6-1.5. New articles and new divisions may be included in the same way or, in the case of articles, may be placed at the end of the chapter embracing the subject, and, in the case of divisions, may be placed at the end of the article embracing the subject. The next successive number shall be assigned to the new article or division. New chapters may be included by using one of the reserved chapter numbers. Care should be taken that the alphabetical arrangement of chapters is maintained when including new chapters.

## Page Numbering System

The page numbering system used in this Code is a prefix system. The letters to the left of the colon are an abbreviation which represents a certain portion of the volume. The number to the right of the colon represents the number of the page in that portion. In the case of a chapter of the Code, the number to the left of the colon indicates the number of the chapter. In the case of an appendix to the Code, the letter

EXHIBIT

15

1/5

immediately to the left of the colon indicates the letter of the appendix. The following are typical parts of codes of ordinances, which may or may not appear in this Code at this time, and their corresponding prefixes:

| CODE | CD1:1 |
|------|-------|
| CODE APPENDIX | CDA:1 |
| CODE COMPARATIVE TABLES | CCT:1 |
| STATE LAW REFERENCE TABLE | SLT:1 |
| CODE INDEX | CDi:1 |

*Index*

The index has been prepared with the greatest of care. Each particular item has been placed under several headings, some of which are couched in lay phraseology, others in legal terminology, and still others in language generally used by local government officials and employees. There are numerous cross references within the index itself that stand as guideposts to direct the user to the particular item in which the user is interested.

*Looseleaf Supplements*

A special feature of this publication is the looseleaf system of binding and supplemental servicing of the publication. With this system, the publication will be kept up to date. Subsequent amendatory legislation will be properly edited, and the affected page or pages will be reprinted. These new pages will be distributed to holders of copies of the publication, with instructions for the manner of inserting the new pages and deleting the obsolete pages.

Keeping this publication up to date at all times will depend largely upon the holder of the publication. As revised pages are received, it will then become the responsibility of the holder to have the amendments inserted according to the attached instructions. It is strongly recommended by the publisher that all such amendments be inserted immediately upon receipt to avoid misplacing them and, in addition, that all deleted pages be saved and filed for historical reference purposes.

*Acknowledgments*

This publication was under the direct supervision of Roger D. Merriam, Senior Code Attorney, and Jean B. Lindsay, Editor, of the Municipal Code Corporation, Tallahassee, Florida. Credit is gratefully given to the other members of the publisher's staff for their sincere interest and able assistance throughout the project.

The publisher is most grateful to Ms. Tammara S. Sanderson, City Clerk, Ms. Lindsay Parish, Assistant City Clerk, and Mr. W. David Denton, Denton Law Firm, PLLC, for cooperation and assistance during the progress of the work on this publication. It is hoped that their efforts and those of the publisher have resulted in a Code of Ordinances which will make the active law of the city readily accessible to all citizens and which will be a valuable tool in the day-to-day administration of the city's affairs.

## Copyright

All editorial enhancements of this Code are copyrighted by Municipal Code Corporation and the City of Paducah, Kentucky. Editorial enhancements include, but are not limited to: organization; table of contents; section catchlines; prechapter section analyses; editor's notes; cross references; state law references; numbering system; code comparative table; state law reference table; and index. Such material may not be used or reproduced for commercial purposes without the express written consent of Municipal Code Corporation and the City of Paducah, Kentucky.

© Copyrighted material.

Municipal Code Corporation and the City of Paducah, Kentucky. 2018.

### ORDINANCE NO. 2018-7-8539

AN ORDINANCE ADOPTING AND ENACTING A NEW CODE FOR THE CITY OF PADUCAH, KENTUCKY; PROVIDING FOR THE REPEAL OF CERTAIN ORDINANCES NOT INCLUDED THEREIN; PROVIDING A PENALTY FOR THE VIOLATION THEREOF; PROVIDING FOR THE MANNER OF AMENDING SUCH CODE; AND PROVIDING WHEN SUCH CODE AND THIS ORDINANCE SHALL BECOME EFFECTIVE.

BE IT ORDAINED BY THE BOARD OF COMMISSIONERS OF THE CITY OF PADUCAH, KENTUCKY, AS FOLLOWS:

Section 1. The Code entitled "Code of Ordinances, City of Paducah, Kentucky," published by Municipal Code Corporation, consisting of chapters 1 through 126, each inclusive, is adopted.

Section 2. All ordinances of a general and permanent nature enacted on or before November 28, 2017, and not included in the Code or recognized and continued in force by reference therein, are repealed in their entirety.

Section 3. The repeal provided for in section 2 hereof shall not be construed to revive any ordinance or part thereof that has been repealed by a subsequent ordinance that is repealed by this ordinance.



ARTICLE II. - STANDARD CODES ADOPTED

Sec. 18-31. - Building and residential code adopted; applicability of building and residential code.

    (a)   The Kentucky Building Code and the Kentucky Residential Code are hereby adopted by reference and made a part of this Code as if fully set forth herein.

    (b)   The Kentucky Building Code is hereby made applicable to all buildings within the City, excluding one- and two-family dwellings.

    (c)   The Kentucky Residential Code is hereby made applicable to all one- and two-family dwellings and normally accepted accessory structures.

(Code 1968, § 7-6; Code 1996, § 150.15; Code 1997, § 18-31; Ord. of 3-28-1967; Ord. No. 80-3-1873, 3-11-1980; Ord. No. 81-4-2081, 4-28-1981; Ord. No. 83-6-2389, 6-14-1983; Ord. No. 96-12-5618, 12-30-1996; Ord. No. 2003-2-6619, § 1, 2-25-2003; Ord. No. 2007-09-7336, § 1, 9-25-2007; Ord. No. 2012-6-7928, § 3, 6-26-2012; Ord. No. 2013-7-8044, § 1, 7-2-2013)

**State Law reference—** Adoption by reference, KRS 83A.060 (5).

Sec. 18-32. - Reserved.

Sec. 18-33. - Fire prevention code.

For provisions concerning the adoption of the Kentucky Standards of Safety (Fire Prevention Code) by the City, see sections 46-30.5 through 46-34.

(Code 1996, § 150.17; Code 1997, § 18-33; Ord. No. 92-1-4710, 1-14-1992; Ord. No. 2012-6-7928, § 3, 6-26-2012; Ord. No. 2013-7-8044, § 1, 7-2-2013)

Sec. 18-34. - Reserved.

Sec. 18-35. - Electrical code.

The National Electrical Code is incorporated by reference in the Kentucky Building Code adopted by section 18-31. The National Electrical Code is to be the standard by which inspections are conducted and made part of the public records of the City by this section.

(Code 1968, § 7-28; Code 1996, § 150.19; Code 1997, § 18-35; Ord. of 12-28-1965; Ord. No. 74-12-1057, 12-10-1974; Ord. No. 78-1-1526, 1-24-1978; Ord. No. 80-11-2032, 11-25-1980; Ord. No. 96-2-5451, 2-27-1996; Ord. No. 2003-2-6620, § 1, 2-25-2003; Ord. No. 2007-09-7336, § 1, 9-25-2007; Ord. No. 2012-6-7928, § 3, 6-26-2012; Ord. No. 2013-7-8044, § 1, 7-2-2013)

**State Law reference—** Adoption by reference, KRS 83A.060 (5).

Secs. 18-36—18-60. - Reserved.



Chapter 98 - STREETS, SIDEWALKS AND OTHER PUBLIC PLACES

ARTICLE I. - IN GENERAL

Sec. 98-1. - Chapter not to affect certain ordinances relating to streets and alleys.

Nothing in this Code or the ordinance adopting this Code shall be deemed to affect the validity of any ordinance dedicating, opening, closing, widening, improving, naming, renaming, locating or relocating any street, alley or other public way in the City, and all such ordinances shall remain in full force and effect under their own terms.

(Code 1968, § 28-1; Code 1996, § 101.01; Code 1997, § 98-1)

Sec. 98-2. - Contracts and agreements for maintenance of State or Federal highways.

Whenever the Commissioner of Highways of the Commonwealth, by authority of KRS 177.042 and 177.047, designates any streets or portions thereof, including viaducts and bridges, as connection links of State or Federal maintained highways, or necessary feeder streets thereto, and thereby undertakes the future maintenance, repair, construction or reconstruction of such streets, bridges or viaducts in the manner provided by such statutes, the Mayor is hereby expressly authorized, instructed and directed to enter into any and all contracts and agreements with the State Department of Highways necessary to carry out the purposes and provisions of such statutes.

(Code 1968, § 28-2; Code 1996, § 101.02; Code 1997, § 98-2; Ord. of 10-30-1956)

Sec. 98-3. - Obstructions generally.

It shall be unlawful for any person to place any article or substance upon any street, sidewalk, alley, gutter, drain or public ground, except such as are permitted by any applicable provisions of this Code and other ordinances of the City, so as to obstruct the same.

(Code 1968, § 28-3; Code 1996, § 101.03; Code 1997, § 98-3)

Sec. 98-4. - Obstruction of streets or drawbridges by trains.

No railroad company shall obstruct any public highway or street, or the navigation of any stream, by stopping and permitting trains, engines or cars to stand upon a public grade crossing or upon a drawbridge for more than five (5) minutes at any one (1) time, unless such stopping and standing is caused by circumstances beyond the control of the railroad company.

(Code 1968, § 28-4; Code 1996, § 101.04; Code 1997, § 98-4; Ord. of 9-14-1925; Ord. of 1-11-1947; Ord. of 1-21-1947; Ord. No. 73-2-761, 2-20-1973)

Sec. 98-5. - Reserved.

Sec. 98-6. - Sale of merchandise on sidewalk.

(a) Any merchant who regularly engages in the retail sales of merchandise shall have the right to display and sell merchandise regularly sold by such merchant on any City sidewalk which adjoins the place of business of such merchant without the necessity of procuring a permit which is otherwise required pursuant to section 98-3; provided, however, such activities shall not extend into any adjoining street or thoroughfare.

(b) Notwithstanding the foregoing authorization, any merchant who displays and sells merchandise on City sidewalks shall comply with the following regulations:

(1) The display and sale of merchandise on any City sidewalk shall only take place during the business hours of the merchant, and all merchandise, including any display apparatus, and any equipment or other related apparatus, together with any trash and debris, shall be removed from the City sidewalk immediately upon the close of business.

(2) The display and sale of merchandise on any City sidewalk shall be done in an orderly and reasonable manner, and shall at no time obstruct the public's reasonable access upon and across any City sidewalk or right-of-way, nor shall it in any manner be inimical to any necessary emergency or safety access.

(3) Any merchant who displays and sells merchandise on any City sidewalk shall regularly inspect the City sidewalk which adjoins the place of business of the merchant for defects or hazardous conditions, and, should any defect or hazardous condition be found, the merchant shall immediately cure and remedy such defect or hazardous condition, and, in the event such defect or hazardous condition cannot be immediately cured and remedied, then the merchant shall provide visible notice to the public of the existence of such defect or hazardous condition and otherwise preclude the public's access upon such defect or hazardous condition until such time that the defect or hazardous condition is cured and remedied.

(4) Any merchant who displays and sells merchandise on any City sidewalk shall maintain premises and general liability insurance which provides general liability insurance coverage for such merchant's use and activity upon any city sidewalk, and shall cause the City to be named as an additional insured under the policy. The merchant shall also indemnify the City and save it harmless from any claim or cause of action which may be asserted by any person against the City by reason of the merchant's use and operation upon the City sidewalk, or by reason of the merchant's violation of any provision as set forth herein.

(Code 1996, § 101.06; Code 1997, § 98-6; Ord. No. 93-6-4960, 6-29-1993; Ord. No. 2009-5-7550, § 1, 5-19-2009)

Sec. 98-7. - Depositing injurious substances on street; burning waste matter in street.

It shall be unlawful for any person to dump or pour onto any street, alley or other public way any oil, tar, asphalt, or any injurious liquid or substance, or burn any paper, rubbish, trash, leaves or any other waste matter in any street, alley or public way of the City.

(Code 1968, § 28-12; Code 1996, § 101.07; Code 1997, § 98-7; Ord. of 12-10-1940)

Sec. 98-8. - Application for street or alley closing.

An applicant filing for the closing of any portion of a street or alley shall file an application with the Planning Department. The application shall be accompanied by a professional property survey of the street or alley requested to be closed and an application fee of $500.00. The application is to be signed by all real property owners whose land adjoins any part of the right-of-way within the block of any section of right-of-way that is proposed to be closed; provided, however, the application may be filed without the signature of all adjoining real property owners if the applicant agrees to be responsible for those damages, if any, that may be awarded pursuant to KRS 82.405 (4).

(Code 1968, § 28-14; Code 1996, § 101.08; Code 1997, § 98-8; Ord. No. 86-6-2855, 6-10-1986; Ord. No. 93-6-4964, 6-29-1993)

Sec. 98-9. - Penalty.

Whoever violates any provision of this chapter, for which no other penalty is provided, shall be guilty of a misdemeanor and shall be fined not more than $500.00, or be imprisoned for not more than thirty (30) days, or both, for each offense or violation.

(Code 1996, § 101.99; Code 1997, § 98-9)

State Law reference— Penalty for ordinance violations, KRS 83A.065 .

Secs. 98-10—98-30. - Reserved.

ARTICLE II. - MAINTENANCE

Sec. 98-31. - Duties of abutting property owners regarding maintenance within right-of-way.

The property owner shall be responsible for maintaining, in a clean and sanitary condition, the sidewalks, ditches, curbs and gutters, driveway pipes, drainage pipes and unpaved/undeveloped portion of rights-of-way abutting such premises, and for keeping the aforementioned in good repair.

(Code 1996, § 101.15; Code 1997, § 98-31; Ord. No. 96-6-5503, 6-11-1996)

Sec. 98-32. - Sidewalk replacement agreement.

(a) In order to encourage and support the integrity of the existing infrastructure facilities within the City right-of-way, the City will provide assistance to the property owner in the reconstruction of sidewalks. This reconstruction work shall commence upon execution of an agreement between the City Engineer and the property owner wherein the City shall be responsible for the actual construction work necessary to replace and/or repair sidewalks and the adjoining property owner shall be responsible for the purchase of the concrete required to perform the required work.

(b) The purpose of this assistance by the City shall be to replace existing sidewalks located in the right-of-way that are in need of repair and not for the purpose of construction of new sidewalks or construction of same on private property or reconstruction of same for cosmetic purposes only. Sidewalks damaged by property owners or replaced for the convenience of the owner shall be the sole responsibility of the property owner. The City Engineer shall be the sole judge as to which sidewalks are in need of replacement and/or repair under this replacement program.

(c) The City Engineer shall be the interpreter of this article, and any questions or unusual circumstances which might arise regarding this article shall be resolved by the City Engineer.

(Code 1996, § 101.16; Code 1997, § 98-32; Ord. No. 96-6-5503, 6-11-1996; Ord. No. 98-8-5912, § 1, 8-11-1998)

Sec. 98-33. - Driveway entrance pipes.

In order to encourage and support the integrity of the existing infrastructure facilities within the City right-of-way, the City will provide assistance to the property owner in the installation or reinstallation of driveway entrance pipes within the City right-of-way. The property owner shall be responsible for driveway pipes on private property. This work shall commence upon execution of an agreement between the City and the property owner wherein the City shall be responsible for the actual construction work necessary to place, install or reinstall driveway entrance pipes, and the property owner shall be responsible for the purchase of the pipe required.

(1) The City Engineer will inspect the drainage ditch and/or existing driveway entrance pipe and inform the property owner of the required pipe size. All driveway entrance pipes shall meet the specifications as set forth by the City Engineer. The minimum driveway pipe size shall be twelve (12) inches in diameter.

(2) The property owner shall be responsible for supplying the required pipe as set forth by the City Engineer.

(3) The City shall be responsible for driveway entrance pipe installation, reinstallation and/or maintenance within the right-of-way as follows:

a. The City will install a new driveway entrance pipe in an open drainage ditch upon request by the adjacent property owner after the new pipe has been delivered and is on-site.

b. The City will remove an existing damaged driveway pipe and install a new driveway pipe at the existing driveway entrance upon request by the adjacent property owner after the new pipe has been delivered and is on-site.

c. If an existing driveway pipe is blocked with natural material (such as leaves), which impedes the flow of the drainage facility, the City shall clear the blockage.

d. If a driveway pipe is blocked due to the pipe being damaged or collapsed, the City shall attempt to clear the blockage and shall notify the property owner that the pipe will need to be repaired or replaced.

e. If an existing driveway pipe is too small in diameter to carry sufficient flow of the drainage facility, the City shall notify the property owner that the pipe will need to be removed and a new pipe will need to be installed in the drainage ditch.

f. If an existing driveway pipe is laid at an improper grade, and the pipe is in good condition, the City shall remove the pipe and reinstall the pipe at the proper grade.

g. If an existing driveway pipe is laid at an improper grade, and the pipe is damaged, the City shall notify the property owner that a new pipe will need to be installed at proper grade.

(4) The City shall install and/or reinstall the specified driveway pipe to proper grade and cover with granular material. In cases where pipe is being replaced, the City shall remove the existing pipe and install the new pipe and cover with granular material. The City shall not install any other type of material, nor will additional granular material be supplied after initial installation of the pipe. The City shall not be responsible for the replacement of any existing driveway improvements.

(Code 1996, § 101.17; Code 1997, § 98-33; Ord. No. 96-6-5503, 6-11-1996)

Sec. 98-34. - New development or redevelopment.

When property is developed and/or redeveloped, it shall be the sole responsibility of the property owner and/or developer to replace and/or construct curbs, gutters, driveway entrance aprons, and/or sidewalks at the property owner's/developer's own cost in order to conform to the current city ordinances, standards, designs and specifications. All work done within the City right-of-way shall require a right-of-way permit and shall be in accordance with the provisions of this article, city engineering standards, and additional related ordinances as they may apply.

(Code 1996, § 101.18; Code 1997, § 98-34; Ord. No. 96-6-5503, 6-11-1996)

Sec. 98-35. - Driveway entrance aprons.

A property owner is responsible for the total cost of construction and replacement of driveway entrance aprons. The City shall not share in this cost. All work done within the City right-of-way shall be in accordance with the provisions of this article and the City engineering standards.

(Code 1996, § 101.19; Code 1997, § 98-35; Ord. No. 96-6-5503, 6-11-1996)

Sec. 98-36. - Street shoulders.

The City shall not maintain an area adjacent to an improved street which has not been improved pursuant to city engineering standards and is being used by adjoining residents as a parking area, nor shall the City furnish granular material or any other type of material, or keep this area graded. If this area causes a blockage and prevents proper drainage, at the option of the City Engineer, the City will perform whatever work is necessary to maintain proper drainage. If the City Engineer determines that this type of activity in any way violates or impedes traffic safety, traffic movement, safety of other citizens, development of the City's infrastructure, damage to the City's infrastructure, or any other provisions within this article, city engineering standards, and/or additional related ordinances, then the City Engineer shall notify the property owner to remove the improvements within the right-of-way, or the City may perform whatever work is necessary to remove the improvements within the right-of-way.

(Code 1996, § 101.20; Code 1997, § 98-36; Ord. No. 96-6-5503, 6-11-1996)

Sec. 98-37. - Undeveloped right-of-way.

The City shall not maintain an area within the undeveloped right-of-way which has not been improved pursuant to City Engineer standards and is being used by adjoining property owners as private access, driveway or parking area, nor shall the City furnish bituminous asphalt, Portland cement concrete, dense graded aggregate, granular material or any other type of fill or improvement, or keep this area graded. If this area causes a blockage and prevents proper drainage, at the option of the City Engineer, the City will perform whatever work is necessary to maintain proper drainage. If maintenance, repair or installation of any utility is required within any of these areas, the City and/or utility company shall be able to remove any improvements within the right-of-way as may be necessary. If the City Engineer determines that this type of activity in any way violates or impedes traffic safety, traffic movement, safety of other citizens, development of the City's infrastructure, damage to the City's infrastructure, or any other provisions within this article, city engineering standards, and/or additional related ordinances, then the City Engineer shall notify the property owner to remove the improvements within the right-of-way, or the City will perform whatever work is necessary to remove the improvements within the right-of-way.

(Code 1996, § 101.21; Code 1997, § 98-37)

Secs. 98-38—98-60. - Reserved.

ARTICLE III. - STREET CUTS

Sec. 98-61. - Permit required; application.

(a) It shall be unlawful for any person to make any opening, breach or excavation in any street, grassplot, sidewalk, alley or other public way in the City, for any purpose whatsoever, without first obtaining a permit so to do from the City Engineer.

## State Adoptions

Kentucky, with amendments, has adopted the 2015 editions of IBC and IRC statewide. In the KBC (Kentucky Building Code) the state has adopted by reference the 2015 edition of the IMC and the 2012 IECC. The 2012 IFC is utilized for new construction projects. While the Kentucky codes are applicable statewide, enforcement is only mandatory statewide for commercial buildings. Residential buildings must follow the 2009 IECC with amendments.

- *2015 International Building Code*
- *2012 International Energy Conservation Code (commercial)*
- *2009 International Energy Conservation Code (residential)*
- *2012 International Fire Code*
- *2015 International Mechanical Code*
- *2018 International Residential Code*

## Links to State Adoption Agencies

Dept. of Housing, Buildings & Construction

Department of Energy

State Fire Marshal

Energy And Environment Cabinet

Dept. Of Insurance

Division of Forestry

Department of Public Health

KY Cabinet for Health and Family Services

## Key Contacts

**State Building Official**
Stephen A. Milby
Commissioner
KY Dept. Of Housing, Buildings & Construction
101 Sea Hero Rd., Suite 100
Frankfort, KY 40601
Tel: (502) 573-0365
Fax: (502) 573-1057

**State Building Code Review Board**
Kentucky Board of Housing, Buildings, and Construction
dhbc.ky.gov/Pages/default.aspx

**State Fire Marshal**
William Swope, Jr.
KY Dept. Of Housing, Buildings & Construction
Office of the State Fire Marshal
101 Sea Hero Rd., Suite 100
Frankfort, KY 40601
Tel: (502) 573-0382
Fax: (502) 573-1004
William.swope@ky.gov

**Energy and Environmental Affairs:**
Dr. Len Peters, Cabinet Secretary
500 Mero Street
5th Fl., Capital Plaza Tower
Frankfort, KY 40601
Tel: (502) 564-5525
Fax: (502) 564-3969
Len.Peters@ky.gov

**State Insurance Commissioner:**
Sharon P. Clark
PO Box 517
Frankfort, KY 40602

Kentucky - ICC

Tel: (502) 564-3630
Fax: (502) 564-1453
Debbie.Stamper@ky.gov

**State Forester:**
Leah MacSwords, Director
Kentucky Division of Forestry
627 Comanche Trail
Frankfort, KY 40601
Tel: (502) 564-4496
Diana.Olszowy@ky.gov

**Pool Adoption Agency:**
Stephanie Mayfield Gibson, Commissioner
Kentucky Department for Public Health
275 East Main St.
Frankfort, KY 40621
Tel: (502) 564-3970

https://www.iccsafe.org/advocacy/adoptions-map/kentucky/

7/11/2019

**1003.3.3 Horizontal projections.**

Objects with leading edges more than 27 inches (685 mm) and not more than 80 inches (2030 mm) above the floor shall not project horizontally more than 4 inches (102 mm) into the *circulation path*.

> **Exception:** *Handrails* are permitted to protrude 4½ inches (114 mm) from the wall.

**1003.3.4 Clear width.**

Protruding objects shall not reduce the minimum clear width of *accessible routes*.

**1003.4 Floor surface.**

Walking surfaces of the *means of egress* shall have a slip-resistant surface and be securely attached.

**1003.5 Elevation change.**

Where changes in elevation of less than 12 inches (305 mm) exist in the *means of egress*, sloped surfaces shall be used. Where the slope is greater than one unit vertical in 20 units horizontal (5-percent slope), *ramps* complying with Section 1012 shall be used. Where the difference in elevation is 6 inches (152 mm) or less, the *ramp* shall be equipped with either *handrails* or floor finish materials that contrast with adjacent floor finish materials.

**Exceptions:**

1. A single step with a maximum riser height of 7 inches (178 mm) is permitted for buildings with occupancies in Groups F, H, R-2, R-3, S and U at exterior doors not required to be *accessible* by Chapter 11.

2. A *stair* with a single riser or with two risers and a tread is permitted at locations not required to be *accessible* by Chapter 11 where the risers and treads comply with Section 1011.5, the minimum depth of the tread is 13 inches (330 mm) and not less than one *handrail* complying with Section 1014 is provided within 30 inches (762 mm) of the centerline of the normal path of egress travel on the *stair*.

3. A step is permitted in *aisles* serving seating that has a difference in elevation less than 12 inches (305 mm) at locations not required to be *accessible* by Chapter 11, provided that the risers and treads comply with Section 1029.13 and the *aisle* is provided with a *handrail* complying with Section 1029.15.

Throughout a story in a Group I-2 occupancy, any change in elevation in portions of the *means of egress* that serve non-ambulatory persons shall be by means of a *ramp* or sloped walkway.

**1003.6 Means of egress continuity.**

The path of egress travel along a *means of egress* shall not be interrupted by a building element other than a *means of egress* component as specified in this chapter. Obstructions shall not be placed in the minimum width or required capacity of a *means of egress* component except projections permitted by this chapter. The minimum width or required capacity of a *means of egress* system shall not be diminished along the path of egress travel.



The *means of egress* shall have a ceiling height of not less than 7 feet 6 inches (2286 mm).

**Exceptions:**

1. Sloped ceilings in accordance with Section 1208.2.
2. Ceilings of *dwelling units* and *sleeping units* within residential occupancies in accordance with Section 1208.2.
3. Allowable projections in accordance with Section 1003.3.
4. *Stair* headroom in accordance with Section 1011.3.
5. Door height in accordance with Section 1010.1.1.
6. *Ramp* headroom in accordance with Section 1012.5.2.
7. The clear height of floor levels in vehicular and pedestrian traffic areas of public and private parking garages in accordance with Section 406.4.1.
8. Areas above and below *mezzanine* floors in accordance with Section 505.2.

## 1003.3 Protruding objects.

Protruding objects on *circulation paths* shall comply with the requirements of Sections 1003.3.1 through 1003.3.4.

### 1003.3.1 Headroom.

Protruding objects are permitted to extend below the minimum ceiling height required by Section 1003.2 where a minimum headroom of 80 inches (2032 mm) is provided over any walking surface, including walks, *corridors*, *aisles* and passageways. Not more than 50 percent of the ceiling area of a *means of egress* shall be reduced in height by protruding objects.

**Exception:** Door closers and stops shall not reduce headroom to less than 78 inches (1981 mm).

A barrier shall be provided where the vertical clearance is less than 80 inches (2032 mm) high. The leading edge of such a barrier shall be located 27 inches (686 mm) maximum above the floor.

### 1003.3.2 Post-mounted objects.

A free-standing object mounted on a post or pylon shall not overhang that post or pylon more than 4 inches (102 mm) where the lowest point of the leading edge is more than 27 inches (686 mm) and less than 80 inches (2032 mm) above the walking surface. Where a sign or other obstruction is mounted between posts or pylons and the clear distance between the posts or pylons is greater than 12 inches (305 mm), the lowest edge of such sign or obstruction shall be 27 inches (686 mm) maximum or 80 inches (2032 mm) minimum above the finished floor or ground.

**Exception:** These requirements shall not apply to sloping portions of *handrails* between the top and bottom riser of *stairs* and above the *ramp* run.

### 1003.3.3 Horizontal projections.

Objects with leading edges more than 27 inches (685 mm) and not more than 80 inches (2030 mm) above the floor shall not project horizontally more than 4 inches (102 mm) into the *circulation path*.

Case 5:18-cv-00069-TBR-LLK   Document 31-2   Filed 10/15/19   Page 101 of 111   PageID #: 661



# DATA SHEET
## Black Jack™

**1-800-EDGINGS**
(334-4647)
edgings@olyola.com
www.olyola.com

*The Edging Experts*

*LANDSCAPE EDGING*

### 4.75 INCH LAWN EDGING WITH A 1 INCH BEAD AND A SINGLE V-LIP WALL ANCHOR



An alternative to the popular Black Edg-Knight™ style, Black Jack™ is the industry's best single 'v-lip' edging. Without compromising quality, this edging was designed to be slightly smaller, making it a more economical option to help you win those close bids.

Black Jack™ is also available in a boxed and rolled version which includes 4 stakes and 1 crosslock connector. It is ideal for independent retail nursery and garden centers that want to carry a high quality, pre-packaged edging for their customers.

Black Jack™ is made with 100% recycled, high grade polyethylene, without fillers or blown in materials. It is made to last!

*Available in 20 and 10 ft. lengths or 20 ft. roll*



1.0 in. — Bead

3.75 in. — Wall

## SPECIFICATIONS

| | |
|---|---|
| Packaging: | 20 foot - 5 pieces per flat bundle<br>10 foot - 5 pieces per flat bundle<br>Boxed 20 foot roll *(Includes 4 Stakes & 1 Connector)* |
| Material: | Pure medium density polyethylene and 4% carbon black concentrate. Melt factor under 2 |
| Average Wall Thickness: | .07 - .09 inches |
| Dimensions Per Piece: | Length: 20 ft.   Height: 4.75 in. |
| Features: | 1 in. round top bead<br>Single 'v-lip' wall anchor |
| Can be Formed with Heat: | Yes - heat gun or propane torch *(No Contact)* |
| Connection Type: | Jack/Knight Connector *(Sold Separately)* |
| Staking: | Through edging wall at 45° angle using nail or Oly-Ola's 9.25 inch stake *(Sold Separately)* |
| Approx. Weight: | 20 ft. piece: 5.6 lbs.   10 ft. piece: 2.5 lbs.<br>20 ft. bundle: 28 lbs.   10 ft. bundle: 12.5 lbs.<br>Pack - 6 Rolls: 48 lbs.   Skid - 32 Rolls: 294 lbs. |

## CONNECTOR:
### CROSSLOCK



The Black Jack™ connector is not universal. Be sure to verify that the product stamp says 'Jack' before attempting to use with this edging.

*Installation Guidelines & Tips*



## BASICS

Dig a trench 5 inches deep along the lawn or bed edge. Place the edging in the trench and anchor it with stakes as indicated below. Use only Oly-Ola's exclusive crosslock connector when joining two lengths of edging together and be sure to use the overlap method pictured below.

## STAKING

Pound a stake through the edging wall every 4 feet at a 45 degree angle. The stake should be installed at about the midway point of the wall. Pound the stake through the edging but be sure to leave at least 2 inches undriven to allow for resistance on both sides of the wall. Use extra stakes when securing joints and curves. Do not make the mistake of using too few stakes, especially when the ground is exposed to cold temperatures.

## JOINING

Our unique crosslock connector is provided exclusively by Oly-Ola with our roundtop style edgings, except Trim-Line™. The fit of this connector can be adjusted by rotating it. When looking at the connector's end, it appears as a '+'. Inserted into the edging as a plus sign, this will give it a tighter fit. Rotate the plug 45 degrees and insert the plug as an 'X' and you will get a slightly looser fit.

 

*Avoid weak and unsightly joints by using the overlap method, and by using Oly-Ola's specifically engineered crosslock connector.*

## OVERLAP METHOD (FOR JOINING LENGTHS): *Guard Against Gapping & Frost Heave*

 

1. Cut off a 4" section of the round bead on one of the edging pieces and a 4" section of the v-lip on the other piece with a metal snip, utility knife or saw.

2. Use our exclusive crosslock connector to join the two sections, while overlapping the two pieces of edging.

3. Drive 1 or 2 steel anchoring stakes through both sections at a 45 degree angle toward the turf or outside portion of the bed.

Oly-Ola's 9.25 in. Non-bending Steel Stake



*Discover*
## THE OLY-OLA
# EDGE

Oly-Ola Edgings, Inc.  |  124 E St. Charles Road  -  Villa Park, IL  -  60181  |  Phone: 1-800-EDGINGS  Fax: 630 833-0816  Email: edgings@olyola.com

## Lawn Edgings

Proper Staking Depth



BURY THE TOP BEAD
HALFWAY BELOW GRADE

TURF

MULCH/ROCK

STAKE AT
45° ANGLE

All of our landscape edgings should be nearly invisible when installed properly. The round bead should be buried halfway below grade so that the turf and bedding are divided, yet they help to conceal the edging itself. When staked properly and installed at this depth, the edging should stay in the ground and be out of the way of mower blades and string trimmers.



**The Edging Experts**

**Quick Search**

**CHOOSE A PRODUCT**

**+1 800 EDGINGS**

edgings@olyola.com

**LANDSCAPE EDGING**

# EDGING INSTALL BASICS

Our edgings are made of high quality materials and are guaranteed to last but proper installation goes a long way toward ensuring a successful landscape project. Be sure to have enough stakes and connectors available.

Lawn Edging    Paver Edging

**Lawn Edging Installation Basics** with Overlap Method

## Step 1



https://www.olyola.com/install-lawn-edging/                           7/11/2019

Edging Install Basics - Landscape Edging, Lawn Edging & Paver EdgingLandscape Edgi...    Page 2 of 8



Outline the border of the lawn edging to assure an accurate and straight installation. Dig a 6 inch deep trench using a trenching machine or straight edge spade shovel.

## Step 2



https://www.olyola.com/install-lawn-edging/                                    7/11/2019

Place edging into trench with the edging's top bead a half of an inch above the finished grade. Drive a few steel stakes at a 45 degree angle through the lawn edging toward the trench wall to hold the edging in place and be sure to leave 2 inches undriven. See 'General Tips' for proper staking techniques. Sparingly stake the edging until you are satisfied with your design.

# Step 3



Use Oly-Ola's overlap method when joining two pieces of lawn edging together. Learn more about this installation technique below or on our 'Connecting Lengths' page.

# Step 4



Finish securing the lawn edging with additional stakes. Oly-Ola provides 4 steel stakes with each piece of edging; however, we recommend using extra stakes when securing joints and curves. Do not make the mistake of using too few stakes, especially when the ground is exposed to cold temperatures.

# Step 5





Backfill both sides of the edging. Compact the backfill material along the lawn edging until the top of the edging is a half of an inch above grade. Clean up and remove excess material from the site.

# Step 6



Properly installed lawn edgings form a clean, neat, almost invisible line between planting areas and turf or ground covers. Poly or PVC edgings have no sharp edges and are safe to install.

*Photos courtesy of Vande Hey Company - Appleton, WI.*

# Edg–King™ Connecting Basics – Overlap Method



1. Using a hacksaw, cut both pieces of edging leaving a stake slot 3" from the end. Apply PVC cement to both sides of the edging, front and back.



2. Use the connecting H-clip that comes with the edging to join the two sections. Do this quickly before the glue sets.



3. Drive the 14" steel anchoring stake through both sections using the pre-cut slots until the stake cannot go any deeper.

## PROJECT GALLERY



## SITE SEARCH

SEARCH

## QUICK LINKS

About Us

Customer Testimonials

FAQs

The Edging Handbook – Vol II

Product Specs

Upcoming Events

Edging How-to Videos

Product Displays

Order Online

Privacy Policy

## BEST GUARANTEE



**FOLLOW US**

  

● **Office is currently OPEN**
Hours today  8 30 AM - 4 30 PM



HOME   ABOUT   PRODUCTS   SUPPORT   PROJECTS   CONTACT US

℗ Copyright 2019 Oly-Ola Edgings, Inc. All Rights Reserved

https://www.olyola.com/install-lawn-edging/

7/11/2019